**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KEVIN GREEN,

        Petitioner,

v.                                     ACTION NO.
                                     2:05cv340

GENE M. JOHNSON, Director of the
Virginia Department of Corrections,

        Respondent.

## OPINION AND ORDER

This matter was initiated by petition for writ of habeas corpus under 28 U.S.C. §2254. The matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The petition contains a request for an evidentiary hearing on the issue of whether petitioner is mentally retarded under Virginia law. This opinion explains the Court's reasons for GRANTING the evidentiary hearing.

## I. Procedural Background

Petitioner Kevin Green ("Green") was tried before a jury in Brunswick County Circuit Court from June 19, 2000, through June 22, 2000, and was convicted of capital murder during the commission of robbery, robbery, malicious wounding, and three counts of illegal use of a firearm. The jury recommended the death penalty for the capital murder, life imprisonment for the robbery,

twenty years for the malicious wounding, and three years for each of the illegal use of firearm convictions.  On October 6, 2000, the Court sentenced Green according to the jury's verdict.

Green's trial counsel, who continued to represent him throughout both of his direct appeals, appealed only Green's capital murder conviction and sentence.  On June 8, 2001, the Virginia Supreme Court reversed the capital murder conviction and the sentence of death, and remanded the case to the circuit court for a new trial on the capital murder offense. Green v. Commonwealth, 546 S.E.2d 446, 452 (Va. 2001).

Green's retrial took place from October 29, 2001, through November 2, 2001, in Brunswick County Circuit Court.  A jury found Green guilty of capital murder and again recommended a sentence of death. The circuit court sentenced Green in accordance with the jury verdict on January 24, 2002.  The Virginia Supreme Court affirmed the conviction and sentence on June 6, 2003, and the United States Supreme Court denied Green's Petition for a Writ of Certiorari on February 23, 2004.

Green was appointed new counsel to represent him for his state habeas appeal. Green's new counsel filed a habeas petition to the Virginia Supreme Court on April 22, 2004, alleging in Claim VIII that "the sentence imposed by the Brunswick County Circuit Court is in violation of the Eighth Amendment of the United States Constitution, Atkins v. Virginia, and Virginia Code § 8.01-654.2." (State Hab. Pet. p. 35.)   On February 9, 2005, the Virginia Supreme Court found the claim of mental retardation to be frivolous. Green v. Warden of the Sussex I State Prison, Record No. 040932 ** 9-10 (Va. S. Ct. Feb. 9, 2005).

Green filed a petition for rehearing on March 10, 2005.  The petition for rehearing was denied without comment on April 29, 2005, and Green's petition for writ of certiorari to the United States

Supreme Court was denied on December 5, 2005. <u>Green v. True</u>, 126 S. Ct. 809 (2005).

Green, presently in the custody of the Virginia Department of Corrections, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 1, 2005.  One of the grounds Green alleges entitles him to relief under 28 U.S.C. § 2254 is that he is under sentence of death in violation of the Eighth Amendment to the United States Constitution due to his mental retardation. In his petition, Green requests an evidentiary hearing to determine whether he is mentally retarded under Virginia law.  On January 13, 2006, respondent filed a Rule 5 Answer and Motion to Dismiss Green's petition [Document No. 24]. Green filed a response to the Motion to Dismiss on February 3, 2006, along with a Motion for an expert investigator and mitigation specialist [Document No. 27], and a motion to strike redundant, immaterial, impertinent, or scandalous matter [Document No. 29].

The Court entered an Order March 31, 2006, granting petitioner's motion for an expert investigator, denying petitioner's motion for a mitigation specialist, and denying petitioner's motion to strike redundant, immaterial, impertinent, or scandalous matter.  The Court also granted petitioner an evidentiary hearing to determine whether Green is mentally retarded under Virginia law.  The Order was rescinded by a second Order entered April 7, 2006, in which all of Petitioner's motions, including his request for an evidentiary hearing, were denied.

The Court hereby GRANTS petitioner's motion for an expert investigator, and GRANTS petitioner's motion for an evidentiary hearing.  The fees and expenses of the investigator are limited to no more than $7,500.00 pursuant to 21 U.S.C. § 848(q)(10)(B).  The parties and their counsel are entitled to a short explanation on the Court's vacillation on whether an evidentiary hearing is required on the issue of mental retardation.  The Court failed to fully consider the requisite standard to hold an evidentiary hearing on mental retardation in rendering its first two rulings.  The error of

3

the Court's second order became apparent as this opinion was written.  In the end, I would rather correct my own errors than waste the time and effort required to have an appellate judge correct them.

## II. Factual Background

According to a Presentence Report prepared on August 10, 2000, Green lived with his mother and two brothers in Washington, D.C., until 1997. (State Hab. Pet. tab 2 p. 5a.)  He lived with his older sister for less than a year in Brunswick County, Virginia, then began renting his own residence in Brunswick County where he lived for approximately five months until he was arrested on charges for the underlying offense and was incarcerated in August of 1998. (State Hab. Pet. tab 2 pp. 5a, 7.) His girlfriend and her two children lived with him for two of the five months. (State Hab. Pet. tab 2 p. 5a.) At the time of his interview, Green reported he dropped out of school in the ninth grade, and that he attended both regular and special education classes. (State Hab. Pet. tab 2 p. 6.)  However, trial counsel's notes indicate Green told counsel he dropped out of school during the seventh grade when he was fifteen years old, and was held back in the first grade once, and in the third grade twice. (State Hab. Pet. tab 9.) His brother also related that Green dropped out of school during the seventh grade, at the age of an eleventh grader.  (State Hab. Pet. tab 10.)  He stated the school may have ordered a psychological test to see what was at the root of Green's problems.

Green was employed with Domino's Pizza in South Hill from December 18, 1997, through August 12, 1998, (Transcript of Proceedings in <u>Commonwealth v. Green</u>, Nos. CR98000141-01 through 06, before the Honorable James A. Luke on June 19, 2000, through June 22, 2000, "First Tr." 21-22) when he was terminated due to a speeding ticket.  (State Hab. Pet. tab 2 p. 7.) His

primary job was delivering pizzas, though he also made pizzas, swept floors, boxed pizzas, answered the telephone, and washed dishes. (Transcript of Proceedings in <u>Commonwealth v. Green</u>, No. 98-141, before the Honorable James A. Luke on October 29, 2001, through November 1, 2001, "Second Tr." 1026.) He provided his own vehicle (First Tr. 22.) His employer testified that Green was able to deliver pizzas to customers and calculate change when customers paid him for the pizzas. (Second Tr. 1027-28.)  She testified that he could take orders over the telephone, and type phone numbers, addresses, and orders into the computer without difficulty. (Second Tr. 1028-29.)

The underlying offense occurred on August 21, 1998, and Green's first jury trial was held in June of 2000.[1]  Prior to Green's first trial in Brunswick County Circuit Court, the Court appointed Dr. Scott Sautter, a clinical neurologist, to evaluate Green and testify on his behalf.  Dr. Sautter evaluated Green in May of 2000, when Green was twenty-three years old.  Dr. Sautter testified during the penalty phase of Green's first trial in June of 2000 that Green is mentally retarded. (First Tr. 84.)

Dr. Sautter testified that based on his assessment of Green on a battery of tests, Green performed in the first percentile (i.e. ninety-nine percent of his age group would be expected to perform better than he did on the test) on motor skills (First Tr. 76), manual dexterity (First Tr. 76-77), visual spacial (First Tr. 78), vocabulary (First Tr. 78), memory (First Tr. 78-79), abstract reasoning (First Tr. 80), and academic testing, which included reading, writing and math skills (First Tr. 83).  He performed in the first to fifth percentile on attention and concentration (First Tr. 77), and he performed in the fifth percentile on language (First Tr. 78).

---

[1]     For a recitation of the facts surrounding the crime and the testimony at trial, see <u>Green v. Commonwealth</u>, 580 S.E.2d 834, 837-39 (Va. 2003).

Green completed an abbreviated IQ test, the Wechsler Abbreviated Intelligence Scale (WASI) in May of 2000, and scored a 55. (First Tr. 83.)  Dr. Sautter testified that in his opinion, Green is mentally retarded based on Green's IQ score, Green's adaptive skills in the areas of memory, language usage, visual spacial skills and motor skills, and interviews with his mother and sister, where they related that Green was a slow learner and had been placed in special classes in school. (First Tr. 84-85.)  He opined Green functions intellectually like a twelve year old, and is functionally illiterate. (First Tr. 85.)  He also testified that mental retardation is something you are born with, and that Green was born with mental retardation. (First Tr. 88, 102-103.)  He further testified that due to Green's performance on a test specifically designed to test for malingering, Green was not malingering. (First Tr. 89.)

On cross-examination, Dr. Sautter admitted Green had a driver's license, and had worked at a pizza parlor where he took orders, entered information into a computer, and made deliveries. (First Tr. 110-111.)  Dr. Sautter stated that these activities were not inconsistent with his opinion that Green was mentally retarded. (First Tr. 111-112.)  Dr. Sautter also admitted that Green lived on his own for a short period of time, paid rent, and paid bills. (First Tr. 112.)  Dr. Sautter further testified that this "did not go very well," and that in his opinion Green could not have lived on his own for a lengthy period of time. (First Tr. 112.)  When asked about Green's scoring a 74 on the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) IQ test administered by the clinical psychologist appointed to assist the prosecution, Dr. Sautter testified that there is an error to measurement, and that a specific score indicates a certain range of performance. (First Tr. 118-119.)  He testified that Green's scores of 55 on one test and 74 on another would tend to indicate a range of performance somewhere in the middle. (First Tr. 118-19.)

6

Dr. Thomas Pasquale, a clinical psychologist who was appointed to assist the prosecution prior to Green's first trial, also evaluated Green in May of 2000.[2]  He testified during the penalty phase of Green's first trial that he met with Green on three separate occasions for a total of nine hours. (First Tr. 125.)  He administered the WAIS-III IQ test to Green, and Green scored a 74 on the test. (First Tr. 126.)   Dr. Pasquale testified that Green fell into the "borderline intellectual functioning" range, the range directly above mentally retarded.  (First Tr. 127.)  He further testified that Green was malingering on the tests, and that while it is possible to fake a lower IQ score, there is no way to fake a higher score. (First Tr. 131-32.)   Dr. Pasquale testified that according to interviews with Green's mother and sister, they did not view Green as mentally retarded, although he had been placed in special classes in school. (First Tr. 130.)  Dr. Pasquale further testified that based on Green's score on the Hare Psychopathy Inventory, he diagnosed Green as a psychopath. (First Tr. 135-36.)

Following an appeal of the capital murder conviction and sentence, the Virginia Supreme Court reversed the conviction and sentence and remanded to the Circuit Court for a new trial.  After remand by the Virginia Supreme Court, and prior to the retrial, Dr. Scott Sautter administered another battery of tests to Green, including the Wechsler Adult Intelligence Scale - Revised (WAIS-R) IQ test, on which Green scored a 74. (Second Tr. 953.)

The second jury trial was held October 29 through November 2, 2001. Dr. Sautter testified during the sentencing phase of Green's retrial that he had met with Green on three occasions for a total of seventeen to eighteen hours. (Second Tr.  948.)   He testified that he administered two IQ

---

[2]Dr. Pasquale prepared a report dated June 16, 2000, describing the psychological assessment performed, and summarizing his findings. (Fed. Pet. App. tab 6.)

tests to Green, who scored a 74 on the WAIS-R, and a 55 on the WAIS.  (Second Tr.  953.)  He testified that the Woodrow Wilson Rehab Center and other agencies within the Department of Rehab Services in Virginia consider people with IQ test scores in the seventies to be mentally retarded (Second Tr.  954-55); that Green was mentally retarded (Second Tr.  975-76); and, that Green was functionally illiterate (Second Tr.  965).  Dr. Sautter's remaining testimony was similar to that given in the first trial.

Dr. Pasquale testified that he had met with Green on four occasions for a total of ten and one-half hours. (Second Tr.  1008.)[3]  He testified that Green had been employed by Domino's Pizza, and that he had functioned within a normal limit for someone employed by Domino's Pizza. (Second Tr. 1012.)  His additional testimony mirrored that given in Green's first trial. (Second Tr. 1008-18.)

In addition, the prosecution presented evidence that Green was sent to Riverside Jail in 1999 because he had been talking about hurting himself. (Second Tr. 1001).   As part of the intake procedure at the jail, Dr. Lynda Hyatt met with Green twice, and administered the Ammons and Ammons Quick Test to Green.  (Second Tr. 1001-1002.)  Dr. Hyatt testified during Green's retrial that using a conversion formula, Green's Quick Test score "suggest[ed]" a full-scale IQ score of 84, which falls in the "low average" category of mental functioning. ( Second Tr. 1001-1002.) Dr. Hyatt testified that there is a "strong" correlation between scores on the Quick Test and scores on the full-scale Wechsler, a correlation of between .65 and .87. (Second Tr.  1002.)  She testified there were inconsistencies between her first meeting with Green, and her meeting with him three days later,

_____

[3]Dr. Pasquale prepared a second report on October 26, 2001, stating he had interviewed Green again on October 12, 2001, that his overall conclusions from his first report remain in place, and summarizing that Green is not mentally retarded, and was malingering on his tests. (Fed. Pet. App. tab 6.)

which suggested he was not forthcoming with his answers. (Second Tr. 1002.)  She further testified that testing revealed Green was malingering on the tests she performed. (Second Tr.  1003.)

On February 17, 2005, the Fourth Circuit decided the case of <u>Walker v. True</u>, finding an evidentiary hearing was necessary where Walker had IQ test scores similar to Green's, and had attached affidavits explaining how these test scores actually fell within Virginia's definition of mental retardation when the "Flynn Effect" and standard error of measurement were taken into consideration. 399 F.3d 315 (4th Cir. 2005).[4]

Consequently, Green filed a petition for rehearing on March 10, 2005, asking the Virginia Supreme Court to take into consideration the standard error of measurement and the Flynn Effect when analyzing his test scores.  Accounting for the standard error of measurement, IQ test scores between 65 and 75 could support a diagnosis of mental retardation. Under this approach, all but one of Green's IQ test scores could support such a diagnosis. Secondly, Green argued the Virginia Supreme Court could not employ a definition of mental retardation narrower than the definition in <u>Atkins</u>.  The petition was denied.

In Green's habeas petition in this court, Green alleged his sentence of death violates the Eighth Amendment due to the fact that he is mentally retarded.  Attached to his federal habeas petition is the declaration of Matthew H. Scullin, Ph.D. (Fed. Pet. App. tab 4, "Scullin Decl.")  Dr. Scullin opines that the Court must consider both the Flynn Effect (Scullin Decl. ¶¶ 24-38) and the

---

[4]According to the affidavits attached to Walker's petition, the Flynn Effect "posits that IQ scores rise over time and that IQ tests which are not 're-normed' to adjust for rising IQ levels will overstate a testee's IQ." <u>Walker v. True</u>, 399 F.3d at 322.  Further, the experts related that the American Association on Mental Retardation and the American Psychological Association recognized that IQ tests have a measurement error of plus or minus five points. <u>Id.</u> The experts conclude, a score of 65 to 75 may indicate mental retardation if there is evidence of poor adaptive functioning. <u>Id.</u>

standard error of measurement (Scullin Decl. ¶¶ 12-20) when evaluating Green's scores on the IQ

tests in the record.  He states that the Ammons and Ammons Quick Test administered by Dr. Lynda

Hyatt at the Riverside Jail is not a reliable IQ test, as it was last normed prior to 1962. (Scullin Decl.

¶¶ 39-40.) Next, he applies the Flynn Effect to Green's remaining scores, and opines that each score

is at least two standard deviations below the mean as required by the Virginia statute. (Scullin Decl.

¶¶ 41-59.) He concludes that Green's claim of mental retardation is not frivolous, and requires

further investigation and development. (Scullin Decl. ¶ 60.)

Green also attaches an amicus brief written by The Arc of Virginia which was submitted in

the Walker v. True case. 399 F.3d at 315. (Fed. Pet. App. tab 7.)  The brief explains the necessity

of accounting for the standard error of measurement and the "Flynn Effect" in assessing whether a

petitioner has a qualifying IQ score of at least two standard deviations below the mean under

Virginia's statute.  The brief further argues that a "raw" IQ score must be professionally assessed for

individual factors and measurement errors to determine whether the score establishes "intellectual

impairment" under the statute.


### III.  Standard of Review

In determining whether Green is entitled to an evidentiary hearing, this court must adhere to

the strictures of 28 U.S.C. §2254(e)(2).  In accordance with that section, this court must first

determine whether the petitioner adequately developed the underlying factual basis of his claim.

If the Petitioner has failed to develop the factual elements in question, only under the most narrow

of circumstances may a court then order an evidentiary hearing.

If the applicant has failed to develop the factual basis of a claim in

> State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that -
>
> (A) The claim relies on -
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2254(e)(2). The Supreme Court in Williams v. Taylor, 529 U.S. 420, 430 (2000), held that the phrase "failed to develop" reasonably "implies some lack of diligence." Thus, this court must first determine whether Green developed the factual basis of his claim to the full extent practicable in the state habeas proceeding, but may not hold Green culpable for factual developments stymied by the state.

Green's claim of mental retardation would not exonerate him from his conviction for capital murder. Consequently, if this court finds that Green was not diligent in developing his claim, he would not be entitled to an evidentiary hearing pursuant to § 2254(e)(2)(B).

If Green was diligent in state court, the Fourth Circuit has erected a second hurdle that must be overcome in order to obtain an evidentiary hearing. "An evidentiary hearing is permitted only when the petitioner alleges additional facts that, if true, would entitle him to relief." Cardwell v. Greene, 152 F.3d 331 (1998)(overruled on other grounds)(internal quotations and citations omitted). Thus, the court must next determine whether the facts alleged in Green's federal petition, if true, would entitle him to relief on his claim of mental retardation. See Conner v. Polk, 407 F.3d 198, 208 (4th Cir. 2005); Fullwood v. Lee, 290 F.3d 663, 681 (4th Cir. 2002).

Where an evidentiary hearing is not restricted by § 2254(e)(2), and the petitioner has alleged sufficient facts entitling him to relief, the Fourth Circuit has applied Townsend v. Sain to determine whether it is necessary to grant an evidentiary hearing.  See Cardwell v. Greene, 152 F.3d at 331 (citing Townsend v. Sain, 372 U.S. 293, 313 (1963)(overruled in part)).  Townsend establishes six circumstances where a federal court must grant an evidentiary hearing:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

Townsend v. Sain, 372 U.S. at 313.  Note that ground number five was overruled by Keeney v. Tomayo-Reyes, which instituted a cause and prejudice standard that must be overcome in order to receive relief when material facts were not adequately developed at the sate-court hearing.  Keeney v. Tamayo-Reyes, 504 U.S. 1, 8 (1992).  Keeney applied the cause and prejudice standard used in procedural default cases. Id.  The Supreme Court found that "application of the cause-and-prejudice standard to excuse a state prisoner's failure to develop material facts in state court will appropriately accommodate concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forums." Id. at 8.

Thus, Green must perform the following to successfully request an evidentiary hearing while avoiding the limitations instituted by section 2254(e)(2)(A) and (B): (i) overcome the diligence hurdle presented by §2254(e)(2) through showing that he did not fail

to develop the factual basis of his claim; (ii) allege sufficient facts in his federal habeas petition to entitle him to relief; and, (iii) show that one of the five remaining Townsend factors applies or show that cause and prejudice exist for his failure to develop facts in the state-court hearings.

## IV. Findings of Fact and Conclusions of Law

On June 20, 2002, the Supreme Court of the United States held in the case of Atkins v. Virginia, that executions of mentally retarded criminals were "cruel and unusual punishments" prohibited by the Eighth Amendment. 536 U.S. 304 (2002).   While the Supreme Court referred to the definitions of mental retardation adopted by the American Association on Mental Retardation and The American Psychiatric Association[5], the Court left to the states the "task of developing appropriate ways to enforce the constitutional

---

[5] "The American Association on Mental Retardation (AAMR) defines mental retardation as follows: '*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.' Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).  'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  *Id.,* at 42-43." Atkins, 536 U.S. at 309 n. 3.

restriction upon [their] execution of sentences." Id. at 317.

The Virginia legislature moved quickly to establish procedures for regulating execution of the mentally retarded. See Atkins v. Commonwealth, 581 S.E.2d 514 (Va. 2003) (Atkins II). Virginia's definition of mentally retarded is included in the new procedures.

> "Mentally retarded" means a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Virginia Code § 19.2-264.3:1.1 (A) (Michie 2003). The Supreme Court of Virginia has held "[p]erformance on a standardized measure of intellectual functioning . . . at least two standard deviations below the mean" corresponds to an IQ score of 70 or below. Johnson v. Commonwealth, 591 S.E.2d 47, 59 (Va. 2004)(vacated on other grounds). Further, "assessment of intellectual functioning shall include administration of at least one standardized measure generally accepted by the field of psychological testing" and "[t]he Commissioner of Mental Health, Mental Retardation and Substance Abuse Services shall maintain an exclusive list of standardized measures of intellectual functioning generally accepted by the field of psychological testing." Virginia Code § 19.2-264.3:1.1 (B)(1) (Michie 2003).[6] Interestingly, the current List of Standardized Measures of Intellectual

---

[6] The only IQ test administered to Green which appears on the List of Standardized Measures of Intellectual Functioning compiled in accordance with Virginia Code § 19.2-264.3:1.1 is the WAIS-III test administered by Dr. Pasquale, on which Green scored a 74.

Functioning compiled in accordance with the statute contains a reference to the "Flynn effect":

> [r]ecent research findings regarding the reportedly dynamic nature of measured intelligence, such as those related to the so-called "Flynn effect," may augur the development of approaches to retrospective diagnosis of mental retardation in adults that require the use of more complex methods for the assessment of intelligence in capital sentencing matters than has been previously been considered necessary.

(Fed. Pet. App. tab 5.)  Therefore, the Commonwealth does acknowledge that evaluating IQ test scores requires more than determining whether the score is above or below 70.

For someone like Green who was convicted and sentenced prior to the Supreme Court's decision in Atkins, and who had a direct appeal pending at the time the procedures were established, the Virginia procedures offer the following options for raising a claim of mental retardation:

> if his direct appeal is pending in the Supreme Court, he shall file a supplemental assignment of error and brief containing his claim of mental retardation, or (ii) if the person has not filed a petition for a writ of habeas corpus under subsection C of § 8.01-654, he shall present his claim of mental retardation in a petition for a writ of habeas corpus under such subsection. . .

Virginia Code § 8.01-654.2 (Michie 2003).  Green's direct appeal was pending before the Virginia Supreme Court on April 29, 2003, when the new procedures were established; however, his trial counsel did not file a supplemental assignment of error.

Green was appointed new counsel to handle his state habeas appeal on June 26, 2003. Counsel filed Green's petition for writ of habeas corpus in the Virginia Supreme Court on

April 22, 2004, which included Green's claim of mental retardation.[7]  Claim VIII states, "the

sentence imposed by the Brunswick County Circuit Court is in violation of the Eighth

Amendment of the United States Constitution, <u>Atkins v. Virginia</u>, and Virginia Code § 8.01-

654.2." (State Hab. Pet. p. 35.) Green argued that based on his IQ test scores, which ranged

from 55 to 84, and the testimony of Dr. Sautter that Green is mentally retarded, his claim of

mental retardation was not frivolous. (State Hab. Pet. p. 40.)  Green asked the Virginia

Supreme Court to remand his case for a new trial, or, at a minimum, an evidentiary hearing

on the issue of mental retardation. (State Hab. Pet. p. 41.)

On February 9, 2005, the Virginia Supreme Court found Green's claim of mental

retardation to be frivolous based on the IQ scores which were in the record.  The Court

stated:

> [t]his Court has previously held that the ceiling for a
> classification of mental retardation is an IQ Score of 70.  <u>See
> Johnson v. Commonwealth</u>, 267 Va. 53, 75, 591 S. E. 2d 47,
> 59 (2004), <u>Petition for cert. filed</u>, No. 03-10877 (U.S. May
> 17, 2004).  The record shows that Green was administered
> four standardized tests for measuring intellectual functioning.
> Green scored an 84 on the Ammons & Ammons quick test, a
> 74 on the Wechsler Adult Intelligence Scale, Third Edition,
> a 74 on the Wechsler Adult Intelligence Scale, Revised, and
> below a 70 on the Abbreviated Wechsler Adult Intelligence
> Scale.  Based on these test scores, Green has failed to meet
> his burden of proving that his claim of mental retardation is
> not frivolous.

---

[7]      The Virginia Supreme Court denied the Commonwealth's argument that Green's
mental retardation claim should be barred due to Green's failure to file a supplemental
assignment of error to raise the issue while his direct appeal was pending before the Court. <u>Green
v. Warden of the Sussex I State Prison</u>, Record No. 040932 *8 (Va. S. Ct. Feb. 9, 2005).  The
Court held Va. Code § 8.01-654.2(ii) provides two options for raising claims of mental
retardation to defendants whose sentences of death became final before April 29, 2003:  in a
direct appeal or in a petition for writ of habeas corpus. <u>Id.</u> at *8.

Green v. Warden of the Sussex I State Prison, Record No. 040932 ** 9-10 (Va. S. Ct. Feb. 9, 2005).

On February 17, 2005, the Fourth Circuit decided the case of Walker v. True, finding an evidentiary hearing was necessary where Walker had received IQ test scores similar to Green's. Walker v. True, 399 F.3d at 319. Walker had completed both his direct appeal and state habeas corpus proceedings prior to the decision in Atkins. Id. As a result, his claim of mental retardation was presented for the first time to the district court pursuant to Virginia Code § 8.01-654.2. Id. The district court and the Fourth Circuit reviewed the claim de novo, because it had never been "adjudicated on the merits" in state court. Id. The district court granted the state's motion to dismiss the petition, and the Fourth Circuit reversed and remanded to the district court for an evidentiary hearing to determine whether Walker was mentally retarded under Virginia law. Id. at 327.

Walker's petition presented two expert affidavits concluding Walker was mentally retarded under the criteria set forth in the Virginia statute. Id. at 320. Walker's petition contained expert affidavits describing the "Flynn Effect," and stating Walker's score of 76 on a Wechsler Intelligence Scale for Children-Revised (WISC-R), which was administered in 1984 when Walker was eleven years old, should be viewed as a 72. Id. at 322. Further, the expert affidavits stated that AAMR and APA recognize that IQ tests have a measurement of error of plus or minus five points which must be taken into account when considering IQ test scores. Id. Walker's petition also contained an expert report stating his score of 86 on the Wechsler Adult Intelligence Scale (WAIS) test taken in 1998 was so unreliable that it should be discarded. Id. at 323. Lastly, a WAIS-III test, on which Walker received a score of 77,

was administered in 2000 by Dr. Sautter who explained in an expert affidavit that after looking at a comprehensive set of Walker's records, Walker's cognitive deficits "are consistent with mental retardation" as defined by the Virginia statute.

Additionally, Walker set forth facts pertaining to his limitations in adaptive behavior both before and after he was eighteen years old. Id. at 321.  His school records showed he was in need of special education "as a child with specific learning disabilities as well as emotional disturbance." Id.  His family members reported he never rented an apartment, never paid a bill, did not hold a job, and did not have a driver's license. Id.

The Fourth Circuit held that if the facts alleged in Walker's petition were true, he would have established that he was mentally retarded. Id. at 321.  Further, the Fourth Circuit concluded that where a petitioner has received IQ scores above and below "two standard deviations below the mean," and where uncontested expert opinion suggests he is mentally retarded under Virginia's definition, dismissal is inappropriate. Id. at 324.

Following the Fourth Circuit's decision in Walker v. True, Green filed a petition for rehearing on March 10, 2005.  In his petition for rehearing, Green relied on the discussion of the standard error of measurement contained in the Walker case. Walker v. True, 399 F.3d at 322.  Green cited the Diagnostic and Statistical Manual of Mental Disorders, 39-40 (4th Edition), which states, "an IQ standard score of approximately 70-75 or below on a standardized, individually administered intelligence test could satisfy the first element of mental retardation."  Further, Green attached to his petition for rehearing the declaration of Richard J. Bonnie, the John S. Battle Professor of Law, Professor of Psychiatric Medicine, and the Director of the Institute of Law, Psychiatry and Public Policy at the University of

18

Virginia Schools of Law and Medicine in Charlottesville, Virginia.  In his declaration, Professor Bonnie states that he was asked to assemble an advisory group of experts in the field of mental retardation to prepare a legislative response to Atkins. (Bonnie Decl. ¶ 2.) He states that one of the first drafts of the bill defining mental retardation stated that significantly subaverage intellectual functioning had to be:

> demonstrated by performance on a standardized measure of intellectual functioning *carried out in conformity with accepted professional practice*, that is at least two standard deviations below the mean, *considering the standard error of measurement for the specific instruments used*.

(Bonnie Decl. ¶ 4.)   However, the group decided the language regarding the standard error of measurement was not necessary, because a test administered and interpreted in accordance with standard professional practice would have to take into account the standard error of measurement. (Bonnie Decl. ¶ 6.)

In a footnote in his petition for rehearing, Green discusses the "Flynn Effect," and cites several articles supporting "the uncontroversial observation that there is pronounced improvement in intelligence test performance on a given test over the 'lifetime' of the particular test." (Pet. for Rehearing p. 11 fn. 6.) The improvement is approximately 1/3 of an IQ point each year, requiring the test manufacturers to periodically re-norm the tests. Based on Green's test scores, the need to consider the scores in light of the Flynn Effect and the standard error of measurement, and Dr. Sautter's testimony at both trials that Green was mentally retarded, Green argued his claim of mental retardation was not frivolous.  He requested an evidentiary hearing in which a jury could determine whether he was mentally

retarded.  The petition for rehearing was denied without comment.  Further, Green's petition

for writ of certiorari to the United States Supreme Court was denied on December 5, 2005.

Green v. True, 126 S. Ct. 809 (2005).

One year after its decision in Walker v. True, the Fourth Circuit decided *en banc* the

case of Walton v. Johnson, upholding a district court's dismissal of Walton's mental

retardation claim. 440 F.3d 160 (4th Cir. 2006).  Like Walker, Walton's direct appeal and

state habeas appeal concluded prior to the ruling in Atkins, so Walton was presenting his

mental retardation claim for the first time to the district court which reviewed the claim de

novo. Id. at 162-64. Walton had received a score of 90 on an IQ test administered in 1996,

shortly before he turned eighteen. Id. at 177.  In his petition, Walton alleged little was known

about the test or how it was administered, and whether it could be considered reliable. Id.

Walton scored a 77 on an IQ test administered a few months after he turned eighteen, but he

alleged the score should be reduced to 74 based on the Flynn Effect. Id.  After the motion to

dismiss was filed, Walton alleged his score of 74 should further be reduced based on the

"standard error of measurement" to meet Virginia's mental retardation standard.  The Fourth

Circuit noted that, while it was not necessary for their ruling, three experts including

Walton's own expert testified at trial that Walton was not mentally retarded. Walton, 440

F.3d at 178 fn. 24.

The Fourth Circuit held that Walton was only speculating that the standard error of

measurement, which can increase or lower an IQ score by five points, would cause his score

of 77 to be *lowered* enough to meet Virginia's mental retardation standard. Id. at 178.  The

court affirmed the district court's dismissal of Walton's mental retardation claim based on

Walton's failure to allege sufficient facts demonstrating that his intellectual functioning was 70 or less before he turned eighteen. Id. at 178.

It is important to noted that in the Walker and Walton cases, the Fourth Circuit was determining whether the petitioners had pled sufficient facts to withstand a motion to dismiss. Similarly, in Green's case, one issue this Court must determine is whether Green has pled sufficient facts to show he is entitled to relief on his claim of mental retardation. With these cases in mind, the Court turns to whether Green has made the necessary showings in order to obtain an evidentiary hearing: (i) show that he did not fail to develop the factual basis of his claim in state court; (ii) allege sufficient facts in his federal habeas petition to entitle him to relief; and, (iii) show that one of the five remaining Townsend factors applies or show that cause and prejudice exist for his failure to develop facts in the state court.

### A.    Development of the Claim in State Court

Section 2254(e)(2) of the AEDPA creates "an express limitation on the power of a federal court to grant an evidentiary hearing." Cardwell v. Greene, 152 F.3d at 336. Under § 2254(e)(2), the Court must ascertain whether Green "failed to develop the factual basis of [his mental retardation] claim in State court." 28 U.S.C. § 2254(e)(2). The United States Supreme Court has held, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. at 432. The Court finds the factual basis of Green's claim was not developed in state court; however, this was not due to Green's lack of diligence. At the time of Green's first trial, direct appeal of the first trial, and retrial, Atkins had not been decided. As a result, all evidence given at the trials concerning Green's

21

mental retardation was presented solely as mitigation evidence to be considered during sentencing under the holding of <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989)(overruled).

Following the <u>Atkins</u> holding, Green's habeas counsel included a mental retardation claim in Green's petition for writ of habeas corpus to the Virginia Supreme Court relying on the conflicting evidence presented at the trials regarding Green's mental retardation. The Supreme Court has advised that diligence requires, "at a minimum," seeking an evidentiary hearing in state court. <u>Williams v. Taylor</u>, 529 U.S. at 437. Green requested an evidentiary hearing; however, the Virginia Supreme Court found Green's claim of mental retardation to be frivolous, and did not hold an evidentiary hearing. Further, "an applicant 'fails' to develop the evidence supporting a claim only if he or she relinquishes an opportunity to introduce evidence or neglects to seek such an opportunity." <u>Cardwell v. Greene</u>, 152 F.3d at 337. Green did not relinquish such an opportunity. Once the <u>Walker</u> case was decided discussing the Flynn Effect and the standard error of measurement, Green petitioned for a rehearing so that these factors could be considered when evaluating his test scores. The Virginia Supreme Court denied his petition.

The Court finds that Green was diligent in pursuing his mental retardation claim in state court. Therefore, Green is able to overcome the first hurdle presented by § 2254(e)(2) through showing that he did not "fail to develop the factual basis of his claim."

### B.    Additional Facts Which Entitle Green to Relief

Where § 2254(e)(2) does not bar an evidentiary hearing, "[a]n evidentiary hearing is permitted only when the petitioner alleges additional facts that, if true, would entitle him to relief." <u>Cardwell v. Greene</u>, 152 at 338 (internal quotations and citations omitted). An

22

evidentiary hearing is "an instrument to test the truth of facts already alleged in the habeas petition." Jones v. Polk, 401 F.3d 257, 269 (4th Cir. 2005). Green has alleged additional facts in his federal petition pertaining to his IQ test scores that, if true, would entitle him to relief.

The definition of mentally retarded in Virginia Code § 19.2-264.3:1.1 has two components, both of which must be present for a petitioner to meet the definition:

> i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

With respect to the first prong, Green has alleged additional facts in his federal habeas petition which were not presented in his state petition. These facts do not support a new claim, rather they buttress his mental retardation arguments made in his initial petition and petition for rehearing presented to the Virginia Supreme Court. Most notable are the additional facts regarding the application of the Flynn Effect and standard error of measurement to Green's IQ test scores. Green attaches the declaration of Matthew H. Scullin, Ph.D. Green is entitled to attach a declaration to his federal habeas petition under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts (2003). See Walton v. Johnson, 440 F.3d at 178 fn.24.[8] The declaration discusses the

---

[8]In some instances, the Fourth Circuit has admitted new evidence at the federal habeas stage, and conducted de novo review of the evidence on the theory that there is no relevant state-court determination to which the Court can defer. See Monroe v. Angelone, 323 F.3d 286, 297-99 (4th Cir. 2003). The Supreme Court has neither adopted nor overturned this approach, see Holland v. Jackson, 542 U.S. 649, 653 (2004), but has discussed the approach as it relates to a situation, like the one here, where the new evidence does not support a new claim, but buttresses a previously rejected one.

standard error of measurement, and explains that a person whose true IQ score is 70 is roughly 95% likely to score between 65 and 75 on any individual IQ test. (Scullin Decl. ¶ 18.)  He concludes,

> an IQ score above 70 is by no means dispositive in a diagnosis of mental retardation, if other lower test scores are present.  Indeed, it could be *consistent* with a diagnosis of mental retardation in the test-taker if the test-taker has received other IQ test scores that are more than two standard deviations below the mean and satisfies the adaptive functioning prong of a mental retardation definition.

(Scullin Decl. ¶ 20.)   Next, Dr. Scullin discusses the "practice effect," and explains that when an individual is retested using the same test instrument, "one can expect an increase due to the practice effect on the second test score of about 5 to 8 IQ points, and it is possible for the increase to be up to 15 IQ points." (Scullin Decl. ¶ 22.)  Lastly, Dr. Scullin explains the Flynn Effect, which causes the accuracy of a test to decline as time passes after it is re-normed. (Scullin Decl. ¶ 28.)  As a result, Dr. Scullin states, "some psychologists now adjust IQs by deducting points to compensate for the time that has elapsed since the last time a test was re-normed." (Scullin Decl. ¶ 29.)

Dr. Scullin explains how the Flynn Effect would apply to the IQ tests taken by Green. He states that the Ammons Quick test, on which Green scored an 84, was last normed prior to 1962 and "should be considered neither reliable nor valid." (Scullin Decl. ¶¶ 39-40.)  He opines that Dr. Flynn's research shows that the WAIS-III test, which was normed in 1995, inflated scores by 2.34 points in the year it was normed. (Scullin Decl. ¶¶ 43, 51.)  He next states that the test was administered to Green in June of 2000, 5 years after the test was normed. (Scullin Decl. ¶ 43.)  Accordingly, adjusting for the Flynn Effect, which causes IQ

24

gains of about .3 points per year after the test is normed, would mean adjusting the score an additional 1.5 points (5 years x 0.3 points per year). (Scullin Decl. ¶ 53.)  Deducting these points from Green's score of 74 would result in a score of 70.16 on the WAIS-III test. (Scullin Decl. ¶ 53.)  Dr. Scullin asserts the WAIS-R was normed in 1978. (Scullin Decl. ¶ 57.)  Adjusting Green's score of 74 for the Flynn Effect results in a score of 67. (Scullin Decl. ¶¶ 55-59.)  Dr. Scullin concludes,

> Mr. Green's performances on the foregoing intelligence tests on the foregoing dates indicate to me that, all other things being equal, the claim that he is mentally retarded under Virginia's definition of mental retardation is not frivolous and requires further investigation and development before any final conclusion can be reached.

(Scullin Decl. ¶ 60.)

Assuming all facts in Green's petition to be true, he has scored at least two standard deviations below the mean on three IQ tests, and the fourth test administered to him is invalid.  This would meet the requirement of the first prong of Virginia's definition of mentally retarded, the prong relied upon by the Virginia Supreme Court when denying his state habeas petition – "significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning."

As for the second prong of the mentally retarded definition, "significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills," there is testimony in the record that Green held a driver's license, and held a job at Domino's pizza as a delivery person.  Further, he lived alone for a short period of time. There is testimony in the record from Dr. Pasquale that Green's ability to function like other Domino's

employees supports his conclusion Green is not mentally retarded.  However,  there is the

testimony of Dr. Sautter at Green's first trial regarding his performance on a battery of tests.

Dr. Sautter testified that Green performed in the first to fifth percentiles on all tests

administered.  In other words, ninety-nine percent of his age group would be expected to

perform better than he did on the test. (First Tr. 76-83.)  In Dr. Sautter's opinion, Green

functions intellectually like a twelve year old, and is functionally illiterate. (First Tr. 85.) Dr.

Sautter opines that Green's working at Domino's and living on his own for a short period of

time is not inconsistent with his diagnosis of mental retardation. (First Tr. 977.)

There is also evidence in the record that Green was held back in school three times,

and attended special education classes.  No additional information is contained in Green's

federal petition regarding his conceptual, social and practical adaptive skills which was not

present in the record when the Virginia Supreme Court found the claim to be frivolous.

However, one expert has testified the evidence pertaining to the second prong is consistent

with a diagnosis of mental retardation.  Green has now alleged that his test scores fall two

standard deviations below the mean, and has provided an expert declaration to support his

allegations.  The Fourth Circuit has held,

> We do not require *direct* factual support for each allegation a
> petitioner wishes to prove at a hearing. Rather, we hold only
> that to obtain an evidentiary hearing, the petitioner must rely
> on more than merely plausible inferences that there is a
> factual basis for his claim for relief.

Jones v. Polk, 401 F.3d at 269 fn. 6.  The Court finds Green has relied on more than

plausible inferences that there is a factual basis for his claim of mental retardation.  He has

attached the declaration of an expert stating that when his IQ tests are evaluated properly,

they support a diagnosis of mentally retarded under Virginia's definition.  In light of record as a whole, the additional facts Green has alleged regarding his IQ test scores are sufficient to allege Green is mentally retarded under the statutory definition and support his request for an evidentiary hearing.

### C.    *Townsend* **Factors**

As Green has cleared the first two hurdles to obtaining an evidentiary hearing, the Court must now determine whether any of the Townsend factors apply which would necessitate the hearing.  Townsend holds that "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." Townsend, 372 U.S. at 312.  The facts regarding Green's mental impairments remain disputed, and he was not afforded a "full and fair" evidentiary hearing in state court to resolve the disputes.  As a result, Green satisfies several of the Townsend factors including "(1) the merits of the factual dispute were not resolved in the state hearing;" and, "(6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing." Townsend, 372 U.S. at 313.

Green also fulfills Townsend circumstance number five, which is analyzed under the Keeney cause and prejudice rule. Id.; Keeney v. Tomayo-Reyes, 504 U.S. at 8.  There is no doubt that "the material facts [related to Green's mental retardation] were not adequately developed at the state-court hearing."  Green's test scores were not analyzed by a professional post-Atkins, or by a professional taking into account the Flynn Effect and standard error of measurement affects.  The reason, or cause, that those facts were not developed is directly attributable to the state – the Virginia Supreme Court denied an

27

evidentiary hearing on this issue.  According to Virginia Code §8.01-654.2, the Virginia statutes governing the appointment of expert counsel do not go into effect until the Virginia Supreme Court has determined that the Petitioner's claim is not frivolous.  Because the Virginia Supreme Court determined that Green's claim of mental retardation was frivolous, he did not have the opportunity to request or receive any of the expert assistance provided under Va. Code §19.2-264.3:1.2.  This has prejudiced Green in that it has precluded him from exploring a possible sentence reprieve under Atkins.  Therefore, Green has fulfilled several of the requirements of Townsend as modified by Keeney.  Accordingly, an evidentiary hearing will be held to determine whether Green is mentally retarded under Virginia law.

## V.  Order

For the reasons stated above, this Court GRANTS Green's request for an evidentiary hearing to determine whether the Petitioner is mentally retarded under Virginia law, and GRANTS Green's motion for an expert investigator.  Counsel are advised to contact the Court by May 10, 2006, in order to schedule the evidentiary hearing.

The Clerk shall mail a copy of this Opinion and Order to all counsel of record.

_____
/s/
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 4, 2006

28