**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KEVIN GREEN,

          Petitioner,

v.                                               ACTION NO.
                                               2:05cv340

GENE M. JOHNSON, Director of the
Virginia Department of Corrections,

          Respondent.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

      This matter was initiated by petition for writ of habeas corpus under 28 U.S.C. §2254.  The matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Court recommends denying petitioner's petition for writ of habeas corpus.

## I.  STATEMENT OF THE CASE

### A.  Background

      Petitioner Kevin Green ("Green") was tried before a jury in Brunswick County Circuit Court from June 19, 2000, through June 22, 2000, and was convicted of capital murder during the commission of robbery, robbery, malicious wounding, and three counts of illegal use of a firearm. The jury recommended the death penalty for the capital murder, life imprisonment for the robbery, twenty years for the malicious wounding, and three years for each of the illegal use of firearm

convictions.  On October 6, 2000, the circuit court sentenced Green according to the jury's verdict.

Green's trial counsel appealed only Green's capital murder conviction.  Pursuant to Virginia Code § 17.1-313(F), the Virginia Supreme Court consolidated for review Green's capital murder conviction and death sentence.  See Green v. Commonwealth, 546 S.E.2d 446, 447 (Va. 2001).  On June 8, 2001, the Virginia Supreme Court reversed the capital murder conviction and the sentence of death, holding that the trial court committed manifest error by seating two jurors who were not impartial.  Green v. Commonwealth, 546 S.E.2d at 452.  The Virginia Supreme Court remanded the case to the circuit court for a new trial on the capital murder offense.

Green's retrial took place from October 29, 2001, through November 2, 2001, in Brunswick County Circuit Court.  A second jury found Green guilty of capital murder and again recommended a sentence of death. The circuit court sentenced Green in accordance with the jury verdict on January 24, 2002.  The Virginia Supreme Court affirmed the conviction and sentence on June 6, 2003, Green v. Commonwealth, 580 S.E.2d 834 (Va. 2003), and the United States Supreme Court denied Green's Petition for a Writ of Certiorari on February 23, 2004.  Green v. Virginia, 540 U.S. 1194 (2004).

The evidence presented at trial, as summarized by the Supreme Court of Virginia, showed the following:

> The victim, Patricia L. Vaughan, and her husband, Lawrence T. Vaughan, owned and operated a small grocery store in Brunswick County.  As part of their grocery store operation, the Vaughans regularly cashed checks for employees of several nearby businesses, including a lumber company that paid its employees on Friday of each week.  Consequently, Mr. Vaughan routinely went to a bank on Fridays to obtain sufficient currency to cash payroll checks for the lumber company employees.  And, he did so on Friday, August 21, 1998.  Upon returning from the bank on that Friday, he placed $10,000 in a bank bag that he kept in a cabinet underneath the cash

2

register, another $10,000 elsewhere in the store, and the remaining cash in a safe.

On the day in question, as Mr. Vaughan was starting to eat lunch and to file an invoice, two men entered the store. Mr. Vaughan saw them and recognized the taller of the two men as Kevin Green, the defendant. Green had worked for the lumber company for approximately eight to ten weeks during the preceding spring, and had frequented the Vaughans' grocery store at lunchtime, after work, and on Fridays to cash his payroll checks.

When the two men entered the store, Mrs. Vaughan had her back to the door and was standing five or six feet from Mr. Vaughan. Thinking that the shorter man was going over to the "drink box," Mr. Vaughan turned around to finish his filing. As he did so, he heard his wife scream, "Oh, God." At trial, Mr. Vaughan described what he then heard:

> It was four bangs. Bang, bang and I was hit. I didn't know where I was hit, but I was hurt. I turned a complete turn and fell on the floor, sit [sic] down on my right foot and broke my right ankle. And about [the] time I went down, I looked up and I realized it was a gun being fired. I could see him, he shot toward my wife with the fourth shot. I saw his hand with a pistol in it. He was holding [it] like he was target practicing.

Mr. Vaughan testified that Green, after firing the four shots, walked back to the door and stood there "as a lookout" while the other man came around behind the counter and tried to open the cash register. When the drawer on the cash register jammed, Green directed the shorter man to look under the counter. Upon doing so, he found the bank bag containing approximately $9,000 in cash and Mr. Vaughan's pistol, which he then used to shoot through the key hole in the cash register drawer. Taking the bank bag and the pistol, the shorter man exited the store, but Green walked a few steps over to where Mrs. Vaughan was lying on the floor and pointed the gun at her again. According to Mr. Vaughan, the gun misfired, and Green ejected a live cartridge onto the floor. Green then fired two more shots in the direction of Mrs. Vaughan. Lowering his head, Mr. Vaughan heard the gun "snap" one more time, but he did not know whether Green was pointing the gun at him or his wife. Only then, when the gun was empty, did Green leave the store.

3

After Green left, Mr. Vaughan dragged himself approximately five feet across the floor of the store to a telephone and dialed the "911" emergency number, but he was too weak to reach his wife who was still lying on the floor.  One of the first police officers to arrive at the scene testified that he observed "puddles of blood just pouring out of [Mrs. Vaughan's] nose, her mouth, [and] her head." A local volunteer medical examiner determined that Mrs. Vaughan had died at the scene of the shooting.

A subsequent autopsy of Mrs. Vaughan's body revealed that she sustained four gunshot wounds.  One bullet penetrated the left side of her head, passed through the temporal and frontal lobes of her brain, and lodged in the inner frontal sinus of her face.  Another bullet entered the right side of her chest and went into the upper lobe of her right lung.  A third bullet penetrated the left side of her back.  This was the only non-lethal wound.  The fourth bullet entered the right side of Mrs. Vaughan's back and penetrated two lobes of her right lung.  According to the forensic pathologist who performed the autopsy, Dr. Jose Abrenio, this wound caused hemorrhaging in her thoracic cavity, which led to difficulty in breathing and had the effect of suffocating her.  Dr. Abrenio also opined that Mrs. Vaughan survived "seconds to minutes" after she was first shot.

Four days after the murder, a warrant was issued to search Green, his residence, and automobile.  During the search of his home, six bullets were retrieved from the trunk of a tree in his yard.  The bullets were found behind a "makeshift target" hanging on the tree. Forensic testing on those six bullets and the four bullets recovered from Mrs. Vaughan's body during the autopsy revealed that all ten "caliber 25 Auto full metal jacketed bullets" had been fired from one weapon. About 35 to 50 feet from the tree, 16 25-caliber empty cartridge casings were also recovered.

After Green was arrested, he executed a form waiving his Miranda rights and agreed to be questioned by law enforcement officers. During that interrogation, Green admitted that he and his cousin, David Green, robbed the Vaughans' grocery store and that he selected their store because he knew the Vaughans kept a lot of money there.  Green and his cousin had originally planned to wear masks to conceal their faces.  However, they discarded the masks after they had to wait behind the store in their automobile for about an hour because other people were in the grocery store.  Green also admitted that he shot both of the Vaughans, hitting Mrs. Vaughan four times.

Green v. Commonwealth, 580 S.E.2d at 837-39.

The same trial counsel represented Green during both trials and both direct appeals; however, Green was appointed new counsel to represent him for his state habeas appeal. Green's habeas counsel filed a habeas petition with the Virginia Supreme Court on April 22, 2004, which was denied on February 9, 2005. Green's petition for rehearing was denied on April 29, 2005, and his Petition for Writ of Certiorari was denied on December 5, 2005. Green v. True, 126 S. Ct. 809 (2005).

Green, presently in the custody of the Virginia Department of Corrections, filed this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") on December 1, 2005. In his petition, Green requested an evidentiary hearing to determine whether he is mentally retarded under Virginia law. On January 13, 2006, Respondent filed a Rule 5 Answer and Motion to Dismiss Green's petition with a memorandum in support ("Resp. Mem."). Green filed a response to the Motion to Dismiss on February 3, 2006, along with a Motion for an expert investigator and mitigation specialist, and a motion to strike redundant, immaterial, impertinent, or scandalous matter.

The Court entered an Order March 31, 2006, granting petitioner's motion for an expert investigator, denying petitioner's motion for a mitigation specialist, and denying petitioner's motion to strike redundant, immaterial, impertinent, or scandalous matter. The Court also granted petitioner an evidentiary hearing to determine whether Green is mentally retarded under Virginia law. The Order was rescinded by a second Order entered April 7, 2006, in which all of Petitioner's motions, including his request for an evidentiary hearing, were denied. A subsequent order was entered on May 4, 2006, granting petitioner's motion for an expert investigator, and petitioner's motion for an

evidentiary hearing. Green v. Johnson, 431 F. Supp. 2d 601 (E.D. Va. 2006). This order was upheld by District Judge Rebecca Smith on June 19, 2006.

An evidentiary hearing was held on October 31, 2006, November 1, 2006, and November 3, 2006.

## B. Claims Alleged

Green asserts the following entitle him to relief under 28 U.S.C. § 2254:

(a)   Claim I – the trial court erred in denying Green's motion for a change of venue, and trial counsel unreasonably failed to timely object;

(b)   Claim II – trial counsel unreasonably failed to note an appeal of Green's noncapital convictions and sentences after the first trial;

(c)   Claim III – trial counsel unreasonably failed to request a mitigation expert and they unreasonably failed to investigate and present mitigation evidence, in violation of Green's rights under the Sixth Amendment;

(d)   Claim IV – trial counsel unreasonably failed to articulate the "particularized need" that was necessary to obtain the assistance of an investigator; and,

(e)   Claim V – Green is under sentence of death in violation of the Eighth Amendment to the United States Constitution due to his being mentally retarded.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In order for this Court to address the merits of this habeas petition, all of Green's claims must be exhausted. See 28 U.S.C. § 2254(b) (2000). The exhaustion requirement is satisfied when the "essential legal theories and factual allegations advanced in federal court . . . [are] the same as those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428, 1436

(E.D.Va. 1991), <u>aff'd</u>, 996 F.2d 1560 (4th Cir. 1993).  Exhaustion may be accomplished either on direct appeal or in post-conviction proceedings.  <u>See</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844 (1999) (citing <u>Brown v. Allen</u>, 344 U.S. 443, 447 (1953)); <u>see also</u> <u>Skipper v. French</u>, 130 F.3d 603, 610 n.4 (4th Cir. 1997). All of Green's claims are exhausted either because they were decided by the Supreme Court of Virginia on direct appeal or on state habeas appeal, they were presented to the Virginia Supreme Court but barred from review under state procedural rules or they never were presented to the Virginia Supreme Court and, under Virginia rules, Green has no further remedy in state court.

### A.  Claim I - Challenges to the Denial of Motion for Change of Venue

In Claim I, Green alleges the trial court erred in denying his motion for a change of venue. This claim was raised on direct appeal, and denied on procedural grounds. (Petition 31.)  Green further asserts in Claim I that his trial counsel were ineffective due to counsels' failure to properly raise and preserve the motion to change venue and failure to move for a mistrial. (Petition 36.) Green raised this claim in his state habeas appeal as "Claim VI," and the Virginia Supreme Court denied the claim on the merits.

Following the reversal of Green's conviction for capital murder in Brunswick County, Virginia, and sentence of death, his attorneys moved for a change of venue. (Joint Appendix, <u>Green v. Commonwealth</u>, No. 020757, Va. Sup. Ct. "Second J.A." at 5.) Counsel argued that Brunswick County has a population of approximately 18,000. (Second J.A. at 168, 240, 414.) Green's first trial, conviction, and reversal received considerable attention, with at least thirty-seven newspaper articles devoted to the topic. (Second J.A. at 191-231, 461.)  Some articles reported Green's statement to the police in which he admitted to the shooting, and the concession by Green's attorney that Green

7

fired the gun. (Second J.A. at 193, 195, 202, 205.)  At least ten articles following the first trial reported Green had received the death penalty.  (Second J.A. at 195-203, 205.)  Seven articles reported Green had been charged with murder in adjacent Mecklenburg County (Second J.A. at 202-03, 205, 207-08, 210-12), and four reported he was acquitted of those charges (Second J.A. at 193-96).  Further, four articles, which reported Green was awarded a new trial, stated he had received the death penalty after the first trial.  (Second J.A. at 191-94.)

The trial court took the motion for change of venue under advisement until after jury selection.  (Second J.A. at 421.)  Fifty-eight jurors were summoned, and thirty-four were excused for cause.  Of those excused, twenty-six were excused for knowledge of the outcome of the first trial and/or knowledge of or relation to a person connected with the proceedings. (Second J.A. at 464-1018.)  Nine of the twelve jurors who decided the case admitted during *voir dire* that they had prior knowledge of the case. (Second J.A. at 469-947.)  Green's counsel failed to renew the motion prior to the jury being impaneled and sworn, and failed to move for a mistrial.  At the close of the second trial, the trial court found that the court was able to successfully seat a jury, and denied the motion for a change of venue. (Second J.A. at 1531.)

### 1.      Trial Court's Denial of Motion for Change of Venue

Green alleges the trial court's failure to grant his motion for a change of venue due to prejudicial pretrial publicity was an abuse of discretion and deprived Green of his right to a fair and impartial jury and due process of law under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Petition 31.)  On direct appeal, the Virginia Supreme Court refused to address the merits of this claim on procedural grounds due to counsels' failure to timely raise and preserve the error.  The Court made the following findings:

> Green [] did not object to the circuit court's decision to take the motion [to change venue] under advisement pending the outcome of voir dire. Consequently, it was incumbent upon Green to renew the motion before the jury was impaneled and sworn, or at least remind the court that it was still pending and that he wanted the court to rule on it.
>
> . . .
>
> After voir dire was completed but before the parties exercised their peremptory strikes, the court specifically asked whether the parties had any matters to bring before the court.  Similarly, when the parties completed their peremptory strikes, the court asked, "[I]s that your jury?"  Instead of reminding the court about his pending change of venue motion at that point, Green's responses to the court's questions actually indicated that he had no remaining issues to raise with regard to jury selection or any objections to empanelling that jury.  In short, he gave the circuit court no reason to believe that he was still pursuing a change of venue.

Green v. Commonwealth, 580 S.E.2d at 842.  Consequently, the Court refused to address the merits of Green's claim, citing Rule 5:25 of the Rules of the Virginia Supreme Court which provides that an error will not be sustained on appeal unless the objection was "stated with reasonable certainty at the time of the ruling."

"Absent cause and prejudice or a miscarriage of justice, a federal court sitting in habeas may not review a constitutional claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule." Mu'Min v. Pruett, 125 F.3d 192, 196-97 (4th Cir. 1997) (internal citations omitted).  Green asserts the deficient performance of his trial counsel was cause for the procedural default, and that Green was prejudiced as a result.  Therefore, Green argues this Court can review his constitutional claim even though it was procedurally defaulted.

Green asks the Court to review both prongs of the Strickland analysis de novo for the limited purpose of assessing whether cause and prejudice can excuse the procedural default. Strickland v.

Washington, 466 U.S. 668 (1984); See Fischetti v. Johnson, 384 F.3d 140, 154-55 (3d Cir. 2004).

Respondent argues the Court must instead follow the Eastern District of Virginia case of Orbe v. True, 233 F. Supp.2d 749 (2002).  In Orbe, the Court reviewed the ineffective assistance of counsel claim under the § 2254(d) deference standard even though the petitioner was asserting the claim to prove cause and prejudice sufficient to excuse procedural default. Id. at 757-60.  Notably, the Fourth Circuit declined to endorse the District Court's analysis in Orbe, finding it "less clear" that the district court was correct when it applied § 2254(d) to questions of cause and prejudice.  Orbe v. True, 82 Fed. Appx. 802, 807-08 (4th Cir. 2003).  The Fourth Circuit found it unnecessary to rule on the issue, however, holding the petitioner in Orbe failed to prove counsel was ineffective even when the court reviewed the claim de novo. Id. at 808.  Similarly, analyzing Green's claim de novo, this Court finds Green has not shown cause and prejudice sufficient to excuse the procedural default.

The controlling standard for ineffective assistance of counsel claims is found in Strickland v. Washington, 466 U.S. 668 (1984), which requires the court to analyze Green's claims under a two-prong test: competence and prejudice.  To grant relief, the Court must find that (1) Green's counsels' performance fell below the range of competence demanded of counsel in criminal cases, Strickland, 466 U.S. at 690 (the "competence prong" of the test); and (2) there is a reasonable probability that but for the deficient performance by counsel the ultimate result would have been different. Strickland, 466 U.S. at 694 (the "prejudice prong" of the test).  Further, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

The Virginia Supreme Court's opinion pointed out the deficiencies in trial counsels' performance.  Counsel did not object to the trial court's taking the motion for change of venue under

advisement pending the outcome of *voir dire*, did not renew the motion after *voir dire* was completed, and did not renew the motion after the parties completed their peremptory strikes. Green v. Commonwealth, 580 S.E.2d at 842.   The American Bar Association Guidelines for the Appointment  and Performance of Defense Counsel in Death Penalty Cases and the American Bar Association Standards for Criminal Justice both require defense counsel to properly preserve a motion to change venue in order to avoid default. See Am. Bar Ass'n. Guidelines for the Appointment & Performance of Def. Counsel in Death Penalty Cases (rev'd. ed. 2003) 10.8(A)(3)(c) (available   at   http://www.abanet.org/legalservices/downloads/sclaid/indigentdefense/ deathpenaltyguidelines2003.pdf); Am. Bar Ass'n. Standards for Criminal Justice 4-3.6 (available at http://222.abanet.org/crimjust/standards/dfunc_toc.html).  The United States Supreme Court has identified both the ABA Guidelines and the ABA Standards as appropriate guides for determining whether counsels' performance was reasonable. See Wiggins v. Smith, 539 U.S. 510, 522, 524 (2003); Rompilla v. Beard, 545 U.S. 374, 387 (2005).   This Court finds Green's counsels' performance, in failing to renew his motion for change of venue and preserve this issue for appeal, fell below the range of competence demanded of lawyers in criminal cases. Strickland, 466 U.S. at 690.  Therefore, counsel failed the competence prong of the Strickland analysis.

The Court further finds counsels' deficient performance did not prejudice Green.  Green asserts that he was prejudiced because the Court would have been constitutionally compelled to grant his motion for change of venue and that, even if not compelled to do so, there is a reasonable probability the trial court would have made "a prudent discretionary decision" to grant the motion. (Petition 39-40.)  Green notes the trial judge stated on several occasions during *voir dire* and the presentation of evidence that the jurors knew more about Green's circumstances than they were

willing to admit. (Second J.A. at 816, 835-36, 1196.)  Admittedly, where the jury pool is so tainted

by prejudicial publicity that the empaneling of an impartial jury is impossible, a change of venue

is required as a matter of constitutional law. <u>Irvin v. Dowd</u>, 366 U.S. 717, 728 (1961).  To prove

entitlement to a change of venue as a matter of constitutional law, however, the petitioner must show

"that the media's coverage of his case - printed or broadcast - compromised the ability of the jury

to judge him fairly." <u>Chandler v. Florida</u>, 449 U.S. 560, 581 (1981).  Green has failed to make this

showing.

Green argues the court was constitutionally compelled to grant his motion for change of

venue based on the Supreme Court's holding in <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), where

the trial court erred in denying a motion for change of venue after the defendant's confession was

televised.  The facts in <u>Rideau</u> are easily distinguished from Green's.   In <u>Rideau</u>, a man robbed a

bank, kidnaped three employees, and killed one of them. <u>Id.</u> at 723-24.  A few hours later, Rideau

was apprehended. <u>Id.</u> at 724.  The next day, a twenty-minute "moving picture film with a sound

track" was made in the jail of an "interview" during which the sheriff of Calcasieu Parish

interrogated Rideau, who admitted to perpetrating the bank robbery, kidnaping and murder. <u>Id.</u>  The

film was broadcast on television that day, as well as the two following days to audiences of 24,000,

53,000 and 20,000 respectively. <u>Id.</u>  Calcasieu Parish has a population of approximately 150,000

people. <u>Id.</u>  Prior to trial, Rideau's counsel moved for change of venue, which was denied, and he

was convicted and sentenced to death on the murder charge in the Calcasieu Parish trial court. <u>Id.</u>

at 725.  Three members of the jury that convicted him stated on *voir dire* that they had seen and

heard the film of Rideau's confession on at least one occasion. <u>Id.</u>  Further, two members of the jury

were deputy sheriffs of Calcasieu Parish. <u>Id.</u>  Not surprisingly, the Supreme Court found that due

process "required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'" Id. at 727.  Consequently, the Supreme Court reversed the conviction.

In Green's case, two newspaper articles appeared in the Richmond Times-Dispatch stating Green's attorney conceded Green shot the gun. (Second J.A. at 193, 205.)  One newspaper article in the Richmond Times-Dispatch mentioned "Green's confession," and one article in the Brunswick Times-Gazette stated, "Green admitted to planning and committing the robbery but denied any intention of shooting anyone."  (Second J.A. at 195, 202.)

During *voir dire*, nine of the twelve jurors admitted they had read or heard something about Green's case in the newspaper.  It is important to note that the *voir dire* for Green's second trial was conducted in October 2001, and the crimes occurred in August 1998.  When asked what they could recall about what they had read, these nine jurors gave the following responses.  Leslie Stigall stated that it had "been a while" since she read about the case, and that "nothing stuck with [her] about the case." (Second J.A. at 471.)  Jacqueline Mangum said she read in the newspaper that Green had "killed Mrs. Vaughan," and then corrected herself to say he was accused of the killing. (Second J.A. at 489-90.)  Hannie Cannon said, "to be honest, I don't know much of nothing about [the case]." (Second J.A. at 522.)  Sylvia Lewis stated, "honestly, I really don't remember anything about [the case]." (Second J.A. at 605.)  Shirley Walker said it had been "some time" since she had read anything, and she had not formed an opinion, "since [she] really didn't know exactly what happened." (Second J.A. at 642.)  Kayvola Coleman heard about the case "when the story came out," but not in recent months. (Second J.A. at 702.)  Antoine Claiborne "read a little about it . . . back when it first happened." (Second J.A. at 753.)  William Willis admitted to reading about the

case "long ago," but could not "recall right off-hand" what he had read. (Second J.A. at 889.) Lastly, Wayne Jones said he had "heard of it . . . a little while after it happened." (Second J.A. at 934.)

After each juror had admitted reading something about the case, and explaining what they remembered (which is recounted above), each juror was asked the following two questions: "[h]ave you expressed or formed any opinion about the case?"; and "[d]o you know of any bias or prejudice which would keep you from being able to give a fair trial both to the defendant and the Commonwealth?" (Second J.A. at 471, 490, 522, 605, 642, 702, 753, 889, 934-35.) Each of the nine jurors responded to the two questions with "no." Id.

This is not a situation like the one in Rideau, where three jurors witnessed a televised confession by the defendant before deciding the case. These jurors were questioned about what they may have read or seen. Most could not recall anything more than that they had read something about the case when it was first in the newspapers. "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 722-23 (internal citations omitted). Under the circumstances described above, the trial court was not constitutionally compelled to grant Green's motion for change of venue.

The Court further disagrees with Green's second argument that he has established prejudice because the court would have made the discretionary decision to grant the motion for change of venue if counsel had properly renewed the motion prior to seating the jury. At the close of the second trial, the trial court made the following ruling, "[d]efense made a motion for change of venue way back. It was taken under advisement, basically to find out if we needed to do that. We were

14

able to successfully seat a jury, so I'll put on the record now that motion was denied at the time we

had a jury seated." (Second J.A. at 1531.)  The trial court clearly ruled after the close of all of the

evidence that the motion for change of venue was denied.  Green's argument that the trial court

would have made the discretionary decision to grant the motion if it had been timely renewed is

without merit.

Green is unable to prove both cause and prejudice for the procedural default; therefore, this

Court will not address the merits of his claim that the trial court erred in denying his motion for

change of venue, and the first prong of Claim I should be DENIED.

**2.     Ineffective Assistance of Trial Counsel Due to Failure to Properly Preserve Motion for Change of Venue and Failure to Move for a Mistrial**

In the next portion of Claim I, Green asserts his trial counsel were ineffective for failing to

properly raise and preserve the motion to change venue and move for a mistrial, and there is a

reasonable probability that absent counsels' deficient performance, the result of his trial would have

been different.  Green raised this claim as "Claim VI" in his state habeas petition.  The Virginia

Supreme Court denied the claim, finding Green failed to satisfy the prejudice prong of Strickland

v. Washington:

> In claim (VI), petitioner argues that his trial counsel were ineffective
> for failing to properly raise and preserve his motion to change venue.
> Although counsel filed a motion to change venue before voir dire,
> they failed to renew the motion before the jury was impaneled.
> Petitioner asserts that there was significant amount of publicity
> surrounding both of his trials in Brunswick County, and that the
> entire venire may have been tainted due to the prospective jurors'
> knowledge and discussions regarding the history of the case.
> Petitioner argues that because so may members of the venire had
> knowledge about his previous trial, his trial counsel were ineffective
> for failing to make a motion for mistrial.
>
> The Court holds that claim (VI) fails to satisfy the "prejudice" prong

15

of <u>Strickland</u>.  The trial court struck all the members of the venire who were aware that petitioner had previously been tried, even if they were unaware of the charges or the outcome of the first trial.  Furthermore, a panel of 24 jurors was selected after voir dire of only 58 prospective jurors.   Thus, jury selection in this case was accomplished with relative ease.  <u>See</u> <u>Kasi v. Commonwealth</u>, 256 Va. 407, 420, 508 S. E. 2d 57, 64 (1998), <u>cert. denied</u>, 527 U.S. 1038 (1999) (holding that jury selection was accomplished with relative ease when a panel of 24 jurors was selected after voir dire of only 58 prospective jurors).  It is the ease of seating a jury that is a relevant factor in determining whether a motion for a change of venue should be granted. <u>Thomas v. Commonwealth</u>, 263 Va. 216, 232, 559 S.E.2d 652, 661 (2002).  As such, petitioner has failed to prove that but for counsel's alleged error, the result of the proceeding would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 687.

<u>Green v. Warden</u>, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1 at 6-7.)

The Virginia Supreme Court did not address the performance prong of <u>Strickland</u>, requiring that prong to be reviewed de novo here. <u>Wiggins v. Smith</u>, 539 U.S. at 534 (where state court did not reach one prong of <u>Strickland</u> analysis, federal court's review of that prong was not circumscribed by the state court's decision).  For the reasons stated in the previous section, the Court finds Green's trial counsels' performance was constitutionally deficient.

The Court must review the prejudice prong of the <u>Strickland</u> analysis with the deference prescribed by 28 U.S.C. § 2254.  As this Court has already found that even when reviewed de novo, Green cannot prove prejudice, Green certainly cannot prove the Virginia Supreme Court's finding of no prejudice was unreasonable.  However, the Court will address counsels' arguments.

Respondent argues Green cannot prove prejudice because the state court made "findings of historical fact" that "no juror sat on Green's case who knew anything about the prior conviction and the trial court easily qualified 24 jurors who were free of bias," which are presumptively correct

16

under 28 U.S.C. § 2254(e)(1).[1]  (Resp. Mem. in Supp. Mot. to Dismiss 14.)  Green counters that these are "mixed determination[s] of law and fact," which are not subject to the presumption of correctness on habeas review. Townsend v. Sain, 372 U.S. 293, 309 n. 6 (1963); See Thompson v. Keohane, 516 U.S. 99, 109-110 (1995) (holding the § 2254(d) presumption is a codification of the holding in Townsend; therefore, the court adheres to the Townsend definition of a "factual issue"); Cuyler v. Sullivan, 446 U.S. 335, 342 (1980).  Respondent cites Irvin v. Dowd, 366 U.S. 717, 723 (1961) to support the argument that the issue of juror impartiality is a mixed question of law and fact.  Irvin v. Dowd was decided five years before Congress added to the habeas corpus statute an explicit presumption of correctness for state-court factual findings. See Patton v. Yount, 467 U.S. 1025, 1032 n. 7 (1984).  The Supreme Court held in Patton v. Yount that the habeas standard was at least as stringent as the "manifest error" standard applied in Irvin, and did not address whether the new habeas standard would apply to the issue of juror impartiality.  Id.  However, the Supreme Court has held on several occasions that a state court's determination of juror impartiality is entitled to the presumption of correctness. See Rushen v. Spain, 464 U.S. 114, 120 (1983) (holding  that the state court conclusion that the jury's deliberations, as a whole, were not biased, is a finding of fact entitled to deference); Wainwright v. Witt, 469 U.S. 412, 429 (1985) (holding juror bias is a factual issue subject to § 2254(d) deference because, "the trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record); Thompson v. Keohane, 516 U.S. 99, 111 (1995) (holding that while issues of juror impartiality

---

[1]Section 2254(e)(1) declares state court determinations "of a factual issue . . . shall be presumed correct," and petitioner bears the burden of rebutting the presumption by clear and convincing evidence.

"encompass more than 'basic, primary, or historical facts,' their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor," and should, therefore, be afforded presumptive weight under § 2254(d).  Therefore, the Virginia Supreme Court's finding that the jurors were free of bias is presumptively correct under 28 U.S.C. § 2254(e)(1).

In an attempt to rebut the presumption, Green points out that on *voir dire*, June Cree informed the court that, during the lunch break on the first day of trial, a prospective juror had told other jurors that Green had previously been convicted of this same offense. (Second J.A. 870-86, 901-03.)  After June Cree's *voir dire*, the Court began asking members of the venire whether they had discussed the case with other members.  However, the Court did not go back to the sixteen previously qualified members of the jury to determine whether they had heard about the case from other prospective jurors.  Green argues that as a result of this oversight, there is no factual basis for the state habeas court's conclusion that "[t]he trial court struck all the members of the venire who were aware that petitioner had previously been tried."  Green's allegations fail to rebut the presumption of correctness by "clear and convincing evidence" as required by 28 U.S.C. § 2254(e)(1).  The Virginia Supreme Court's finding that Green was not prejudiced due to his counsels' failure to properly raise and preserve his motion for change of venue and move for a mistrial was reasonable.

Consequently, Green has failed to show cause and prejudice sufficient to excuse his procedural default on the first portion of Claim I, alleging the trial court erred in denying his motion for a change of venue.  He has also failed to prove the second portion of Claim I, that his counsel were ineffective for failing to properly raise and preserve the motion to change venue and failure to move for a mistrial.  Accordingly, Green's Claim I should be DENIED.

**B.  Claim II - Failure to Note an Appeal of Noncapital Convictions**

Upon completion of Green's first trial, he appealed his capital conviction, but not his death sentence or noncapital convictions, to the Virginia Supreme Court.  Pursuant to Virginia Code §17.1-313, the Virginia Supreme Court then consolidated the automatic review of Green's death sentence with his appeal of the capital murder conviction.  See Green v. Commonwealth, 546 S.E.2d at 447.  On review of the capital conviction, the Supreme Court of Virginia reversed and remanded, holding that the trial court committed manifest error by seating two jurors who were not impartial. Green v. Commonwealth, 546 S.E.2d at 452.  The same attorneys that represented Green at his first trial again represented him at his second trial for capital murder.  Green was again found guilty of capital murder and sentenced to death.  During the sentencing phase of Green's second trial, the convictions for robbery, malicious wounding and illegal use of a firearm, and the sentences imposed - including the life sentence, were presented to the jury.

Despite the fact that there were compelling indicia that an appeal of the noncapital convictions would have been successful, Green's counsel failed to note an appeal of those convictions.  Green's state habeas counsel identified this omission and included a claim of ineffective assistance of counsel in Green's state habeas appeal.  The Virginia Supreme Court found the habeas claim to be procedurally defaulted because it was filed outside of Virginia's two-year statute of limitations.

Green claims in his federal habeas petition that he was denied the constitutionally-guaranteed right to effective assistance of counsel, based upon his trial counsels' failure to appeal the underlying claims after his first trial. U.S. Const. amend. VI.   Respondent asserts that this Court may not examine Green's claim that his defense counsel were constitutionally ineffective because that claim

19

is barred by both a Virginia state procedural rule and the one-year federal statute of limitations delineated by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  Va. Code Ann. §8.01-654(A)(2) (2005); 28 U.S.C. §2254(d)(2).  Respondent does not assert that Green's representation was constitutionally adequate.

      1.      **Procedural Default**

      If a petitioner cannot show good cause for the procedural default in state court, "his claim is not cognizable in federal court for the writ."  Gray v. Netherland, 518 U.S. 152, 162 (1996). Virginia Code §8.01-654(A)(2) requires prisoners to file a petition for habeas corpus within  "two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later."  Green's judgment became final on November 5, 2000, and the Virginia statute of limitations expired on November 5, 2002, while Green continued to be represented by counsel he now claims were ineffective.  On June 26, 2003, Green was appointed new counsel for his state habeas appeal.  With his new attorney, Green raised his ineffective assistance of counsel claim for the first time on April 22, 2004, two-and-one-half years after the November, 2002, deadline.  The Supreme Court of Virginia held the claim was untimely, therefore procedurally defaulted, and dismissed it.  See Green v. Warden, No. 040932 (Va. Feb. 9, 2005), (Pet. App. Tab No. 1 at 6-7). Respondent claims that this Court is "foreclosed" from reviewing Green's allegations due to that tardiness.

      This court must determine whether the Virginia procedural rule that blocked Green's state habeas petition provided Green with the requisite constitutional protections to litigate his ineffective assistance of counsel claim.  Litigants must be given "a *reasonable* opportunity to have the issue as

to the claimed right heard and determined by the state court." <u>Parker v. Illinois</u>, 333 U.S. 571 (1948) (internal citation omitted) (emphasis added). Procedurally defaulted claims are not unequivocally rejected by federal courts. In fact, there are circumstances in which a federal court *must* review a habeas petition even if it appears to be procedurally barred from doing so. <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478 (1986). This is especially so when the constitutional claim in question is ineffective assistance of counsel. "[I]neffective-assistance claims usually should be excused from procedural default rules because an attorney who handles both trial and appeal is unlikely to raise an ineffective-assistance claim against himself." <u>Massaro v. United States</u>, 538 U.S. 500, 502-503 (2003). In determining their ability to hear a procedurally defaulted claim, federal courts must first determine whether the procedural rule that barred the claim in state court was adequate and independent. <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986). If the rule is found to be inadequate, the court may consider the claim with no further showing from the petitioner. If the claim is found to be adequate and independent, the court may still address the merits if one of two exceptions apply: (1) there is cause and prejudice for the procedural default; or, (2) enforcement of the rule would represent a miscarriage of justice. This Court finds the Virginia procedural rule is inadequate as applied in Green's case. Additionally, Green can show cause and prejudice excusing the procedural default.

### a.       Adequate and Independent Procedural Rule

A state procedural rule must be adequate to preclude a court from hearing a constitutional claim. <u>Kimmelman v. Morrison</u>, 477 U.S. at 365. Adequacy exists when the state procedural rule is "firmly established and regularly followed" and when the application of the rule under the particular circumstances of the case serves a legitimate state interest. <u>Ford v. Georgia</u>, 498 U.S. 411,

21

423-24 (1991); Lee v. Kemna, 534 U.S. 362, 386-387 (2002).  The Fourth Circuit has ruled that the adequacy of a procedural rule must be assessed by reference to "the particular claim raised."  Brown v. Lee, 319 F.3d 162, 170 (4th Cir. 2003).   Adequacy demands that a petitioner be given a "reasonable opportunity to have the issue as to the claimed right heard and determined by the state court."  Michel v. Louisiana, 350 U.S. 91, 93 (1955) (citations omitted).  Virginia procedure allows ineffective assistance of counsel claims only upon habeas appeal, and then allows two years for that appeal to be filed.  In this case, Green continued to be represented by the same counsel he now claims to have been ineffective when the Virginia statute of limitations expired.  Because of this scenario, Mr. Green avers that the Virginia statute of limitations is inadequate as applied, serves no legitimate state interest, and does not provide him with a reasonable opportunity to litigate his constitutional claim.  To support his argument that this Virginia procedural rule is inadequate, Green additionally relies upon the fact that the Virginia Supreme Court has not applied this rule to any other petitioner in a factually similar situation.  Further, the Virginia procedural rule in question, as applied, does not provide adequate protections for petitioners still represented by the counsel petitioners allege to be constitutionally ineffective.  While there are many good reasons for a time limit to apply to such claims, this rule, as applied to this factual scenario, does not provide a meaningful opportunity to litigate this fundamental, constitutionally-protected right.

Respondent relies upon Coleman v. Thompson to buttress its argument that Green did not have an absolute right to counsel on his habeas appeal and that he should be bound by the default caused by his attorney. 501 U.S. 722, 752-53 (1991).  Respondent argues that this negates Green's assertion that the state procedural bar was not adequate. (Resp. Mem. 16.)  However, Respondent's remonstrance is meaningless to our determination of whether the state rule afforded Green a

22

reasonable opportunity to raise his claim, and whether the rule was adequate as applied to Green's case. Green relied upon his attorneys for all legal advice and direction, and it is logical that Green would expect them to file any necessary appeals or collateral attacks against his sentence. It is unconstitutional to place the burden of counsel's deficiency upon the shoulders of a capital defendant in circumstances where that defendant is at the mercy of his counsel. Parker v. Illinois, 333 U.S. 571, 574 (1948). "So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." Coleman, 501 U.S. at 752 (internal citations omitted). However, if an attorney's performance is constitutionally ineffective, as in this case, procedural default should not be the petitioner's burden to bear. "The Sixth Amendment mandates that the State bear the risk of constitutionally deficient assistance of counsel." Kimmelman v. Morrison, 477 U.S. at 379; see also Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) (holding that when "procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State").

Respondent further argues that Green should have filed a pro se habeas petition attacking his counsels' performance. While some inmates might be expected to take greater ownership of their cases, an individual such as Green, who unarguably has a limited mental capacity, could not be expected to understand the implications of these circumstances. There is no indication that he knew or understood that his convictions had not been appealed or that such a failure would warrant a habeas complaint.

> A layman will ordinarily be unable to recognize counsel's errors and
> to evaluate counsel's professional performance; consequently a

> criminal defendant will rarely know that he has not been represented competently until after trial and appeal, usually when he consults another lawyer about his case.  Indeed, an accused will often not realize that he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly if he retained trial counsel on direct appeal.

Kimmelman v. Morrison, 477 U.S. at 378.

Further, and an even more objectionable concept, is Respondent's expectation that Green file a habeas complaint against his lawyers while he was still represented by them.  Virginia law waives the attorney-client privilege when Virginia inmates assert ineffective assistance of counsel in habeas claims.  "If petitioner alleges as a ground for illegality of his detention the inadequacy of counsel, he shall be deemed to waive his privilege with respect to communications between such counsel and himself to the extent necessary to permit a full and fair hearing for the alleged ground."  Va. Code Ann. §8.01-654(b)(6) (2005).  Were Green capable of noticing such dereliction, which we do not find, filing a pro se petition could still be a grave mistake capable of prejudicing the ongoing appeal of his second trial based on the animosity such a claim would likely cause between Green and his attorneys, not to mention the revelation to Respondent of otherwise privileged attorney-client information.

Respondent additionally asserts that the fact that the Virginia Supreme Court has not applied this rule to cases like Green's is theoretical and "proves nothing except that the Virginia Supreme Court has not been confronted with Green's particular facts." (Resp. Mem. 17.)  Green's petition was the first time that this procedural rule had been applied to a petitioner whose statute of limitations had run while represented by the allegedly ineffective attorney.  This does not fulfill the "firmly established and regularly followed" standard discussed in Ford v. Georgia, 498 U.S. at 423-24.  This Court finds Virginia's statute of limitations is not an adequate state procedural rule as

applied to Green's ineffective assistance of counsel claim, where Green continued to be represented by ineffective counsel throughout the running of the statute. The application of the rule to Green's claim did not serve a legitimate state interest, and did not give Green a "reasonable opportunity to have the issue as to the claimed right heard and determined by the state court." Michel v. Louisiana, 350 U.S. 91, 93 (1955). Therefore, Green's state procedural default will not bar this Court's review of his ineffective assistance of counsel claim.

### b.      Cause and Prejudice to Excuse Procedural Default

In addition, the Court finds Green can show cause and prejudice sufficient to excuse the procedural default. When a petitioner can prove cause for his procedural default and prejudice attributable thereto, the petitioner's failure to comply with the state procedural rule will not bar consideration of a constitutional claim by a federal court. Murray v. Carrier, 477 U.S. 478, 485-86 (1986). The Supreme Court has defined cause as "some objective factor external to the defense" which impeded efforts to comply with the state procedural rule. Id. at 488. Attorney error that rises to the level of ineffective assistance of counsel under the Sixth Amendment establishes external 'cause' to overcome a procedural default. Id. at 488-89 ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."); see also Fischetti v. Johnson, 384 F.3d 140 (3d Cir. 2004). "Ineffective assistance of counsel, then, is cause for a procedural default." Murray, 477 U.S. at 488. The Supreme Court has limited ineffective assistance of counsel as a "cause" for excusing procedural default to circumstances where assistance of counsel is constitutionally guaranteed. Coleman v. Thompson, 501 U.S. at 755-56. Green was guaranteed effective assistance of counsel on appeal. See Evitts v. Lucy, 469 U.S. 387, 393-94 (1985) (holding the constitutional right to

effective assistance of counsel on direct appeal means counsel "must be available to assist in preparing and submitting a brief to the appellate court, and must play the role of an active advocate, rather than a mere friend of the court assisting in a detached evaluation of the appellant's claim"). This Court finds that Green was effectively denied counsel on appeal of his noncapital convictions by the fact that his attorney inexcusably failed to file any appeal on those convictions. Thus, Green fulfills the cause prong of the cause and prejudice test.

Green was certainly prejudiced by his counsels' failure to appeal the underlying convictions from his first trial. Given the fact that the capital conviction was reversed, and a new trial ordered based upon juror bias, Green's noncapital convictions would certainly have been overturned as well. Because they were not appealed, these tainted convictions were intact and presented to the jury at the second trial. Further, Green had already been convicted and sentenced to life in prison for those offenses, leaving the jury no alternative but to sentence Green to death if they wished to inflict additional punishment for the capital murder of Mrs. Vaughan. There is no question that Green was significantly prejudiced by his counsels' failure to appeal his noncapital convictions. This Court finds that Green showed both cause for and prejudice as a result of, his attorney's failure to appeal his noncapital convictions, and his state procedural default will not bar consideration of his constitutional claim by this Court.

### 2.      Statute of Limitations

The next hurdle Green must overcome to allow this Court to address the merits of this ineffective assistance claim is the federal statute of limitations. The federal statute of limitations for actions under 28 U.S.C. § 2254 is governed by 28 U.S.C. § 2244(d)(1):

> A1-year period of limitations shall apply to an application for a writ
> of habeas corpus by a person in custody pursuant to the judgment of

a State court.  The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1)(2000).

### a.    Triggering the Statute of Limitations

The first step this Court must take, in determining whether the statute of limitations bars Green's habeas application, is to decide from which date the statute of limitations should run. Respondent argues that the appropriate statute of limitations start date for this case should be the date on which the judgment became final. See 28 U.S.C. § 2244(d)(1)(A) (2000).  Because Green's noncapital convictions were not appealed, they became final on November 5, 2000. Rule 5A:5 of the Rules of the Sup. Ct. of Va; 28 U.S.C. § 2244(d)(1)(A).  According to this interpretation, the federal statute of limitations for filing a habeas petition citing ineffective assistance of counsel would have expired on November 5, 2001.  Green was still represented by his original trial counsel on November 5, 2001.  Further, 28 U.S.C. § 2244 states that the statute of limitations shall run from the *latest of* all potential dates (as described by sections (A) through (D)).  Therefore, the date on which Green's convictions became final is not the appropriate date on which to begin running the

federal statute of limitations.

The federal statute of limitations may also start running the date "on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action." 28 U.S.C. § 2244(d)(1)(B). Supreme Court cases have held the appointment of counsel to be State action; therefore, appointment of ineffective counsel is the responsibility of the State. See Evitts v. Lucy, 469 U.S. at 396. In Green's case, the State's appointment of ineffective counsel would serve as the impediment to filing that would be removed when competent counsel were appointed. Under § 2244(d)(1)(B), the start date for Green's federal statute of limitations would be June 26, 2003, the date on which Green's state habeas attorneys were appointed.

The final circumstance that might trigger the running of the statute of limitations, in this case, is the date on which the factual predicate underlying the claim could have become apparent through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(D). The Sixth Circuit has held, the "limitations period for ineffective assistance of counsel for failing to file direct appeal 'began to run when [prisoner] received his attorney's . . . letter informing him that no appeal had been filed"; "[a]lthough we acknowledge that [the petitioner] could have discovered his counsel's failure" on the "date when the time for filing his notice of appeal expired," to "require that he do so ignores the reality of the prison system and imposes an unreasonable burden on prisoners seeking to appeal." Granger v. Hurt, 90 Fed. Appx. 97, 100 (6th Cir. Jan. 23, 2004); see also Hasan v. Galaza, 254 F.3d 1150 (9th Cir. 2001); accord Wims v. United States, 225 F.3d 186 (2d Cir. 2000); Easterwood v. Champion, 213 F.3d 1321, 1323 (10th Cir. 2000). The briefs do not identify when the factual predicate of this ineffective assistance of counsel should have become apparent to Green. It is

impossible for this Court to say when Green should have discovered the underlying neglect of his first trial counsel.  Therefore, the Court finds § 2254(d)(1)(B), the date on which the impediment to filing was removed,  governs.  Accordingly, Green's federal statute of limitations  began to run on June 26, 2003, when competent counsel were appointed to represent him.

### b.      Tolling the Statute of Limitations

The second step in this statute of limitations analysis, is determining whether the statute should be tolled from April 22, 2004, to April 29, 2005, while the Virginia Supreme Court considered  Green's state habeas petition.  Under 28 U.S.C. § 2244(d)(2), "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  The statute of limitations is tolled for the whole duration of state collateral review, from the time the initial petition is filed until the final ruling is made, including any gaps in between. See Taylor v. Lee, 186 F.3d 557, 561 (4th Cir. 1999).  This includes the time during which a petition for rehearing is pending.  See Crawley v. Catoe, 257 F.3d 395, 398 (4th Cir. 2001) (holding a state post-conviction petition was "pending" for purposes of section 2244(d)(2) from the time of filing until the state supreme court "denied [petitioner's] request for rehearing"); see also Rouse v. Lee, 339 F.3d 238, 244 (4th Cir. 2003) (en banc), cert. denied, 541 U.S. 905 (2004).  Green filed his state habeas petition with the Virginia Supreme Court on April 22, 2004.  The Court denied and dismissed his petition on February 9, 2005, and denied his petition for rehearing on April 29, 2005.

Respondent argues that Green's state habeas application[2] was not properly filed, and thus

---

[2]The terms "application" and "petition" are used interchangeably in the Supreme Court cases discussing this issue, and throughout this portion of the Report and Recommendation.

should not benefit from statutory tolling due to the fact that this ineffective assistance claim was untimely. Green asserts that there is a distinction between a properly filed application and a properly filed claim, and that his application was properly filed, although this ineffective assistance of counsel claim may not have been.  Green's habeas petition to the Virginia Supreme Court presented both timely and time-barred claims.  The application itself was accepted by the clerk of the Virginia Supreme Court, and the Virginia Supreme Court decided a number of the claims asserted by Green on the merits.  The claim in question - ineffective assistance of counsel due to counsels' failure to appeal Green's noncapital convictions - was rejected as untimely and barred by a Virginia procedural rule.

Two Supreme Court cases discuss the enigmatic "properly filed application": <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005), and <u>Artuz v. Bennett</u>, 531 U.S. 4 (2000).  In a unanimous decision, the Supreme Court held in <u>Artuz</u> that "an application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." <u>Artuz</u>, 531 U.S. at 9 (emphasis in original).  The Court further explained that a properly filed application can contain claims which are procedurally barred, and that it is important to distinguish between "an application" and "a claim." <u>Id.</u>

> Ignoring this distinction would require judges to engage in verbal gymnastics when an application contains some claims that are procedurally barred and some that are not. Presumably a court would have to say that the application is "properly filed" *as to* the nonbarred claims, and not "properly filed" *as to* the rest. The statute, however, refers only to "properly filed" applications and does not contain the peculiar suggestion that a single application can be both "properly filed" and not "properly filed." Ordinary English would refer to

> certain *claims* as having been properly *presented* or *raised,*
> irrespective of whether the application containing those claims was
> properly filed.

Id. at 10.  However, the Court reserved ruling on the issue of "whether the existence of certain exceptions to a timely filing requirement can prevent a late application from being considered improperly filed." Id. at 9 n.2.

Following the decision in Artuz, circuits divided over whether habeas petitions rejected by the state as untimely were nonetheless properly filed, and the Supreme Court granted certiorari to address the issue in the case of Pace v. DiGuglielmo. 544 U.S. at 408.  In a five to four decision, the Court held that when a habeas petition is untimely under state law, it is not a properly filed petition under § 2244(d)(2). Id. at 414.  The Court rejected the argument that any condition that must be applied on a claim-by-claim basis cannot be a condition to filing, noting that "§ 2244(d)(2) itself, [] refers not just to a 'properly filed application,' but to a 'properly filed application . . . *with respect to the pertinent judgment or claim*." Id. at 415-16 (emphasis in original).  To muddle the waters a bit more, the Court closed its discussion of this issue by stating, "[f]ar from requiring 'verbal gymnastics,' it must be the case that a petition that cannot even be initiated or considered due to the failure to include *a* timely claim is not 'properly filed.'" Id. at 417 (emphasis added).

The dissent in Pace discussed the possible incoherent results from applying the new standard, and sets out the exact scenario Green now faces:  a state habeas petition that contains both timely and untimely claims, which, under Pace, is both properly filed and not properly filed. Id. at 424-25.  Nevertheless, this Court must apply the Pace decision, and arrive at that exact finding – Green's state petition was not properly filed with respect to this ineffective assistance of counsel claim.  Consequently, § 2244(d)(2) cannot apply to toll the running of his federal statute of limitations.

31

Accordingly, Green's ineffective of assistance of appellate counsel claim was not timely filed and is barred by the statute of limitations, and Claim II should be DENIED.

Due to the nature of a report and recommendation, this Court finds it necessary to address what would happen if Green's petition were found to be properly filed, or if equitable tolling applied to the time during which his state habeas petition were pending in the Virginia Supreme Court. The next issue becomes what needs to happen before the expiration of the statute of limitations.

### c.    Initiating a Federal Habeas Corpus Proceeding

The Supreme Court has considered the question of what pleading actually initiates federal habeas corpus proceedings in two distinct contexts. First, in McFarland v. Scott, 512 U.S. 849 (1994), the Court faced the issue of whether a capital defendant must file a formal habeas corpus petition in order to invoke the 21 U.S.C. § 848(q)(4)(B) right to qualified legal representation for capital defendants in federal habeas proceedings and to establish a federal court's jurisdiction to enter a stay of execution. Recognizing that the statute does not specify how the right to representation is invoked, the Court held that "the right to appointed counsel adheres prior to the filing of a formal, legally sufficient habeas corpus proceeding." Id. at 855. The Court further established that "once a capital defendant invokes his right to appointed counsel, a federal court also has jurisdiction under 28 U.S.C. § 2251 to enter a stay of execution." Id. at 858. Most relevant to this discussion, the Court concluded that "a post conviction proceeding within the meaning of § 848(q)(4)(B) is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his federal habeas corpus proceeding." Id. at 856-57 (internal quotation omitted).

Next, in Woodford v. Garceau, the Court considered "when a capital habeas case becomes

'pending' for purposes of the rule announced in Lindh." 538 U.S. 202, 204 (2003). In Lindh v. Murphy, 521 U.S. 320 (1997), the Court held that the AEDPA does not apply to habeas cases that were pending as of the statute's April 26, 1996, effective date. The Court did not, however, announce when a habeas case becomes "pending." After acknowledging AEDPA's "heavy emphasis on the standards governing the review of the *merits* of a habeas application," the Court interpreted the rule announced in Lindh in view of that emphasis. Id. at 206-207 (emphasis in original). Accordingly, the Court held that

> whether AEDPA applies to a state prisoner turns on what was before a federal court on the date AEDPA became effective. If, on that date, the state prisoner had before a federal court an application for habeas relief seeking an adjudication on the *merits* of the petitioner's claims, then amended § 2254(d) does not apply. Otherwise, an application filed after AEDPA's effective date should be reviewed under the AEDPA, *even if other filings by that same applicant - such as, for example, a request for the appointment of counsel or a motion for a stay of execution - were presented to a federal court prior to AEDPA's effective date.*

Id. at 207 (emphasis added).

In support of its conclusion, the Court specifically rejected the proposition that a capital habeas case becomes pending for the purposes of Lindh with the filing of a request for appointment of counsel or a motion for a stay of execution. See id. The Court instructed that such an interpretation would render much of chapter 153, including, but not limited to, § 2254(e)(1),[3]

---

[3]28 U.S.C. § 2254(e)(1) provides that, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be Correct."

§ 2241(d),[4] and § 2244(a),[5] inapplicable to capital prisoners who seek appointment of counsel and a stay, a result Congress did not intend. Id. at 208. Significantly, both § 2244(a) and § 2244(d) are contained under "§ 2244 Finality of Determination," and both sections govern the authority of a federal district court to consider an "application for a writ of habeas corpus."[6] Just as the Supreme Court found it unreasonable to believe that Congress intended for a capital prisoner to avoid the application of § 2244(a) simply by filing a request for counsel and a stay before filing an actual application for habeas relief, it *may* similarly be unreasonable to believe Congress intended for a capital prisoner to avoid application of § 2244(d) by doing the same.

The Court found additional support from the Federal Rules of Civil Procedure, which "apply in the context of habeas suits to the extent that they are not inconsistent with the Habeas Corpus Rules." Id. (internal citations omitted). Citing Federal Rule of Civil Procedure 3, which "explains that '[a] civil action is commenced by filing a complaint'" and is nowhere contradicted by the Habeas Corpus Rules, the Court arrived at "[t]he logical conclusion . . . that a habeas suit begins with the filing of an application for habeas corpus relief - the equivalent of a complaint in an ordinary civil case." Id. Ultimately, however, the Court limited the scope of its holding by stating that "for purposes of applying the rule announced in *Lindh*, a case does not become "pending" until an actual application for habeas corpus relief is filed in federal court." Id. at 210.

---

[4]The Court found that § 2241(d) indicates that the power to grant a writ is not triggered except by "application for a writ of habeas corpus." 28 U.S.C. § 2241(d); See Woodford, 538 U.S. at 208.

[5]28 U.S.C. § 2244(a) provides "that federal judges are not required to 'entertain' a second or successive 'application for a writ of habeas corpus' except as provided for by statute." Woodford, 538 U.S. at 208 (citing 28 U.S.C. § 2244(a)).

[6]"A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court." 28 U.S.C. § 2244(d)(1).

34

The Supreme Court has not yet espoused a rule for when habeas corpus proceedings become pending for the purpose of determining whether a petitioner has timely filed for relief under 28 U.S.C. § 2244(d), the issue here presented.  However, it appears from the reasoning applied in McFarland and Woodford that Green's habeas petition needed to be filed prior to the expiration of the one-year statute of limitations established by § 2244(d), and that a motion for appointment of counsel and stay of execution would not suffice to avoid the one-year time bar.

If the statute of limitations were tolled while Green's state habeas petition was pending before the Virginia Supreme Court, he would have had until June 13, 2005, to file a timely federal petition.  Green filed his motion to stay execution on June 6, 2005, and his motion for appointment of counsel on June 10, 2005; however, his federal habeas petition was not filed until December 1, 2005.  As a result, unless equitable tolling were applied following Green's motion for appointment of counsel in this Court, his petition would remain barred by the statute of limitations even if the statute were tolled while his state habeas petition was pending before the Virginia Supreme Court.

## C.  Claim III - Failure to Request a Mitigation Expert and Present Mitigation Evidence

Green asserts in his third claim that his trial counsel were ineffective for failing to locate and present sufficient mitigation evidence at his second trial.  Green alleges that his counsel (A) unreasonably failed to request a mitigation expert; (B) failed to conduct an adequate mitigation investigation; and, (C) failed to present adequate mitigation evidence.  Green raised this claim in his state habeas appeal as "Claim III," and the Virginia Supreme Court denied the claim on the merits. See Green v. Warden, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1 at 6-7).

Prior to Green's first trial, his counsel moved for the appointment of a mitigation expert. (Joint Appendix, Green v. Commonwealth, No. 002976, Va. Sup. Ct. "First J.A." at 102-06.)  The

trial court denied the motion, and counsel assigned the ruling as error on direct appeal. (<u>Green v. Commonwealth</u>, No. 002976, Br. of Appellant at 10.)  It is clear counsel felt a mitigation expert was needed, and that the denial of the motion was error by the trial court.

Following the remand of Green's capital murder conviction, counsel made no motion for a mitigation expert despite their intention stated in a letter to the Commonwealth's Attorney "to file anew all motions relevant to Mr. Green's capital murder indictment."  (June 19, 2005 Letter, Pet. App. Tab No. 8.)  Counsels' failure to file the motion was not strategic.  This is made abundantly clear by counsels' assigning as error on direct appeal the trial court's denial of the motion. (<u>Green v. Commonwealth</u>, No. 020757, Br. of Appellant at 6A.)  The Virginia Supreme Court found the claim barred because the record showed counsel "never asked for a mitigation specialist." <u>Green v. Commonwealth</u>, 580 S.E.2d at 840.

The Virginia Supreme Court denied Green's corresponding habeas claim (Claim III) on the merits on February 9, 2005, stating:

> In claim III, petitioner argues that his trial counsel were ineffective for failing to request the appointment of a mitigation expert and for failing to adequately prepare mitigation evidence on his behalf. Petitioner argues that his trial counsel should have requested a mitigation expert and, at the very least, should have made efforts to obtain mitigation evidence such as petitioner's school records, juvenile records, and information regarding petitioner's difficult childhood.
>
> The Court holds that claim (iii) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in <u>Strickland</u>, 466 U.S. at 687.  Counsel's affidavits demonstrate that efforts were made to obtain potentially mitigating records, but none were located.   Petitioner has failed to meet his burden of proving what information is contained in the records, or that the records are even available.   Petitioner also has failed to identify specific witnesses who could testify regarding the alleged details concerning his childhood.   Thus, petitioner has failed to demonstrate the

> existence of any specific information that a mitigation expert could
> have used that would have affected the outcome of the trial.  As such,
> petitioner has failed to prove that counsel's performance was
> deficient or that, but for counsel's alleged error, the result of the
> proceeding would have been different.  See Strickland, 466 U.S. at
> 687.

Green v. Warden, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1).  The Virginia Supreme

Court denied Green's petition for rehearing of this issue on April 29, 2005.

In order to recommend granting Green relief on his ineffective assistance of counsel claims,

this Court must find that the Virginia Supreme Court's dismissal of Green's claims was an

unreasonable application of Strickland.  Examining the first portion of Green's claim through the

Strickland paradigm, this Court finds that Green's counsels' performance fell below the range of

competence demanded of counsel in criminal cases when they did not move for the appointment of

a mitigation expert.  Strickland, 466 U.S. at 690.  Green must show his counsels' performance "fell

below an objective standard of reasonableness" based on the situation at the time, rather than on

hindsight.  Strickland, 466 U.S. at 688-90.

A mitigation expert is undoubtedly of substantial use in the sentencing phase of a capital

trial.  ABA Guideline 4.1(A)(1) mandates that a defense team should consist of no fewer than two

attorneys, an investigator and a mitigation expert for that very reason.  Green had been sentenced

to death at his first trial; therefore, counsel were acutely aware of the need to present a stronger case

for life at the retrial.  Secondly, after his first trial, Green was tested for cognitive abilities and was

found to be mildly higher-functioning than before his first trial, placing Green in a weaker position

to argue for life than in the first trial.

Green's counsel were on notice that Green might have led a troubled childhood and had a

limited mental capacity.  Trial counsels' notes indicate Green told counsel he dropped out of school

37

during the seventh grade when he was fifteen years old, and was held back in the first grade once, and in the third grade two times. (State Hab. Pet. Tab No. 9.)  His brother also related that when Green dropped out of school during the seventh grade, he was the age of an eleventh grader. (State Hab. Pet. Tab No. 10.)  Further, the prosecution's mental health expert prepared a report, which was provided to defense counsel prior to the first trial.  The report stated:

> Other factors for consideration in the defendant's background or character that may mitigate against imposition of the death sentence would include reported issues of: family of origin dysfunction, perceived rejection and emotional neglect by his father at an early age; having been undressed by a neighborhood woman when he was three or four years of age; being raised in a high crime neighborhood with a witnessing of others being shot; early drug and alcohol abuse; and the lack of a consistent, healthy male role model to diminish "protest masculinity" and increase communication skills.

(State Hab. Pet. Tab No. 11.)  All of these factors placed counsel on notice of the need for further investigation, and the need for a mitigation expert.  Because the decision not to request a mitigation expert was clearly a mistake, and because prevailing professional norms (as evinced by the ABA Guideline) recommend a mitigation expert, this Court finds that Green's counsels' performance fails the competence prong of the Strickland test.  See Strickland, 466 U.S. at 689-91.  While Strickland "does not require counsel to investigate every conceivable line of mitigating evidence," Wiggins, 539 U.S. at 533, it mandates a competent investigation when counsel has been put on notice that there is a basis for such investigation. Id.; see also Rompilla v. Beard, 125 S. Ct. 2456 (2005). Here, Green had been sentenced to death by one jury, placing counsel on notice that mitigation evidence was needed to convince a second jury to choose a life sentence even if Green were eligible for the death penalty.  Green's attorneys did not perform to a competent professional standard when they failed to move for a mitigation expert during Green's second trial, and to the extent that the Virginia

Supreme Court found that this failure did not satisfy the "competence" prong of the <u>Strickland</u> test, the finding was unreasonable.[7]

However, Green has failed to show how he was prejudiced by counsels' failure to move for the appointment of a mitigation expert. The second prong of <u>Strickland</u> requires Green to demonstrate a "'reasonable probability,' or by somewhat less than a preponderance of the evidence," that, but for counsels' constitutionally deficient performance, he would not have been sentenced to death. <u>Buckner v. Polk</u>, 453 F.3d 195, 203 (4th Cir. 2006) (<u>citing Strickland</u>, 466 U.S. at 694). A reasonable probability that, despite Green's eligibility for the death penalty, one juror considering the new evidence in addition to that provided at trial would have voted for life imprisonment satisfies the standard. <u>Id.</u> at 203 (<u>citing Wiggins</u>, 539 U.S. at 536-37); <u>see</u> Va. Code Ann. §19.2-264.4(E) (2004) ("In the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life."). This Court cannot conduct a de novo review, weighing the aggravating and mitigating evidence to determine whether prejudice exists. Instead, it must defer to the Virginia Supreme Court's finding of no prejudice unless the finding was unreasonable in light of clearly established Supreme Court precedent or in light of the evidence presented. <u>See</u> 28 U.S.C. § 2254(d)(1)-(2). Green cannot show the Virginia Supreme Court's finding that he was not prejudiced was unreasonable.

First, Green's motion for the appointment of a mitigation expert was denied prior to his first trial, and Green has presented no argument that the motion would have been successful prior to the second trial. Secondly, much of the evidence Green argues should have been presented is

---

[7]It should be noted that the Virginia Supreme Court did not address the three portions of this claim separately, as the petitioner has presented them in his federal petition. Rather, the court addressed petitioner's mitigation claims concurrently.

cumulative of evidence presented during his sentencing.  Lastly, Green has failed to produce, or

even suggest, evidence sufficient to convince this Court that the Virginia Supreme Court's finding

of no prejudice was unreasonable.  Green surmised that his attorneys had the kind of "rudimentary

knowledge of his history from a narrow set of sources" that would require the services of a

mitigation expert. (Petition 59; citing Wiggins v. Smith, 539 U.S. at 524.)  Facts that Green argued

might be better-developed by a mitigation expert include:  low IQ scores; anecdotal reports that

Green had repeated first grade once and third grade twice; and, physical abuse by his brother and

occasional beatings by his mother.  Id.

With respect to the low IQ scores, Green was administered four tests[8], and scored from 55

to 84 on the tests.  The three experts who administered the tests testified at Green's trial.  Two

experts testified Green was not mentally retarded, and that he was malingering on his tests.  The

third expert testified Green was mentally retarded and was not malingering on his tests.  Further,

Green's brother, Michael Green, testified at sentencing about Green's difficulties in school, stating

that Green dropped out of school in "about seventh grade," and that he had been placed in special

classes in third or fourth grade. (Transcript of Proceedings in Commonwealth v. Green, No. 98-41,

before the Honorable James A. Luke on October 29, 2001, through November 1, 2001, "Second Tr."

990-91.)  Michael Green also testified that their father "wasn't around that much," and was gone

four or five nights a week when he and Kevin Green were growing up. (Second Tr. 990.)

The Fourth Circuit has upheld as not unreasonable state court applications of Strickland

finding "no prejudice from counsel's failure to introduce evidence adding negligible detail or

---

[8] One of the four tests administered to Green, the one on which he scored an 84, was not
an IQ test as will be discussed in further detail in section II. E.

credibility to mitigating factors that counsel had already presented to the jury." Buckner, 453 F.3d at 206 -207; McHone v. Polk, 392 F.3d 691, 709-10 (4th Cir. 2004) (no prejudice from counsel's failure to present evidence that as a child petitioner had witnessed his father "regularly inflict brutal beatings" on his mother and half-sister when counsel had presented evidence that petitioner's father had engaged in "violent fights" with his mother); Tucker v. Ozmint, 350 F.3d 433, 442-43 (4th Cir. 2003) (no prejudice from counsel's failure to present evidence undermining prosecution's argument that defendant had fabricated his claims of childhood physical and sexual abuse because prosecution and defense witnesses uniformly agreed that petitioner had suffered such abuse); see also Moody v. Polk, 408 F.3d 141, 154 (4th Cir. 2005) (on de novo review, finding no prejudice from counsel's failure to present more evidence concerning petitioner's childhood abuse because one expert and two family members testified that the abuse claims were accurate and the prosecution presented no evidence contradicting that testimony), cert. denied, 126 S. Ct. 1060 (2006).  Green's arguments regarding his IQ scores and difficulty in school were presented to the jury.  Therefore, failure to introduce additional mitigation evidence concerning the same topics did not prejudice Green. See Buckner, 453 F.3d at 206-07.

Green argues a mitigation expert would have investigated the following incidents: his witnessing a murder, his being undressed by a woman in his neighborhood, and physical abuse by his brother and mother. (Petition 65.) The affidavit of Green's trial counsel, Peter Eliades, indicated that Green told counsel that when he was three or four years old, he had been embarrassed when a woman in his neighborhood undressed him, but Green could not provide enough information about the incident to be able to verify it. (Aff. of Peter D. Eliades ¶ 5, Ex. B to Resp't. Mot. to Dismiss, Green v. Warden, No. 040932 (Va. May 24, 2004).)  The affidavit further states Green told counsel

41

that when he was about six years old, he witnessed a murder while exploring abandoned buildings in Washington, D.C., but that Green was unable to clarify when or where the incident occurred and had never reported it to anyone. Id. Counsels' affidavits do not discuss physical abuse by Green's brother or mother. This Court finds that these circumstances, even if true and presented at trial, would do little to mitigate Green's crime in the eyes of a jury.

In contrast to the evidence Green suggests a mitigation expert may have located, cases in which prejudice has been found contain drastic mitigation evidence. Counsel was found incompetent in Wiggins, for failure to present the following potentially mitigating evidence at trial:

> [a]ccording to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed, and on one occasion, forced petitioner's hand against a hot stove burner – an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

Wiggins, 539 U.S. at 516-17 (internal citations omitted). Similarly, in Williams v. Taylor, 529 U.S. 362 (2000), counsel failed to present evidence of defendant's "nightmarish childhood," which included evidence that:

> Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents'

incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

. . . .

Juvenile records contained the following description of his home: The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

Williams, 529 U.S. at 395, n.19.

There is no indication that potential mitigation evidence in Green's case would have shown such a dramatically tormented childhood. Assuming records or witnesses could have been located to substantiate or better develop Green's claims regarding low IQ scores, difficulty in school, physical abuse by his brother and mother, as well as the two incidents where Green witnessed a murder and was undressed by a woman in his neighborhood, this Court does not find that the Virginia Supreme Court contravened Strickland in finding that Green has not shown a reasonable probability that a juror would have found these mitigating circumstances outweigh the aggravating circumstances surrounding Mrs. Vaughan's murder.

In the second portion of Green's claim, Green asserts that his attorneys' performance fell below the requisite level of competency required by Strickland because they failed to conduct an adequate mitigation investigation. This Court's analysis is governed by the Supreme Court's opinion in Wiggins, which held that Strickland does not require counsel to investigate every

43

conceivable line of mitigating evidence. 539 U.S. at 533 (2003).

Counsel interviewed Green's family members, and elicited information from Green about his background, which revealed that Green lead a troubled childhood. In addition, counsel had IQ tests administered, which indicated that Green functioned at a limited mental capacity. Counsel took several steps to locate records pertaining to Green's past which could have been used in mitigation. These included multiple phone calls to and letters sent to Washington, D.C. schools and principals, the Board of Education, the Legal Department, and the D.C. General Hospital, none of which resulted in any records possessing mitigating value.(Aff. of Jerry E. Waldrop ¶ 4, Ex. B to Resp't. Mot. to Dismiss, <u>Green v. Warden</u>, No. 040932 (Va. May 24, 2004).)  In addition, Green's counsel in Mecklenburg County, where Green was also tried for capital murder, states in an affidavit that he enlisted a law student to visit various District of Columbia government agencies in an attempt to obtain any records pertaining to Green, and that he shared the results of the investigation with Green's counsel. (Aff. of Joseph M. Teefey, Jr. ¶¶ 3-4, Ex. D to Resp't. Mot. to Dismiss, <u>Green v. Warden</u>, No. 040932 (Va. May 24, 2004).)  The information gleaned by Green's attorneys from Green and his family, the mental testing performed, as well as the steps taken to obtain records relating to Green's childhood, represent a constitutionally sufficient mitigation investigation. This Court does not find that Green's counsels' performance with respect to gathering mitigating evidence fell below the level of competence required by <u>Strickland</u> and <u>Wiggins</u>. In addition, for the reasons discussed above, Green cannot prove he was prejudiced by counsels' mitigation investigation.

Lastly, Green asserts his counsel unreasonably failed to present mitigation evidence. However, at the sentencing phase of the second trial, Green's counsel called five witnesses to rebut

44

his eligibility for the death penalty.  Dr. Jack Daniel presented expert testimony that if the first shot was the one that struck Patricia Vaughan in the head, she would have died, or at least been rendered unconscious, almost immediately. (Second J.A. at 1371.)  Rev. Alonzo Seward, who ran a Bible study group at Brunswick County jail, Josey Seward, a nurse at the jail, Michael Sheppard, a substance abuse counselor, and Allan Morris who was the housing unit manager at Sussex I prison, all testified to Green's good behavior. (Second J.A. at 1409, 1412-13, 1415, 1424.) Further, Green's counsel presented two witnesses to make a case for a life sentence and not the death penalty. Green's brother, Michael, testified about Green's childhood in Washington, and about visits with Green since the crime during which Green expressed remorse. (Second J.A. at 1420-21.) Lastly, Dr. Sautter presented expert testimony regarding Green's cognitive impairments and opined Green would not be a danger to others. (Second J.A. at 1386-87.)

In light of this mitigating evidence presented during the sentencing phase of Green's second trial, this Court finds that counsel performed adequately under the <u>Strickland</u> test.  Additionally, as discussed in length in the preceding paragraphs, Green has not come forward with any mitigating evidence that counsel failed to present at his trial which would have proven substantially mitigating. In other words, he cannot prove he was prejudiced by counsels' failure to present any specific mitigating evidence.

In sum, none of the ineffective assistance of counsel claims related to the presentation of mitigating evidence satisfy both the competence and prejudice prongs of <u>Strickland</u>; therefore, this Court recommends that Green's Claim III be DENIED.

### D. <u>Claim IV - Failure to Articulate a "Particularized Need" to Obtain an Investigator</u>

In Claim IV of his petition for habeas corpus, Green asserts that he is entitled to relief

because trial counsel unreasonably failed to articulate the "particularized need" necessary to obtain the assistance of an investigator.   On February 9, 2005, the Virginia Supreme Court denied this claim for habeas relief, "Claim II", on the merits.   Green v. Warden, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1 at 3).   This Court also recommends that Green's claim be denied.

The record reflects that Green's counsel moved for appointment of a private investigator prior to both Green's first and second trials. (First J.A. at 107; Second J.A. at 102.)   Despite the trial court's denial of Green's motion for appointment of a private investigator at his first trial, counsel filed an identical motion prior to his second trial.   In each, counsel requested "[o]ne or more investigators trained in criminal work to investigate, interview witnesses, collect data, and analyze all information and evidence associated with the crime with which the Defendant is charged."   Id. The motion further stated that an "investigator has the expertise necessary to locate essential witnesses and data, examine and evaluate testimony and documents using his or her special knowledge of the issues likely to be significant at a capital murder trial, issues beyond the comprehension of the ordinary layman."   (First J.A. at 108; Second J.A. at 103.)   The motion was again denied by the trial court prior to Green's second trial.   (Second J.A. at 279.)

In the instant petition, Green asserts that his trial counsel were ineffective for failing to "identify the subject that the investigator would examine or show how the investigator's services would materially assist in the preparation of the defense." (Petition 72.)   Because he had been tried, convicted, and sentenced to death at his first trial, Green argues that "counsel knew or should have known the exact areas in which an investigator was necessary."   Id.   The specific areas of evidence Green identifies as requiring an investigator include his educational background and corroboration of his accounts of witnessing a murder and suffering sexual and physical abuse as a child.

In order to recommend granting Green relief on Claim IV, the Court must find that the

Virginia Supreme Court's dismissal of his claims was an unreasonable application of Strickland. 466

U.S. at 668.  In its February 9, 2005, opinion, the Virginia Supreme Court denied Green's claim,

which was presented to that court as "Claim II," stating:

> In claim (II), petitioner argues that his trial counsel were ineffective
> for failing to articulate the particularized need necessary to obtain an
> investigator.   Although  his  counsel  filed  a  "Motion  for  Expert
> Investigator," petitioner claims the motion was too general, and that
> his counsel should have specified that an investigator was necessary
> to obtain petitioner's school records and information regarding sexual
> and physical abuse allegedly suffered by petitioner, and information
> about a traumatic incident when petitioner witnessed a murder.
>
> The Court holds that claim (II) satisfied neither the "performance"
> nor the "prejudice" prong of Strickland v. Washington, 466 U.S. 668
> (1984).  Petitioner has failed to meet his burden of proving that such
> records  are  available  or  that  they  contain  relevant  information.
> Further, petitioner has made no proffer of what witnesses would say
> about his childhood.  Thus, petitioner has failed to demonstrate the
> existence of any specific information that would have warranted the
> appointment of an investigator or that could have been obtained by
> an investigator.  As such, petitioner has failed to demonstrate that
> counsel's performance was deficient or that, but for counsel's alleged
> error, the result of the proceeding would have been different.  See
> Strickland, 466 U.S. at 687.

Green v. Warden, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1 at 3.)

Applying  the  two-part  Strickland  test  to  Green's  allegation  of  ineffective  assistance

contained in Claim IV, this Court finds that the Virginia Supreme Court's denial of Green's claim

was reasonable under established federal law.  The Fourteenth Amendment's due process guarantee

of fundamental fairness entitles indigent defendants to "an adequate opportunity to present their

claims fairly within the adversary system."   Ake v. Oklahoma, 470 U.S. 68, 77 (1985) (internal

quotation and citation omitted).   Under this guarantee, the court must appoint an expert to an

indigent defendant when he demonstrates that the assistance of an expert is "likely to be a significant factor in his defense." Id. at 82-83. Although the Ake Court held that an indigent defendant is entitled to the appointment of a psychiatric expert when he demonstrates to the trial judge that his sanity at the time of the offense will be a significant factor at trial, the standard established by the Court is the standard state courts, including Virginia's, apply when determining whether due process requires the appointment of an expert of any kind. See Husske v. Commonwealth, 476 S.E.2d 920, 925 (Va. 1996) ("We hold an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance.") (quoting Ake, 470 U.S. at 82-83); see also State v. Brown, 296 S.E.2d 839 (N.C. App. 1982); Bailey v. State, 424 S.E.2d 503 (S.C. 1992); State v. Less, 294 S.E.2d 62 (W. Va. 1981); Avey v. State, 228 A.2d 614 (Md. App. 1967) (overruled on other grounds by Chapter 501, Title 12 of the Acts of 1984). The Ake standard finds support in Section 3006A of Title 18 of the United States Code, which provides that

> [c]ounsel for a person who is financially unable to obtain investigative, expert or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1).

Green argues that his trial counsel were ineffective for failing to show a particularized need for an investigator by demonstrating to the circuit court that acquisition of specific mitigation evidence, including evidence concerning his educational background and corroboration that Green

witnessed a murder and was abused as a child, would "likely be a significant factor in his defense." To demonstrate a particularized need for an investigator, Green's counsel would have had to offer more than "undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985). This, counsel could not do.

The inability of Green's counsel to demonstrate a particularized need for a private investigator is well-documented. The fact that Green did not report the murder he witnessed or the abuse he suffered as a child, coupled with his inability to elucidate details concerning those incidents, stymied counsel from substantiating assertions that an investigator would have been beneficial. Therefore, to the extent Green's instant claim relates to those incidents, his counsels' failure to obtain appointment of a private investigator cannot be attributed to deficient performance. Instead, it stemmed from the impossibility of showing that the corroborating witnesses could be located or even existed. Without demonstrating a likelihood that the evidence existed, Green could not show that a private investigator was "likely to be a significant factor" in his defense or that he would be "prejudiced by the lack of expert assistance." Ake, 470 U.S. at 82-83. Accordingly, the Virginia Supreme Court's determination that the petitioner satisfied neither the "performance" nor the "prejudice" prong of Strickland was reasonable.

With respect to Green's school records, this Court finds that Green's counsel were not deficient for failing to show in its motion for appointment of an investigator that the evidence would "likely be a significant factor in [Green's] defense." Green's second capital trial was completed before Atkins v. Virginia, in which the Supreme Court held that executions of mentally retarded criminals are prohibited by the Eighth Amendment. 536 U.S. 304 (2002). At that time, subsection (B)(vi) of section 19.2-264.4 of the Virginia Code recognized a defendant's mental retardation as

but a factor considered by Virginia juries in mitigation of capital murder.[9]  Also at that time, treating evidence of a defendant's mental retardation as mitigation evidence was endorsed by the Supreme Court, which, before <u>Atkins</u>, held that "mental retardation is a factor that may well lessen a defendant's culpability for a capital offense.  But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person . . . by virtue of his or her mental retardation alone."  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 340 (1989), <u>overruled</u> by <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).  Because mental retardation was only one of several mitigating factors a jury was charged with considering in pre-<u>Atkins</u> capital sentencing proceedings, introducing evidence to prove mental retardation was not as significant a factor during Green's second trial as it is post-<u>Atkins</u>.

Even if producing evidence to prove mental retardation was as significant a factor in a pre-<u>Atkins</u> defendant's defense as it is post-<u>Atkins</u>, Green's counsels' failure to articulate a particularized need for an investigator to obtain his school records did not constitute deficient performance because much of the content of the school records was duplicative of evidence already adduced at trial.  For instance, Dr. Sautter, a court appointed expert who testified that Green was mentally retarded, told the jury that Green took two intelligence tests under his direction and scored in the mentally retarded range on one and in the borderline intelligence range on the other.  (Second Tr. 953-55).  He also explained that Green's borderline intelligence score indicates that he performs in the fifth percentile in skills such as reasoning, planning, interacting socially, maintaining personal relationships, maintaining employment, living independently, and managing money. (Second Tr.

---

[9]The relevant portion of the statute was amended in 2003 after the Supreme Court decided <u>Atkins</u>.

955.)   The jury also heard Dr. Sautter reject the Commonwealth's theory that Green has psychopathy, and heard his testimony that Green was not manipulative, but rather naive. (Second Tr. 955-58.)  Evidence showed that Green has a "limited capacity for communication," his speech is unusual and that he is functionally illiterate. (Second Tr. 958, 964-65.)

Green's brother, Michael Green, also testified about Green's academic performance, informing the jury that Green dropped out in the seventh grade and that he was placed in special education classes in the third or fourth grade. (Second Tr. 990.)

Green's school records did not contain evidence that would have better proven mental retardation.  The records only reinforced Dr. Sautter's testimony, as they merely documented Green's vocabulary, reading, writing, reasoning and attention deficiencies.  Significantly, nowhere in his records was Green diagnosed or referred to as mentally retarded.  Instead, the records show only that he participated in special education classes - a fact elicited in testimony.  (Second Tr. 990.) Since virtually the same evidence regarding Green's mental faculties  existed independent of the school records and was heard by the jury, this Court finds that the school records were not a significant factor in his defense.  See Buckner, 453 F.3d at 206-07.  Accordingly, Green's counsels' failure to articulate the particularized need necessary to obtain the assistance of a professional investigator to recover his school records did not constitute deficient performance, and the Virginia Supreme Court's application of Strickland to this claim was reasonable.  Therefore, Claim IV should be DENIED.

### E.  Claim V - Mental Retardation

In Claim V, Green asserts his sentence of death violates the Eighth Amendment to the United States Constitution due to his being mentally retarded.

51

_____1.     **Factual Background**_____

According to a Presentence Report prepared on August 10, 2000, Green lived with his mother and two brothers in Washington, D.C., until 1997. (State Hab. Pet. Tab No. 2 at 5a.)  He lived with his older sister for less than a year in Brunswick County, Virginia, then began renting his own residence in Brunswick County where he lived for approximately five months until he was arrested on charges for the underlying offense and was incarcerated in August of 1998. (State Hab. Pet. Tab No. 2 at 5a, 7.) His girlfriend and her two children lived with him for two of the five months he was renting his own residence. (State Hab. Pet. Tab No. 2 at 5a.) At the time of his interview, Green reported he dropped out of school in the ninth grade, and that he attended both regular and special education classes. (State Hab. Pet. Tab No. 2 at 6.)  However, trial counsel's notes indicate Green told counsel he dropped out of school during the seventh grade when he was fifteen years old, and was held back in the first grade once, and in the third grade twice. (State Hab. Pet. Tab No. 9.) His brother also related that Green dropped out of school during the seventh grade, at the age of an eleventh grader.  (State Hab. Pet. Tab No. 10.)

Green was employed with Domino's Pizza in South Hill from December 18, 1997, through August 12, 1998, (Transcript of Proceedings in <u>Commonwealth v. Green</u>, Nos. CR98000141-01 through 06, before the Honorable James A. Luke on June 19, 2000, through June 22, 2000, "First Tr." 21-22) when he was terminated due to a speeding ticket.  (State Hab. Pet. tab 2 p. 7.) His primary job was delivering pizzas, though he also made pizzas, swept floors, boxed pizzas, answered the telephone, and washed dishes.  (Second Tr. 1026.)  He provided his own vehicle (First Tr. 22.) His employer testified that Green was able to deliver pizzas to customers and calculate change when customers paid him for the pizzas. (Second Tr. 1027-28.)  She testified that he could take orders over

the telephone, and type phone numbers, addresses, and orders into the computer without difficulty. (Second Tr. 1028-29.)

The underlying offense occurred on August 21, 1998, and Green's first jury trial was held in June of 2000.  Prior to Green's first trial in Brunswick County Circuit Court, the Court appointed Dr. Scott Sautter, a clinical neurologist, to evaluate Green and testify on his behalf.  Dr. Sautter evaluated Green in May of 2000, when Green was twenty-three years old.  Dr. Sautter testified during the penalty phase of Green's first trial in June of 2000 that Green was mentally retarded. (First Tr. 84.)

Dr. Sautter testified that based on his assessment of Green on a battery of tests, Green performed in the first percentile (i.e. ninety-nine percent of his age group would be expected to perform better than he did on the test) on motor skills (First Tr. 76), manual dexterity (First Tr. 76-77), visual spacial (First Tr. 78), vocabulary (First Tr. 78), memory (First Tr. 78-79), abstract reasoning (First Tr. 80), and academic testing, which included reading, writing and math skills (First Tr. 83).  He performed in the first to fifth percentile on attention and concentration (First Tr. 77), and he performed in the fifth percentile on language (First Tr. 78).

Green completed an abbreviated IQ test, the Wechsler Abbreviated Intelligence Scale (WASI) in May of 2000, and scored a 55. (First Tr. 83.)  Dr. Sautter testified that in his opinion, Green is mentally retarded based on Green's IQ score, Green's adaptive skills in the areas of memory, language usage, visual spacial skills and motor skills, and interviews with his mother and sister, where they related that Green was a slow learner and had been placed in special classes in school. (First Tr. 84-85.)  He opined Green functions intellectually like a twelve year old, and is functionally illiterate. (First Tr. 85.)  He also testified that mental retardation is something you are

born with, and that Green was born with mental retardation. (First Tr. 88, 102-103.)  He further testified Green's performance on a test specifically designed to test for malingering, showed that he was not malingering. (First Tr. 89.)

On cross-examination, Dr. Sautter admitted Green had a driver's license, and had worked at a pizza parlor where he took orders, entered information into a computer, and made deliveries. (First Tr. 110-111.) Dr. Sautter stated that these activities were not inconsistent with his opinion that Green was mentally retarded. (First Tr. 111-112.)  Dr. Sautter also admitted that Green lived on his own for a short period of time, paid rent, and paid bills. (First Tr. 112.)  Dr. Sautter further testified that this "did not go very well," and that in his opinion Green could not have lived on his own for a lengthy period of time. (First Tr. 112.)  When asked about Green's scoring a 74 on the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) IQ test administered by the clinical psychologist appointed to assist the prosecution, Dr. Sautter testified that there is an error to measurement, and that a specific score indicates a certain range of performance. (First Tr. 118-119.)  He testified that Green's scores of 55 on one test and 74 on another would tend to indicate a range of performance somewhere in the middle. (First Tr. 118-19.)

Dr. Thomas Pasquale, a clinical psychologist who was appointed to assist the prosecution prior to Green's first trial, also evaluated Green in May of 2000.[10]  He testified during the penalty phase of Green's first trial that he met with Green on three separate occasions for a total of nine hours. (First Tr. 125.)  He administered the WAIS-III IQ test to Green, and Green scored a 74 on the test. (First Tr. 126.)  Dr. Pasquale testified that Green fell into the "borderline intellectual

---

[10]Dr. Pasquale prepared a report dated June 16, 2000, describing the psychological assessment performed, and summarizing his findings. (Fed. Pet. App. Tab No. 6.)

functioning" range, the range directly above mentally retarded. (First Tr. 127.) He further testified that Green was malingering on the tests, and that while it is possible to fake a lower IQ score, there is no way to fake a higher score. (First Tr. 131-32.) Dr. Pasquale testified that according to interviews with Green's mother and sister, they did not view Green as mentally retarded, although he had been placed in special classes in school. (First Tr. 130.) Dr. Pasquale further testified that based on Green's score on the Hare Psychopathy Inventory, he diagnosed Green as a psychopath. (First Tr. 135-36.)

Following an appeal of the capital murder conviction and sentence, the Virginia Supreme Court reversed the conviction and sentence and remanded to the Circuit Court for a new trial. After remand by the Virginia Supreme Court, and prior to the retrial, Dr. Scott Sautter administered another battery of tests to Green, including the Wechsler Adult Intelligence Scale - Revised (WAIS-R) IQ test, on which Green scored a 74. (Second Tr. 953.)

The second jury trial was held October 29 through November 2, 2001. Dr. Sautter testified during the sentencing phase of Green's retrial that he had met with Green on three occasions for a total of seventeen to eighteen hours. (Second Tr. 948.) He testified that he administered two IQ tests to Green, who scored a 74 on the WAIS-R, and a 55 on the WAIS. (Second Tr. 953.) He testified that the Woodrow Wilson Rehab Center and other agencies within the Department of Rehab Services in Virginia consider people with IQ test scores in the seventies to be mentally retarded (Second Tr. 954-55); that Green was mentally retarded (Second Tr. 975-76); and, that Green was functionally illiterate (Second Tr. 965). Dr. Sautter's remaining testimony was similar to that given in the first trial.

Dr. Pasquale testified that he had met with Green on four occasions for a total of ten and one-

half hours. (Second Tr. 1008.)[11] He testified that Green had been employed by Domino's Pizza, and that he had functioned within a normal limit for someone employed by Domino's Pizza. (Second Tr. 1012.) His additional testimony mirrored that given in Green's first trial. (Second Tr. 1008-18.)

In addition, the prosecution presented evidence that Green was sent to Riverside Jail in 1999 because he had been talking about hurting himself. (Second Tr. 1001). As part of the intake procedure at the jail, Dr. Lynda Hyatt met with Green twice, and administered the Ammons and Ammons Quick Test to Green. (Second Tr. 1001-1002.) Dr. Hyatt testified during Green's retrial that using a conversion formula, Green's Quick Test score "suggest[ed]" a full-scale IQ score of 84, which falls in the "low average" category of mental functioning. ( Second Tr. 1001-1002.) Dr. Hyatt testified that there is a "strong" correlation between scores on the Quick Test and scores on the full-scale Wechsler, a correlation of between .65 and .87. (Second Tr. 1002.) She testified there were inconsistencies between her first meeting with Green, and her meeting with him three days later, which suggested he was not forthcoming with his answers. (Second Tr. 1002.) She further testified that testing revealed Green was malingering. (Second Tr. 1003.)

Following his second trial, Green received a death sentence for the capital murder of Mrs. Vaughan. Subsequently, the case of Atkins v. Virginia, 536 U.S. 304 (2002) was decided, prohibiting execution of the mentally retarded. Green filed a habeas petition with the Virginia Supreme Court claiming his death sentence was unconstitutional under the holding in Atkins. The claim was dismissed as frivolous. Green v. Warden, No. 040932 (Va. Feb. 9, 2005); (Pet. App. Tab.

---

[11]Dr. Pasquale prepared a second report on October 26, 2001, stating he had interviewed Green again on October 12, 2001, that his overall conclusions from his first report remain in place, and summarizing that Green is not mentally retarded, and was malingering on his tests. (Fed. Pet. App. Tab No. 6.)

No. 1 at 6-7).

On February 17, 2005, the Fourth Circuit decided the case of <u>Walker v. True</u>, finding an evidentiary hearing was necessary where Walker had IQ test scores similar to Green's, and had attached affidavits explaining how these test scores actually fell within Virginia's definition of mental retardation when the "Flynn Effect" and standard error of measurement were taken into consideration. 399 F.3d 315 (4th Cir. 2005).[12]

Consequently, Green filed a petition for rehearing on March 10, 2005, asking the Virginia Supreme Court to take into consideration the standard error of measurement and the Flynn Effect when analyzing his test scores. Accounting for the standard error of measurement, IQ test scores between 65 and 75 could support a diagnosis of mental retardation. Under this approach, all but one of Green's IQ test scores could support such a diagnosis. Secondly, Green argued the Virginia Supreme Court could not employ a definition of mental retardation narrower than the definition in <u>Atkins</u>. The petition for rehearing was denied.

In Green's habeas petition in this court, Green alleged his sentence of death violates the Eighth Amendment due to the fact that he is mentally retarded. Attached to his federal habeas petition is the declaration of Matthew H. Scullin, Ph.D. (Pet. App. Tab No. 4, "Scullin Decl.") Dr. Scullin opines that the Court must consider both the Flynn Effect (Scullin Decl. ¶¶ 24-38) and the standard error of measurement (Scullin Decl. ¶¶ 12-20) when evaluating Green's scores on the IQ

---

[12]According to the affidavits attached to Walker's petition, the Flynn Effect "posits that IQ scores rise over time and that IQ tests which are not 're-normed' to adjust for rising IQ levels will overstate a testee's IQ." <u>Walker v. True</u>, 399 F.3d at 322. Further, the experts related that the American Association on Mental Retardation and the American Psychological Association recognized that IQ tests have a measurement error of plus or minus five points. <u>Id.</u> The experts conclude, a score of 65 to 75 may indicate mental retardation if there is evidence of poor adaptive functioning. <u>Id.</u>

tests in the record.  He states that the Ammons and Ammons Quick Test administered by Dr. Lynda Hyatt at the Riverside Jail is not a reliable test, as it was last normed prior to 1962. (Scullin Decl. ¶¶ 39-40.) Next, he applies the Flynn Effect to Green's remaining scores, and opines that each score is at least two standard deviations below the mean as required by the Virginia statute. (Scullin Decl. ¶¶ 41-59.) He concludes that Green's claim of mental retardation is not frivolous, and requires further investigation and development. (Scullin Decl. ¶ 60.)

Green also attached an amicus brief, written by The Arc of Virginia, that was submitted in Walker v. True, 399 F.3d at 315. (Pet. App. Tab No. 7.)  The brief explains the necessity of accounting for the standard error of measurement and the "Flynn Effect" in assessing whether a petitioner has a qualifying IQ score of at least two standard deviations below the mean under Virginia's statute.  The brief further argues that a "raw" IQ score must be professionally assessed for individual factors and measurement errors to determine whether the score establishes "intellectual impairment" under the statute.

This Court granted Green an evidentiary hearing on the issue of mental retardation.  During the evidentiary hearing, Green called two expert witnesses, Matthew H. Scullin, Ph.D., an expert in the field of psychology and evaluating the reliability of IQ test scores (Transcript of Proceedings from the Evidentiary Hearing held on October 31, November 1 and November 3 before the Honorable Tommy E. Miller, "Ev. Tr." 33), and Daniel J. Reschly, Ph.D., Chair of the top-ranked Vanderbilt University Department of Special Education and an expert in the diagnosis of mental retardation and in the field of psychology. (Ev. Tr. 150).  Respondent called two expert witnesses, Roger B. Moore, Jr., Ph.D., an expert in the methodology and diagnosing of mental retardation (Ev. Tr. 454), and Dr. Thomas A. Pasquale, Ph.D., an expert in clinical and forensic psychology, and

specifically in assessing mental retardation. (Ev. Tr. 559).

Dr. Scullin testified about several factors that psychologists must consider when interpreting IQ test results.  He testified that the "Flynn Effect" is a phenomenon known throughout the profession in which the national performance on IQ tests increases at a rate of approximately 0.3 points per year. (Ev. Tr. 41.)  He testified that the WISC-R was replaced by the WISC-III in 1991. (Ev. Tr. 57.)  He conducted a study in 1991 in which school children were administered both the WISC-R and the WISC-III. (Ev. Tr. 32, 57, 82-83; Pet. Ex. 2 ¶¶ 47-49.)  The results were published in an article in 2003, which showed that the children scored approximately five points higher on the WISC-R than on the WISC-III. (Ev. Tr. 83; Pet. Ex. 2 ¶49; Kenaya, T., Ceci, S.J., & Scullin, M.H., The rise and fall of IQ in special ed: Historical trends and their implications, Journal of School Psychology, 41, 453-465 (2003).)

Dr. Scullin testified that the WAIS-III test was not properly normed, and that the first year it was administered, the scores on the test needed to be adjusted by 2.34 points to get an accurate result. (Ev. Tr. 48-49.)  He testified that the "standard error of measurement" is a factor psychologists must consider due to random error in testing. (Ev. Tr. 53.)  He testified that the "practice effect" refers to the phenomenon in which a person who is administered two IQ tests tends to score higher on the second IQ test than on the first. (Ev. Tr. 51.)  He testified that the Ammons & Ammons Quick test is not an IQ test, and is very outdated. (Ev. Tr. 55.)

Dr. Reschly testified that Green is, and was before the age of eighteen, mentally retarded under the definition given in the Virginia statute. (Ev. Tr. 151.)  He discussed the AAMR as the most authoritative classification for diagnosing mental retardation. (Ev. Tr. 153.)  He testified that when determining whether a person's IQ score is more than two standard deviations below the

mean, it is "accepted professional practice" that a psychologist consider many factors including the Flynn Effect, the practice effect and the standard error of measurement. (Ev. Tr. 157-60.)

Dr. Reschly testified that caution should be used in considering Green's WAIS-R test, which was obsolete when administered by Dr. Sautter. (Ev. Tr. 173.) He explained that the Ammons & Ammons Quick Test is not an IQ test, is unreliable, and should not be given any weight in determining whether Green is mentally retarded. (Ev. Tr. 182-83.) He testified about the multiple sources he reviewed to determine whether Green met the adaptive behavior prong of the Virginia statute. (Ev. Tr. 180-82.) Finally, he testified that after reviewing the evidence in the record, it was his opinion that Green was not malingering on his tests. (Ev. Tr. 183-85.)

Dr. Roger Moore testified about studies conducted in Denmark and Norway which indicate the Flynn Effect may have peaked and started to decline in those countries. (Ev. Tr. 460.) He acknowledged that it is accepted that IQ test scores change over time, but stated this is a reason for renorming the tests, not adjusting the scores. (Ev. Tr. 470.) He testified that it is necessary to determine the mean prior to determining whether a given score falls two standard deviations below that mean. (Ev. Tr. 514.) Dr. Moore emphasized that it is not professional practice to adjust WAIS-III test scores by the 2.34 points advocated by Dr. Flynn. (Ev. Tr. 477.) He questioned Dr. Scullin's testimony that the practice effect could have increased Green's test scores on the WAIS-III, and testified that at times taking two tests in close succession results in an interference effect lowering the second score. (Ev. Tr. 481-82.) To support that theory, Dr. Moore testified about a study that showed no increase in test scores when individuals took the WASI and WAIS-III 34 to 35 days apart. (Ev. Tr. 485-86.)

Dr. Pasquale testified that he interviewed Green on three occasions, and found Green to be

manipulative, grandiose, a pathological liar, and a psychopath. (Ev. Tr. 569, 593, 594, 609, 624.)

He found Green to be consistently malingering on multiple tests. (Ev. Tr. 602-609.)  His opinion is

that Green is in the borderline intellectual functioning range based on his WAIS-III test scores and

adaptive functioning. (Ev. Tr. 622.)  Dr. Pasquale found support for this conclusion in Dr. Grant's,

Green's school psychologist's, reports. (Ev. Tr. 625-26.) Though he admitted that the practice effect

can raise test scores, Dr. Pasquale opined that the effect on Green's WAIS-III test taken four weeks

after the WAIS-R was not significant. (Ev. Tr. 602.)  He admitted to making an error when scoring

Green's WAIS-III test, but explained that the error did not change the full-scale score. (Ev. Tr. 657-

59, 695.)  Dr. Pasquale was questioned about his decision to assign scores to certain questions on

the WAIS-III, and stood by his decisions. (Ev. Tr. 659-688.)  Dr. Pasquale testified that he uses the

same definition of mental retardation in the death penalty context as in clinical practice. (Ev. Tr.

725.)  Finally, he admitted that someone with an IQ score of 75 can be diagnosed as mentally

retarded. (Ev. Tr. 725.)

## 2.      Legal Analysis

On June 20, 2002, the Supreme Court of the United States held in the case of <u>Atkins v.</u>

<u>Virginia</u>, that executions of mentally retarded criminals were "cruel and unusual punishments"

prohibited by the Eighth Amendment. 536 U.S. 304 (2002).  Though the Supreme Court referred to

the definitions of mental retardation adopted by the American Association on Mental Retardation

and The American Psychiatric Association[13], the Court left to the states the "task of developing

_____

[13] "The American Association on Mental Retardation (AAMR) defines mental retardation
as follows: '*Mental retardation* refers to substantial limitations in present functioning.  It is
characterized by significantly subaverage intellectual functioning, existing concurrently with
related limitations in two or more of the following applicable adaptive skill areas:
communication, self-care, home living, social skills, community use, self-direction, health and

61

appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id. at 317.

The Virginia legislature moved quickly to establish procedures for regulating execution of the mentally retarded. See Atkins v. Commonwealth, 581 S.E.2d 514 (Va. 2003) (Atkins II).  Under Virginia law, Green bears the burden of establishing that he is mentally retarded by a preponderance of the evidence. Va. Code Ann. § 19.2-264.3:1.1 (A) (2004).  Virginia's definition of mentally retarded is included in the new procedures.

> "Mentally retarded" means a disability, originating before the age of 18 years, characterized concurrently by (I) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Id.  The Supreme Court of Virginia has held "[p]erformance on a standardized measure of intellectual functioning . . . at least two standard deviations below the mean" corresponds to an IQ score of 70 or below.  Johnson v. Commonwealth, 591 S.E.2d 47, 59 (Va. 2004), vacated on other

---

safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.'  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).  'Mild' mental retardation is typically used to describe people with an I.Q. level of 50-55 to approximately 70.  Id., at 42-43." Atkins, 536 U.S. at 309 n. 3.

grounds, 544 U.S. 901 (2005).

For someone like Green, who was convicted and sentenced prior to the Supreme Court's decision in Atkins, and who has a direct appeal pending at the time the procedures were established, the Virginia Code offers the following procedures for raising a claim of mental retardation:

> if his direct appeal is pending in the Supreme Court, he shall file a supplemental assignment of error and brief containing his claim of mental retardation, or (ii) if the person has not filed a petition for a writ of habeas corpus under subsection C of § 8.01-654, he shall present his claim of mental retardation in a petition for a writ of habeas corpus under such subsection . . . .

Va. Code Ann. § 8.01-654.2 (2005). Green's direct appeal was pending before the Virginia Supreme Court on April 29, 2003, when the new procedures were established; however, his trial counsel did not file a supplemental assignment of error.

Green was appointed new counsel to handle his state habeas appeal on June 26, 2003. Counsel filed Green's petition for writ of habeas corpus, which included Green's claim of mental retardation,[14] in the Virginia Supreme Court on April 22, 2004. Claim VIII of the petition stated, "the sentence imposed by the Brunswick County Circuit Court is in violation of the Eighth Amendment of the United States Constitution, Atkins v. Virginia, and Virginia Code § 8.01-654.2." (State Hab. Pet. 35.) Green argued that based on his IQ test scores, which ranged from 55 to 84, and the testimony of Dr. Sautter that Green is mentally retarded, his claim of mental retardation was

---

[14]   The Virginia Supreme Court denied the Commonwealth's argument that Green's mental retardation claim should be barred due to Green's failure to file a supplemental assignment of error to raise the issue while his direct appeal was pending before the Court. See Green v. Warden of the Sussex I State Prison, Record No. 040932 *8 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1). The Court held Virginia Code § 8.01-654.2(ii) provides two options for raising claims of mental retardation to defendants whose sentences of death became final before April 29, 2003: in a direct appeal or in a petition for writ of habeas corpus. Id. at *8.

not frivolous. (State Hab. Pet. 40.)  Green asked the Virginia Supreme Court to remand his case for

a new trial, or, at a minimum, an evidentiary hearing on the issue of mental retardation. (State Hab.

Pet. 41.)

On February 9, 2005, the Virginia Supreme Court found Green's claim of mental retardation

was frivolous based on the I.Q. scores that were in the record.  The Court stated:

> This Court has previously held that the ceiling for a classification of
> mental retardation is an I.Q. Score of 70.  See Johnson v.
> Commonwealth, 267 Va. 53, 75, 591 S. E. 2d 47, 59 (2004), Petition
> for cert. filed, No. 03-10877 (U.S. May 17, 2004).  The record shows
> that Green was administered  four standardized tests for measuring
> intellectual functioning.  Green scored an 84 on the Ammons &
> Ammons quick test, a 74 on the Wechsler Adult Intelligence Scale,
> Third Edition, a 74 on the Wechsler Adult Intelligence Scale,
> Revised, and below a 70 on the Abbreviated Wechsler Adult
> Intelligence Scale.  Based on these test scores, Green has failed to
> meet his burden of proving that his claim of mental retardation is not
> frivolous.

Green v. Warden, Record No. 040932 ** 9-10 (Va. Feb. 9, 2005); (Pet. App. Tab No. 1).

On February 17, 2005, the Fourth Circuit decided the case of Walker v. True, finding an

evidentiary hearing was necessary where Walker had received IQ test scores similar to Green's. 399

F.3d 315 (4th Cir. 2005).  Walker had completed both his direct appeal and state habeas corpus

proceedings prior to the decision in Atkins.  Walker v. True, 399 F.3d at 319.  As a result, his claim

of mental retardation was presented for the first time to the district court pursuant to Virginia Code

§ 8.01-654.2.  Id.  The district court and the Fourth Circuit reviewed the claim de novo, because it

had never been "adjudicated on the merits" in state court.  Id.  The district court granted the state's

motion to dismiss the petition, and the Fourth Circuit reversed and remanded to the district court for

an evidentiary hearing to determine whether Walker was mentally retarded under Virginia law. Id.

at 327.

Walker's petition presented two expert affidavits concluding Walker was mentally retarded under the criteria set forth in the Virginia statute. Id. at 320. Walker had been administered several IQ tests that were considered by the court. Id. at 321-24. Walker received a score of 76 on the Wechsler Intelligence Scale for Children-Revised (WISC-R), which was administered in 1984 when Walker was eleven years old, a score of 86 on the Wechsler Adult Intelligence Scale (WAIS) administered in 1998, a score of 77 on the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) administered in 2000, and a score of 61 on the General Ability Measure for Adults (GAMA)[15] test administered in 2003 when Walker was thirty years old. Id. at 321-23.

Walker's petition contained expert affidavits describing the "Flynn Effect," and stating Walker's score of 76 on the 1984 WISC should be viewed as a 72. Id. at 322. Further, the expert affidavits stated that AAMR and APA recognize that IQ tests have a measurement of error of plus or minus five points, which must be taken into account when considering IQ test scores. Id. Walker's petition also contained an expert report stating the score of 86 on the 1998 WAIS test was so unreliable that it should be discarded. Id. at 323. Lastly, the WAIS-III test, on which Walker received a score of 77, was administered in 2000 by Dr. Sautter, who explained in an expert affidavit that after looking at a comprehensive set of Walker's records, Walker's cognitive deficits "are consistent with mental retardation" as defined by the Virginia statute.

Additionally, Walker set forth facts pertaining to his limitations in adaptive behavior both before and after he was eighteen years old. Id. at 321. His school records showed he was in need

---

[15] The GAMA test was not on Virginia's list of acceptable measures of intellectual functioning at the time of the district court's initial ruling. Id. at 321. After the test was added to the list, the addition was the basis of a motion to amend the judgment, which was denied by the district court. Id.

of special education "as a child with specific learning disabilities as well as emotional disturbance." Id. His family members reported he never rented an apartment, never paid a bill, did not hold a job, and did not have a driver's license. Id.

The Fourth Circuit held that if the facts alleged in Walker's petition were true, he would have established that he was mentally retarded. Id. at 321. Further, the Fourth Circuit concluded that where a petitioner has received IQ scores above and below "two standard deviations below the mean," and where uncontested expert opinion suggests he is mentally retarded under Virginia's definition, dismissal is inappropriate. Id. at 324.

Following the Fourth Circuit's decision in Walker v. True, Green filed a petition for rehearing on March 10, 2005, asking the Virginia Supreme Court to take into consideration the standard error of measurement when viewing Green's IQ scores. Lowering Green's score of 74 on the WAIS-III and WAIS-R by five points to account for the standard error of measurement would place Green's scores within two standard deviations below the mean. In a footnote, Green also discussed the Flynn Effect, and how the mean score on an IQ test increases by approximately 1/3 of a point each year until the test is "re-normed." Lastly, Green argued the Virginia Supreme Court could not employ a definition of mental retardation narrower than the definition in Atkins, arguing that Atkins refers to mentally retarded as the term is used in clinical practice. Therefore, he argued, a state's definition of mentally retarded must include recognition of the standard error of measurement and Flynn Effect, as these are factors recognized in clinical practice. The petition for rehearing was denied without comment on April 29, 2005. Further, Green's petition for writ of certiorari to the United States Supreme Court was denied on December 5, 2005. Green v. True, 126 S. Ct. 809 (2005).

The issue presented here is not whether this Court, sitting in the shoes of the Virginia Supreme Court, would have found Green's claim to be frivolous. Rather, the Court must determine whether the Virginia Supreme Court's decision that the claim was frivolous was reasonable under 28 U.S.C. § 2254(d)(2). The Court concludes that it was not. This Court may not address the merits of Green's claim unless the Virginia Supreme Court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court may address the merits of Green's claim if the Virginia Supreme Court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 405-406 (2000).

The Virginia Supreme Court correctly identified Atkins as the controlling opinion by the United States Supreme Court, but unreasonably applied Atkins to Green's case. Atkins held that the Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Atkins, 536 U.S. at 321. When reviewing the Virginia Supreme Court's decision, findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and must be rebutted by clear and convincing evidence. The findings of fact in Green's case include the recitation of the scores Green received on the "four standardized tests for measuring intellectual functioning." Green received test scores falling both above and below "two standard deviations below the mean." Therefore, he met the statutory requirement of "performance on *a* standardized measure of intellectual functioning . . . that is at least two standard deviations below the mean." Va. Code Ann. § 19.2-264.3:1.1 (2004) (emphasis added). It should be noted that the previous list of standardized measures, which was in effect at the time the Supreme Court of Virginia ruled on

67

Green's habeas petition, included the WASI, on which Green scored a 55, below two standard deviations below the mean. (Petitioner's Exhibit admitted by the Court during the Evidentiary Hearing held on October 31, November 1 and November 3, 2006, before the Honorable Tommy E. Miller, "Pet. Ex." 47.)   In addition to this, the expert witness, who administered two of the four IQ tests considered by the court, testified that Green was mentally retarded. "[A] criminal defendant who seeks to demonstrate to [the Virginia Supreme Court] that his claim of mental retardation is not frivolous must be able to point to credible evidence in the record supporting the requirements set forth in the statutory test." Johnson v. Commonwealth, 591 S.E.2d at 74-75.  Because Green pointed to credible evidence supporting the requirements set forth in Virginia Code § 19.2-264:3.1.1(A), including the result of at least one IQ test that is two standard deviations below the mean, expert testimony that he is mentally retarded, and evidence of significant limitations in adaptive behavior, it was objectively unreasonable for the Virginia Supreme Court to find Green's claim of mental retardation to be frivolous under Atkins, and this Court will address the merits of Green's claim.[16]

For the reasons stated more fully in the Opinion and Order entered May 4, 2006, the Court

---

[16] Moreover, Green presented evidence in his petition for rehearing that, if proven, would place three of the four test scores considered by the Virginia Supreme Court at least "two standard deviations below the mean."  This Court finds that all evidence presented to the Virginia Supreme Court, including evidence presented in Green's petition for rehearing, can be reviewed when making the determination of whether the Virginia Supreme Court's decision was reasonable under § 2254(d)(2).  In Hedrick v. True, the Fourth Circuit held that raising a claim in a petition for rehearing does not fairly present the claim to the state's highest court. Hedrick v. True, 443 F.3d 342, 368 (4th Cir. March 31, 2006).  Therefore, the claims have not been properly exhausted, and cannot be considered by the district court on federal habeas review. Id. This Court finds that by presenting the standard error of measurement and Flynn Effect arguments in his petition for rehearing, Green is not raising new claims, but merely proposing new arguments in support of the same claim, which was properly exhausted.  The arguments were presented to the Virginia Supreme Court, can be considered by this Court, and render the Virginia Supreme Court's finding of frivolousness even more unreasonable.

granted Green an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2).  <u>See</u> <u>Green</u>, 431 F. Supp.

2d 601.  The Court found Green was diligent in pursuing his mental retardation claim in state court,

and did not "fail to develop the factual basis of his claim," the first hurdle which must be overcome

under § 2254(e)(2).  <u>Id.</u> at 614.  The Court next found Green alleged additional facts in his federal

habeas petition that, if true, would entitle him to relief. <u>Id.</u> at 615 (<u>citing</u> <u>Jones v. Polk</u>, 401 F.3d 257,

269 (4th Cir. 2005)).  Lastly, Green satisfies several of the <u>Townsend/Keeney</u> factors requiring this

Court to grant an evidentiary hearing, including:  (I) the merits of the factual dispute were not

resolved in the state hearing; (ii) the state trier of fact did not afford Green a full and fair hearing;

and (iii) Green has shown cause and prejudice for his failure to adequately develop material facts

at the state-court hearing.  <u>Id.</u> at 617 (<u>citing</u> <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963) (overruled

in part);  <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 8 (1992)).  An evidentiary hearing was held on

October 31, 2006, November 1, 2006, and November 3, 2006, to allow Green and the Respondent

to present expert testimony on the issue of Green's mental retardation.

The definition of mentally retarded in Virginia Code § 19.2-264.3:1.1 has two components,

both of which must be present prior to the age of 18 for a petitioner to meet the definition:

"I) significantly subaverage intellectual functioning as demonstrated by performance on a

standardized measure of intellectual functioning administered in conformity with accepted

professional practice, that is at least two standard deviations below the mean and (ii) significant

limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills."

### a.    Significantly Subaverage Intellectual Functioning

To meet the first prong of the mental retardation definition, Green must prove by a

preponderance of the evidence "significantly subaverage intellectual functioning [which originated

before the age of 18 years] as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean."  Va. Code Ann. § 19.2-264.3:1.1 (A) (2004).  The statute further explains, "assessment of intellectual functioning shall include administration of at least one standardized measure generally accepted by the field of psychological testing" and "[t]he Commissioner of Mental Health, Mental Retardation and Substance Abuse Services shall maintain an exclusive list of standardized measures of intellectual functioning generally accepted by the field of psychological testing." Va. Code Ann. § 19.2-264.3:1.1 (B)(1) (2004).

The Supreme Court of Virginia addressed the portion of the statute requiring "[p]erformance on a standardized measure of intellectual functioning . . . at least two standard deviations below the mean" in Johnson v. Commonwealth, 591 S.E.2d 47, 59 (Va. 2004).  In that case, the court discussed "the score of 70 that the General Assembly has chosen as the threshold score below which one may be classified as being mentally retarded."  Id.  On the Wechsler IQ tests, standard deviations are measured in 15 point increments, distributed evenly on either side of the mean.[17]  Therefore, the Virginia Supreme Court is correct that a score of 70 is two standard deviations below the mean on a Wechsler IQ test as long as the mean is 100.  The Fourth Circuit in Walker held, "*[o]n a properly normed IQ test only* scores of 70 or lower are two standard deviations below the mean." Walker, 399 F.3d at 322 (emphasis added).  It is important to note that some states have enacted statutes specifically requiring a score of 70 or below to prove mental retardation in capital cases.  See Ky. Rev. Stat. Ann. § 532.130 (West 1990) (Kentucky statute defining "significantly subaverage general

---

[17]     Dr. Moore testified during the evidentiary hearing that the Stanford-Binet IQ test had a standard deviation of 16 points in the past. (Ev. Tr. 511.)  Therefore, the standard deviation is not necessarily always 15 points on IQ tests.

intellectual functioning" as "an intelligence quotient of 70 or below"); Tenn. Code. Ann. § 39-13-203 (2005) (Tennessee statute using the identical definition); N.C. Gen. Stat. § 15A-2005 (2001) (North Carolina statute with same definition).   Virginia chose instead to use the terminology "two standard deviations below the mean."

Green was administered four IQ tests.  Green received a score of 71 on the WISC-R, which was administered by a school psychologist in 1991 when Green was thirteen  years old.[18] (Pet. Ex. 33.)  The remaining three tests were administered to Green in connection with the prosecution and defense of Green's two jury trials pertaining to the capital murder of Mrs. Vaughan.  Dr. Sautter evaluated Green in May 2000, when Green was twenty-three years old.  During the evaluation, Dr. Sautter administered the Wechsler Abbreviated Intelligence Scale (WASI), and Green scored a 55. (First Tr. 83.)  Dr. Thomas Pasquale also evaluated Green in May of 2000.  He administered the WAIS-III IQ test to Green, and Green scored a 74 on the test. (First Tr. 126.)   After remand by the Virginia Supreme Court, and prior to the retrial, Dr. Scott Sautter administered another battery of tests to Green, including the Wechsler Adult Intelligence Scale - Revised (WAIS-R), on which Green scored a 74. (Second Tr. 953.)

In 1999, Dr. Lynda Hyatt twice met with Green in Riverside Jail, and administered the Ammons and Ammons Quick Test.  (Second Tr. 1001-1002.)  Dr. Hyatt testified during Green's retrial that using a conversion formula, Green's Quick Test score "suggest[ed]" a full-scale IQ score of 84, which falls in the "low average" category of mental functioning. (Second Tr. 1001-1002.) The uncontroverted testimony during the evidentiary hearing was that the Ammons and Ammons

---

[18] This score was not part of the record before the Virginia Supreme Court, as Green's school records were located by federal habeas counsel in preparation for the evidentiary hearing.

Quick Test is not an IQ test, and should not be considered when determining whether Green is mentally retarded. (Ev. Tr. 55, 182-83.)

### (1)    List of Standardized Measures of Intellectual Functioning

The only standardized measure of intellectual functioning, or IQ test (Ev. Tr. 37), administered to Green that is specifically listed on the current List of Standardized Measures of Intellectual Functioning compiled in accordance with Virginia Code § 19.2-264.3:1.1 is the WAIS-III test administered by Dr. Pasquale. (Pet. Ex. 48.) The previous list of standardized measures dated January 4, 2005, which was in effect at the time the Supreme Court of Virginia ruled on Green's habeas petition, included the WASI, one of the tests administered by Dr. Sautter. (Pet. Ex. 47.)

The list of standardized measures includes the current versions of tests "generally accepted by the field of psychological testing." As a result, while a test may be generally accepted at the time it was administered, it will no longer appear on the list once a newer version of the test becomes available. To account for this, the list references previous editions of the listed measures "for historical verification of IQ." (Pet. Exs. 47 & 48.) This provision would apply to the WISC-R, the test administered when Green was thirteen, which is a previous version of the currently listed WISC-III. It would also apply to the WAIS-R, the second test administered by Dr. Sautter, which is a previous version of the currently listed WAIS-III. (Pet. Ex. 48.)

Of the IQ tests administered to Green, this Court gives the greatest weight to the WISC-R administered when Green was thirteen years old, on which Green scored a 71. The WISC-R is the only test administered to Green prior to the age of eighteen, and prior to the prosecution and defense of his capital charges. It is a previous version of the WISC-III, which is currently listed, and was

72

"generally accepted by the field of psychological testing" at the time it was administered to Green.[19]

Next in priority, the Court will consider the WAIS-III, which was administered to Green by Dr. Pasquale prior to Green's first trial, on which Green scored a 74.  The WAIS-III is listed on the current list of standardized measures.  Less weight will be given to the WASI administered by Dr. Sautter prior to Green's first trial, on which Green scored a 55, because the WASI is no longer included on the list.  Respondent's expert, Dr. Pasquale, admitted during his testimony that, at the time the WASI was administered to Green by Dr. Sautter, it was an appropriate test to administer. (Ev. Tr. 707.)  Further, at the time it was administered, the WASI was included on the list of standardized measures.  The introduction to the current list of standardized measures contains the following statement, "[p]revious versions of this list have included comprehensive intelligence batteries, along with several tests that are more limited in scope, such as measure of nonverbal intelligence, or abbreviated tests that may be of value in certain circumstances." (Respondent's Exhibit admitted by the Court during the Evidentiary Hearing held on October 31, November 1 and November 3, 2006, before the Honorable Tommy E. Miller, "Resp. Ex." 8.)  The WASI abbreviated test will be given the least weight in the Court's consideration.

No weight will be given to the WAIS-R administered by Dr. Sautter in 2002, on which Green scored a 74.   The WAIS-R was replaced in 1995 by the WAIS-III.  The testimony during the

_____

[19] Courts have accepted that previous versions of a test presently contained on the standardized list are relevant, and should be considered in determining mental retardation. See Walker v. True, No. 1:03cv764 (E.D.Va. Aug. 30, 2006), at 6 n.5 (finding that the WISC-R is approved by the Commissioner for use in this context because it is a "previous edition" of the currently listed WISC test); Walton v. Johnson, 269 F. Supp.2d 692, 700 n.7 (W.D.Va. 2003) (permitting evidence of performances on the WAIS-R because the WAIS-III appeared on the list); Walker v. True, 299 F.3d 315, 320 n.4, 327 (4th Cir. 2005) (remanding for consideration of WAIS-III administrations and WISC-R administration even though WISC-R was not separately listed). See also Ev. Tr. 317-321.

evidentiary hearing was that it was not "accepted professional practice" to give an IQ test, like the

WAIS-R, which has been replaced by a newer version of the test. (Ev. Tr. 101, 173.)  Dr. Sautter's

administration of the WAIS-R in 2002, which was not "carried out in conformity with accepted

professional practice," therefore, cannot be considered under the statute.  Va. Code Ann. § 19.2-

264.3:1.1(B)(1) (2004).

### (2)    Factors Considered in Evaluating Green's Scores

Petitioner has argued that several factors should be considered when evaluating Green's test

scores, including: the standard error of measurement, the practice effect, the substandard population

used to norm the WAIS-III test, and the Flynn Effect.  Dr. Reschly testified that each of these factors

is taken into account in clinical practice when evaluating IQ scores. (Ev. Tr. 160.)  Respondent filed

a motion to exclude evidence regarding these factors based on Federal Rule of Evidence 702.

The Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S.

579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 US. 137 (1999), prompted an amendment in

2000 of Federal Rule of Evidence 702. <u>See</u> Fed. R. Evid. 702 advisory committee's note, 2000

amendments.  As amended, the rule states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.

"Under Federal Rule of Evidence 702, trial judges act as gatekeepers to 'ensure that any and

all scientific testimony . . . is not only relevant, but reliable.'" <u>Cooper v. Smith & Nephew, Inc.</u>, 259

74

F.3d 194, 199 (4th Cir. 2001) (quoting Daubert, 509 U.S. at 588). As gatekeeper, the trial court must first determine whether the expert is "qualified . . . by knowledge, skill, experience, training, or education" to render the opinions proffered. Fed. R. Evid. 702. After the trial court determines that the expert has sufficient expertise to give the proffered opinion, the court must assess the reliability and relevance of the opinion.  See Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).  To guide the trial court in this analysis, Rule 702 states that the testimony must be "based upon sufficient facts or data," it must be "the product of reliable principles and methods," and the witness must have applied "the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The court's inquiry is "'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached."  Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 595).

Respondent argues the factors Green is asking the Court to consider when determining whether his test scores fall two standard deviations below the mean should be excluded under Federal Rule of Evidence 702.  We will address each of these arguments in turn.

### (a)      Standard Error of Measurement

In his state habeas petition, and to a lesser extent in his federal habeas petition, Green argues that the standard error of measurement should be considered when evaluating his test scores. "[T]here is a measurement error of approximately 5 points in assessing IQ. . . ." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 1994) ("DSM IV").  In other words, a psychologist can be 95% confident that a person's true IQ falls within a range five points above or below the score they received on the test. (Ev. Tr. 38-39, 53; Pet. Ex. 2 ¶ 39.)  No expert testifying during Green's hearing disputed that there is a standard error of

measurement, and that it is a valid consideration when interpreting test scores. The testimony regarding the standard error of measurement establishes that it is a principle relied upon by professionals in clinical practice. However, for the reasons that follow, the Court will not apply a standard error of measurement to Green's scores.

The Fourth Circuit discussed the standard error of measurement in Walton v. Johnson, an *en banc* decision upholding a district court's dismissal of Walton's mental retardation claim. 440 F.3d 160 (4th Cir. 2006). Walton had received a score of 90 on an IQ test administered in 1996, shortly before he turned eighteen. Id. at 177. In his petition, Walton alleged little was known about the test or how it was administered, and whether it could be considered reliable. Id. Walton scored a 77 on an IQ test administered a few months after he turned eighteen, but he alleged the score should be reduced to 74 based on the Flynn Effect. Id. After the motion to dismiss was filed, Walton alleged his score of 74 should further be reduced based on the "standard error of measurement" to meet Virginia's mental retardation standard. Id.[20]

Considering whether the standard error of measurement was applicable in Walton's case, the Fourth Circuit held that Walton was only speculating that the standard error of measurement, which can increase or lower an IQ score by five points, would cause his score of 77 to be *lowered* enough to meet Virginia's mental retardation standard. Id. at 178. Accordingly, the court affirmed the district court's dismissal of Walton's mental retardation claim based on Walton's failure to allege sufficient facts demonstrating that his intellectual functioning was 70 or less before he turned eighteen. Id. at 178.

---

[20]The Fourth Circuit noted that, while it was not necessary for their ruling, three experts, including Walton's own expert, testified at trial that Walton was not mentally retarded. Walton, 440 F.3d at 178 n 24.

Moreover, Green's expert, Dr. Scullin, testified that the standard error of measurement is less important when a person has taken several IQ tests. (Ev. Tr. 54, 127.)  Dr. Scullin explained that when a person has several IQ tests to compare, a psychologist will consider the ten point range indicated by each IQ score, and determine the most common ground among the scores.  (Ev. Tr. 54; Pet. Ex. 50.)  Based on the Fourth Circuit's holding in <u>Walton</u>, Scullin's discussion of the standard error of measurement, and the fact that Green has three IQ scores to consider, it is not appropriate to apply a standard error of measurement to raise or lower Green's test scores.

### (b)    Practice Effect

Next, Green argues that the practice effect could have affected his score on the WAIS-III, which was taken one month after the WASI.[21]  Respondent does not specifically address the practice effect in its motion to exclude.  The practice effect refers to an increase in a person's score on an IQ test when it is administered within a short time after taking the same or similar test. (Ev. Tr. 51, 521-22.)  The experts all accepted that there is a practice effect, and that the effect is more pronounced the closer in time the tests are given. (Ev. Tr. 51, 335, 521-22.)  Dr. Scullin testified that when a test-taker is retested using the same Wechsler test instrument, one can expect a practice effect increase on the second test score of 5 to 8 points, and a potential increase of up to 15 IQ points. (Ev. Tr. 51; Pet. Ex. 2 ¶ 43 (citing Robert J. Sternberg, ed., <u>Encyclopedia of Human Intelligence</u> (1995)).)  Dr. Scullin testified Green's score on the WAIS-III test, which was taken within one month of taking the WASI, was increased by more than 2.5 points as a result of the practice effect. (Ev. Tr. 52, 127-28.) Dr. Moore testified that taking two tests in close proximity can also have a confounding effect,

---

[21] Green also alleges the practice effect could have increased his score on the WAIS-R, but that test is not being considered by the Court.

lowering the second score. (Ev. Tr. 481-82.)  There was no consensus among the experts on the

degree to which the practice effect would effect a test score, especially for someone with low

intellectual functioning. (Ev. Tr. 97, 101-102, 338.)  Therefore, a conclusion that the practice effect

increased Green's test scores by a certain number of points would be purely speculative., and cannot

be reliably applied to Green's test scores under Federal Rule of Evidence 702.  Respondent's motion

to exclude is GRANTED.  Accordingly, the practice effect will not be applied to Green's test scores.

### (c)      Adjustment of WAIS-III Scores

Thirdly, Green's experts argue that the WAIS-III test was "normed" based on a substandard

sampling of the population.  IQ tests are periodically updated to ensure they remain an appropriate

measure of the intellectual functioning of the current population.  An IQ test is "normed" by

administering it to a sample of the general population to determine how to score the test so that a

score of 100 represents the mean score for the population. (Ev. Tr. 38.)  Green's experts take issue

with the sample population used to norm the WAIS-III test. (Ev. Tr. 47-49.)  They argue the test

manufacturers determined the mean score based on a sample of the population with lower than

average intellectual functioning, (Ev. Tr. 46, 123.) which leads to an inflated mean and artificially

inflated IQ scores.  Dr. Scullin argues that based on research by Dr. Flynn, scores on the WAIS-III

test should be adjusted downward by 2.34 points in order to get a true IQ score. (Ev. Tr. 48.)  Dr.

Reschly agreed with this conclusion. (Ev. Tr. 170-71.)  However, this argument is based on only one

article by Dr. Flynn (Ev. Tr. 49) published in Psychology, Public Policy and Law ( a journal of the

APA), and there are competing articles by other specialists in the area indicating the test was

actually normed based on an "elite" sampling of the population, or a sample of the population with

higher than average intellectual functioning, leading to deflated IQ scores. (Ev. Tr. 91, 123;

Kaufman, Alan S., <u>WAIS-III IQs, Horn's Theory, and Generational Changes from Young Adulthood to Old Age</u>, Intelligence, 29, 131-167 (2001).) Dr. Reschly admitted that more research needs to be done on the issue. (Ev. Tr. 171.) There is not enough consensus among the experts in the area to pass the reliability standard of Federal Rule of Evidence 702, and Respondent's motion to exclude this evidence is GRANTED.

### (d)  Flynn Effect

Lastly, Green argues the Flynn Effect must be taken into account when evaluating his test scores. The premise of the Flynn Effect is that IQ scores increase over time and that IQ tests that are not renormed to take into account rising IQ levels will overstate a test-taker's IQ score. <u>Walker</u>, 399 F.3d at 323. The Fourth Circuit has acknowledged that the Flynn Effect may need to be considered when determining whether a defendant is mentally retarded under Virginia's statute. In both <u>Walker</u> and <u>Walton</u>, the defendants made an argument that their scores falling above 70 should be adjusted to account for the Flynn Effect. <u>Walton v. Johnson</u>, 407 F.3d 285, 296 (4th Cir. 2005); <u>Walker</u>, 399 F.3d at 322. The Fourth Circuit remanded both cases to the district courts to determine the "persuasiveness" of the Flynn Effect evidence. <u>Walton</u>, 407 F.3d at 296-97; <u>Walker</u>, 399 F.3d at 323.

Considering all of the case law and evidence, this Court concludes that the Flynn Effect should be considered when determining whether Green's scores fall at least two standard deviations below the mean. There is sufficient evidence in the record to show the Flynn Effect is recognized throughout the profession. In fact, the opening paragraph to the "List of Standardized Measures of Intellectual Functioning" compiled in accordance with the Virginia statute for determination of mental retardation in capital cases, contains the following statement:

> [recent research findings regarding the reportedly dynamic nature of measured intelligence, such as those related to the so-called "Flynn effect", may augur the development of approaches to retrospective diagnosis of mental retardation in adults that require the use of more complex methods for the assessment of intelligence in capital sentencing matters than has been previously been considered necessary.

(Resp. Ex. 8.)  This indicates that something more than simply determining whether an IQ score is 70 or below is necessary in determining whether an individual is mentally retarded under the statute. In fact, the manufacturers of the WAIS-III test themselves acknowledge that IQ test scores rise at about 0.3 points each year.  According to the WAIS-III technical manual,

> [data suggest that an examinee's IQ score will generally be higher when outdated rather than current norms are used.  The inflation rate of IQ scores is about 0.3 points each year.  Therefore, if the mean IQ score of the U.S. population on the WAIS-R was 100 in 1981, the inflation might cause it to be about 105 in 1997. . . . Regardless of the reasons for these changes in test performance, periodic updating of the norms is essential; otherwise, average IQ scores will gradually drift upward and give a progressively deceptive picture of an individual's performance relative to the expected scores in his or her own age group.

(Pet. Ex. 49 p. 9.)  In addition to these indications that the Flynn Effect is widely accepted in the profession, the experts testifying during the evidentiary hearing all accepted that there is a Flynn Effect which causes, or at least caused through the 1990s,  IQ scores to rise over time. (Ev. Tr. 41, 344, 500, 511-12.)

Dr. Moore testified at length that there have been some articles written based on test scores in Denmark and Norway that indicate the Flynn Effect may have leveled off in those countries, and may even be declining. (Ev. Tr. 508-510.)  However, he admitted he did not know what the rate of rise or decrease may be in the United States. (Ev. Tr. 496.)  He agreed that to determine whether a score is two standard deviations below the mean, you must first determine the correct mean. (Ev.

Tr. 514.) In light of the overwhelming evidence that the Flynn Effect is an accepted phenomenon throughout the profession, the Court will accept that the Flynn Effect causes an increase in IQ scores of approximately 0.3 points per year.  The issue then becomes whether the Virginia statute allows consideration of the Flynn Effect when determining mental retardation in capital cases.

The Virginia statute is clearly concerned with measuring "performance" on standardized measures of intellectual functions, not scores.  In terms of capital cases, Virginia has adopted a definition of mental retardation, which replicates that of the American Association of Mental Retardation ("AAMR"), under which a person demonstrates significantly subaverage intellectual functioning by performance on a standardized measure of intellectual functioning that is "at least two standard deviations below the mean."  Va. Code Ann. § 19.2-264.3:1.1(A) (2004).  Virginia adopted this definition as opposed to one requiring a score of 70 or lower on a standardized measure of intellectual functioning, the standard adopted in some other states.  With this in mind, this Court finds it necessary in capital cases to adjust means to reflect the Flynn Effect, a phenomenon accepted throughout the profession, in an effort to get the most accurate indication of mental retardation possible.  This is especially critical in cases like Green's, where one point on an IQ test can mean the difference between life and death.

Respondent's experts argue that it is not accepted practice within the profession to adjust a person's IQ score to reflect the Flynn Effect. (Ev. Tr. 501-502.)  However, Dr. Reschly testified that it is "accepted  professional practice" for a psychologist to interpret test results while taking into account the Flynn Effect. (Ev. Tr. 157-160, 162.)  The AAMR, the most authoritative classification for diagnosing mental retardation, defines mild mental retardation as a range of scores between 55 and 75.  Dr. Pasquale testified that in clinical practice, a person with an IQ of as high as 75 can be

diagnosed as mentally retarded. (Ev. Tr. 725.)  It is understandable that adjusting scores up or down a few points may not be necessary in practice where psychologists are making determinations of mental retardation based on a range of scores.  The Virginia statute is not based on a range of test scores,  however, and requires a score at least two standard deviations below the mean.  Therefore, it is of utmost importance that the measure of performance relied upon to determine mental retardation in capital cases is the most accurate measure possible.

Applying the Flynn Effect to Green's test scores results in scores falling at least two standard deviations below the mean on the WISC-R and the WASI.  These results are reached by calculating the number of years between the time the test has been renormed and the time it was administered to Green, and adjusting the mean upward by  0.3 for each year.[22]  Nineteen years passed between the time the WISC-R was normed in 1972, and it was administered to Green in 1991. (Ev. Tr. 57; Pet. Ex. 54.)  Therefore, the Flynn Effect would account for an increase in the mean from 100 to 105.7 or 106.[23]  Two standard deviations below the mean of 106 would be approximately 76, and Green scored a 71. Dr. Scullin added that his research examining the impact of the Flynn Effect on the WISC-R showed the increase in performance was the same in the mild mental retardation range as it was at the top. (Ev. Tr. 57.) Dr. Reschly testified that, based on multiple studies comparing the WISC-R and the WISC-III conducted in 1991, and the years adjacent to 1991, the average difference

---

[22]According to the experts, there are two ways of adjusting for the Flynn Effect: increase the mean or decrease the individual score.  Dr. Scullin states in his expert report that the more scientifically accurate way is to increase the mean, and that is what we have done. (Pet. Ex.  12 ¶ 26.)

[23]The experts testified at the hearing that psychologists do not score tests based on fractions of a point, and so it is accepted practice to round figures to the nearest point when calculating IQ scores. (Ev. Tr. 46.)

between scores was 5.97 points. (Ev. Tr. 167.)  In other words, studies showed children who were administered both tests scored approximately 5.97 points higher on the WISC-R than on the WISC-III.  Based on these studies, Dr. Reschly testified that if Green had been given the WISC-III in 1991, his score would have been about 65. (Ev. Tr. 167-68.)

Five years passed between the time the WAIS-III was normed in 1995, and it was administered to Green in 2000. (Ev. Tr. 58; Pet. Ex. 56.)  Therefore, the Flynn Effect would account for an increase in the mean from 100 to 101.5 or 102. (Ev. Tr. 59.)  Two standard deviations below the mean of 102 would be approximately 72, and Green scored a 74.  Two years passed between the time the WASI was normed in 1998, and it was administered to Green in 2000. (Ev. Tr. 58.) This would result in an increase in the mean from 100 to 100.6 or 101. (Ev. Tr. 58.)  Two standard deviations below the mean of 101 would be approximately 71, and Green scored a 55. (Ev. Tr. 58; Pet. Ex. 55.)  Consequently, adjusting for the Flynn Effect would place two of Green's IQ scores at least two standard deviations below the mean.  This includes the IQ score on the WISC-R administered when Green was thirteen years old.[24]

### (3)    Other Considerations

During the evidentiary hearing, the experts raised the possibility that scoring errors or malingering could have impacted Green's test scores.

### (a)    Scoring Errors

Green presented testimony to indicate that there were errors in Dr. Pasquale's calculation of

---

[24] The Court would note that the statute only requires "significantly subaverage intellectual functioning as demonstrated by performance on *a* standardized measure of intellectual functioning . . ."  Va. Code Ann. § 19.2-264.3:1.1(A) (2004) (emphasis added). Even without adjusting for the Flynn Effect, Green meets this requirement due to his score of 55 on the WASI.

Green's score on the WAIS-III. (Ev. Tr. 657-94.)  Dr. Pasquale admitted to one error. (Ev. Tr. 657-58.)  However, the admitted error did not result in a change in Green's full-scale score. (Ev. Tr. 695.)  Additional errors were suggested by Green's counsel, during cross-examination, based on how Dr. Pasquale scored specific questions on the test.  Further, Dr. Reschly testified that based on the raw data from Green's WAIS-III test, Reschly would have assigned a score of 72. (Ev. Tr. 742.)  This Court does not condone re-scoring of IQ tests or adjustment of scores based on an interpretation of the raw data after the fact.  Dr. Pasquale, as well as other psychologists, are trained in the administration and scoring of IQ tests.  It is not for the Court to go behind those scores, and question the psychologists' conclusions.  The statute  requires that IQ tests be administered and scored "in accordance with accepted professional practice." Va. Code Ann. § 19.2-264.3:1.1(B)(1) (2004).  Green has not alleged that Dr. Pasquale's administration of the WAIS-III failed this requirement.  Therefore, the score will be accepted as assigned by Dr. Pasquale.

### (b)    Malingering

Lastly, Respondent argues Green's test scores are the product of malingering.  Dr. Sautter found Green was not malingering based on his performance on three tests administered to screen for malingering. (First Tr. 89.)  Conversely, Dr. Pasquale found Green was malingering based on his evaluation. (Ev. Tr. 607.)  In addition, Dr. Hyatt found Green was malingering on the tests she administered, which were not IQ tests. (Second Tr. 1003.)  The experts testifying during the evidentiary hearing disagree on whether Green was malingering when he took his IQ tests, and disagreed on how to determine when a person is malingering. (Ev. Tr. 183-88, 371-77.)  However, there is no indication Green would have been malingering at the age of thirteen when he was administered the WISC-R, and received a score of 71.  Respondent makes much of the statement by

Dr. Grant, the school psychologist, that Green's score showing a borderline range of functioning was "an underestimate of his true ability." (Ev. Tr. 304.)  The psychologist admitted he reached this opinion based on intersubtest scatter, (Ev. Tr. 430.) a trend in which a subject scores much higher on some subtests than on others in the battery of subtests making up the Wechsler test.  Dr. Reschly testified that this type of intersubtest scatter is consistent with mental retardation. (Ev. Tr. 430.)  Further, Dr. Grant stated that Green was "cooperative[] throughout the evaluative session." (Resp. Ex. 1 p. 19.)  The Court finds that Green had no incentive to malinger on the WISC-R, and his score on that test is the best indication of his intellectual functioning as demonstrated on a measure of intellectual functioning prior to the age of eighteen years.

Based on all of the evidence presented, this Court finds that Green has met his burden of proving by a preponderance of the evidence "significantly subaverage intellectual functioning [which originated before the age of 18 years] as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean."   Virginia Code § 19.2-264.3:1.1 (A) (2004).  Next, the Court must consider Green's adaptive functioning.

### b.      Significant Limitations in Adaptive Behavior

Under the second prong of the Virginia Code's definition of mental retardation, a petitioner claiming to be mentally retarded must prove beyond a preponderance of the evidence that he has "significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."  Va. Code Ann. § 19.2-264.3:1.1(A) (2004).  "Assessment of adaptive behavior shall be based on multiple sources of information, including clinical interview, psychological testing and educational, correctional and vocational records."  Va. Code Ann. § 19.2-264.3:1.2(B)(2)

(2004).  Additionally, "[t]he assessment shall include at least one standardized measure generally accepted by the field of psychological testing for assessing adaptive behavior and appropriate for administration to the particular defendant being assessed, unless not feasible." Id.  If an expert who is skilled in administering, scoring and interpreting standardized measures of adaptive behavior determines that such a test is not appropriate for the petitioner, or that administering the test is not feasible, "the expert can still testify as to the defendant's mental retardation and explain why a measure of adaptive behavior was not administered to the defendant." Atkins v. Commonwealth, 631 S.E.2d 93 (Va. 2006).

### (1)    Evidence of Green's Adaptive Behavior

At Green's evidentiary hearing, both Green and the Director offered expert testimony regarding Green's adaptive behavior.  Not surprisingly, the experts arrived at opposing conclusions.

Green's expert, Dr. Reschly, concluded that Green has significant limitations in conceptual, social, and practical adaptive skills, which coexist with low intellectual functioning.  Consistent with the Virginia Code, Dr. Reschly's opinion considered Green's school and prison records, interviews with and personal observation of Green, and declarations from and telephone interviews with family, friends, and former employers regarding Green's adaptive behavior.  See Va. Code Ann. § 19.2-264.3:1.2(B)(2) (2004).

The Director's expert, Dr. Pasquale, concluded that Green's adaptive behavior, though arguably below average, does not meet the threshold for mental retardation.  Also complying with the Virginia Code, Dr. Pasquale's conclusion was formed after considering several interviews with and personal observations of Green, a telephone interview with his mother, Mrs. Green, and sister, Belinda Gaines, prison and hospital records, various court records, and other psychological

assessments.  See Va. Code Ann. § 19.2-264.3:1.2(B)(2) (2004).

The declarations upon which Dr. Reschly relied were prepared by Green's counsel in preparation for the evidentiary hearing.  According to Dr. Reschly, clinical practitioners rely on various sources of information, including declarations. (Ev. Tr. 232-35.)  The extent to which declarations are relied upon varies, he testified, depending on their veracity and consistency. (Ev. Tr. 232-35.)  Dr. Reschly stated that the declarations upon which he relied were credible because they were consistent with other declarations and supported by concrete examples of behavior. (Ev. Tr. 232-35; 412-13.)

The Director, on the other hand, questioned the reliability of many of the declarations.  First, it was noted that the declarations were offered by friends and family who knew their statements were being offered in support of Green's mental retardation claim in what would be his last chance to contest the constitutionality of his capital sentence. (Ev. Tr. 385, 294-95, 365-66.)  Second, Dr. Pasquale testified that the specific examples offered in many of the declarations do little to bolster their credibility since,  as stated by both Mrs. Green and Belinda Gaines, Green kept much of his life private.[25] (Ev. Tr. 634.)  Third, Dr. Pasquale questioned the validity of the method by which the declarations were prepared.  He stated that, as a matter of professional practice, declarations are typically prepared by asking a declarant, in general terms, to describe the subject.  Dr. Pasquale testified that the level of consistency with respect to individual declarants recounting the same, very specific events should not be accepted at face value because such consistency may be the result of suggestive information gathering techniques. (Ev. Tr. 630-34.)  Finally, he testified about the

_____

[25]Green's mother stated that she did not know him in many ways. (Resp. Ex. 6(D), p. 26.) His sister said Green was leading a double life. (Ev. Tr. 634.)

veracity of particular delcarants.  Specifically, Dr. Pasquale and Dr. Reschly both testified that Mrs. Green was not a reliable delcarant because she failed to remember significant events from Green's childhood and admitted that her memory was not very good. (Ev. Tr. 387, 423, 709-19.)  It was also noted that when Dr. Pasquale testified in Green's second trial, he questioned the consistency of Belinda Gaines's statements about Green. (Ev. Tr. 708-09.)

Neither expert administered a standardized measure of adaptive behavior, which necessitates reliance on a third-party respondent who answers questions about the subject's historical performance in the three adaptive behavior skill sets.  Such a test was not employed in this case because a reliable third-party respondent was not available.  Typically, the third-party respondent is an adult who is intimately familiar with the subject's development during childhood and beyond and can readily recall the details of his development, such as a subject's mother or father.  Administering such a test was infeasible in this case because Green's mother, who alone raised him, could not remember significant details of Green's childhood and education.[26] (Ev. Tr. 189-94.)

### (a)        Conceptual Adaptive Skills

According to the American Association on Mental Retardation ("AAMR"), the conceptual domain of adaptive behavior involves skills pertaining to "Language (expressive and receptive), reading and writing, money concepts, and self-direction." (Pet. Ex. 1, ¶ 58.)  Dr. Reschly and Dr. Pasquale testified about each skill.

### (i)        Language Skills

In his testimony regarding Green's language processing capabilities, Dr. Reschly testified

---

[26]For example, Mrs. Green remembered neither attending an Individual Education Program meeting at Green's school, which resulted in his enrollment in special education classes, nor the fact that her son was enrolled in special education classes as a child.

that when Green was thirteen years old a speech and language therapist described him as having severe language deficiencies. (Ev. Tr. 202.)   Similarly, his Individualized Education Program ("IEP") evaluation, conducted when Green was fourteen years old, indicated that his various language skills were equivalent to those expected from children ranging in age from four years, ten months to eight years, four months. (Resp. Ex. 1, p. 45.)   Michael Green, Kevin's brother, stated in his declaration that "Kevin had a bad vocabulary, and was often unable to rhyme when he tried to rap.  I saw friends of his laughing at him for being incapable of saying or knowing a simple word . . . ."  Additionally, according to Michael Green, his brother often found it difficult to follow story lines on television shows or understand the contents of a televised news report. (Id. at ¶ 22-25.)

On the other hand, Dr. Pasquale testified that when he visited Green for an interview prior to his retrial, Green recognized him as the man who called him a psychopath at his trial, told Dr. Pasquale he was wrong, and explained why. (Ev. Tr. 596-98.) Green also stated that he knew he was having a second trial because of a problem with the jurors at his first trial. (Ev. Tr. 600-01.) Despite Michael Green's assertion to the contrary, Green bragged to Dr. Pasquale of his rapping ability. (Resp. Ex. 6(D), p. 27.)

### (ii)      Reading and Writing Skills

According to Green, his reading and writing skills were also severely deficient. (Ev. Tr. 199-200.)  His Multidisciplinary Team Report shows that, at age fourteen, Green was reading at a third grade level. (Resp. Ex. 1, p. 47.)  That same Report states that, while Green could then write in cursive, his understanding of sentence structure and grammar was deficient. (Res. Ex. 1, p. 47.) Many of Green's family and friends also stated in their declarations that they observed Green experience difficulty reading.  For example, James Green, Kevin's older brother, described Green's

inability to read a "He-Man" comic book at age seven. (Pet. Ex. 11, ¶ 5.)  Green's Aunt Emma

Bright related a similar story in which Green could not read a passage from the Bible. (Pet. Ex. 3,

¶ 20.)  He was an adult at the time.

The Director contests the extent to which Green's reading and writing skills are deficient.

For example, evidence was produced that while detained at the Sussex I State Prison, Green has

requested books such as "The Color Purple," the "Koran," and biographies of Booker T. Washington

and Martin Luther King, Jr.  (Resp. Ex. 3; Ev. Tr. 274.)  With respect to writing, his prison records

include a Request Form in which Green effectively explains the reason his commissary account

balance did not satisfy a previous order and requesting that the order be re-processed. (Resp. Ex. 3.)

Finally, evidence was produced at trial, and again in the evidentiary hearing, that Green completed

a Virginia Firearms Transaction Record before purchasing the murder weapon, which required

reading and understanding questions in order to offer the appropriate response. (Resp. Ex. 2[27].)

### (iii)    Money Concepts

The third relevant consideration is Green's understanding of money concepts.  According

to Dr. Reschly, Green has never written a check, needed help paying bills, and was easily tricked

out of his money by peers. (Ev. Tr. 205.)  Brenda Crocket, Green's Aunt, stated in her declaration

that Green did not manage his money well and that his ex-girlfriend had confided in her that money

presented a problem in their relationship. (Pet. Ex. 5, ¶ 6.)  Contrastingly, Mark Johnson, owner and

manager of the Domino's Pizza at which Green was employed as a delivery driver, described in his

---

[27]It should be noted that Dr. Reschly vigorously questioned Green's ability to complete such a form. (Ev. Tr. 355-56.)  However, there is no evidence that Green did not complete the form himself and, in fact, the gun store owner testified at trial that Green, alone, completed the form. (Ev. Tr. 624)

declaration that Green delivered pizzas and managed the money he collected throughout his shift without trouble. (Pet. Ex. 16, ¶¶ 34-45.)

The Director's evidence also depicted Green as more sophisticated than suggested by Dr. Reschly.  For instance, Green boasted in a 2001 interview with Dr. Pasquale that before he was in jail he handled his own money, could make change during drug deals, had a savings account, paid his own rent, paid his own bills, and occasionally used money orders. (Ev. Tr. 599, 652; Resp. Ex.6(E), p. 63.)  Additionally, Green reported to Dr. Pasquale that he profited $250 per day selling drugs. (Resp. Ex. 6(D), p. 26.)

### (iv)    Self-Direction

On the subject of self-direction, Dr. Reschly testified that Green was vulnerable and easily influenced by others. (Ev. Tr. 206.)  He also recounted a conversation in which Green told Dr. Reschly that if he were released from jail he would go to college and get a good job, but Green could not describe to him the steps he would have to complete to get into college. (Ev. Tr. 207-08.)  Green's school records are explicit about his need for individualized attention.  In a Comprehensive Services Form, completed when Green was thirteen and in the fourth grade, his teacher stated that "Kevin needs much one-to-one direction [because] he gets lost in group learning activities.  At these group sessions he mentally wanders off and misses out completely." (Pet. Ex. 17(B).)  Several of the declarations filed on Green's behalf also described Green's need for structured directions.  For example, Green's Aunt Lillie Edmonds stated his ex-girlfriend "would give him detailed common sense instructions on his behavior, conversation, and manners . . . ." (Pet. Ex. 6, ¶ 10.)

In support of his contention that Green is not significantly limited in self-direction skills, Dr. Pasquale cited Green's ability to obtain a driver's license. (Ev. Tr. 599, 650-51.)  Dr. Pasquale also

noted that Green understood the importance of concealing his drug dealing and other criminal activity from his family, as is evidenced by statements from his mother and sister. (Resp. Ex. 6(D), p. 26-27.)  Additionally, after Dr. Pasquale met with Green in jail in 2000, Green requested a copy of the release of his medical records, which indicates a level of responsibility for and direction of his case. (Ev. Tr. 590.)

### (b)    Social Adaptive Skills

The AAMR's description of social adaptive skills contemplates interpersonal skills and responsibility, self-esteem, gullibility, and naivete, and ability to follow rules and obey laws. (Pet. Ex. 1, ¶ 59; Resp. Ex. 6(D), p. 27.)  Again, both experts thoroughly testified as to each.

### (i)    Interpersonal Skills and Responsibility

With respect to Green's interpersonal skills, family and friends often described dealings with him as awkward.  For instance, April Crockett, Green's cousin who is six years his junior, stated that "[h]e stuck out from the rest of the family because he was always acting 'silly' and joking around. He stuck out even more so because he did not understand when a joke was over.  He often would awkwardly continue laughing and carrying on even when the others had stopped laughing."  (Pet. Ex. 4, ¶ 4.) Additionally, Green favored socializing with people much younger than him.  His Aunt Emma Bright described a family gathering at which Green "kept sneaking away to play with the kids."  She went on to say, "he was just like a child at family holiday gatherings, who is forced to come over and say a few words to the adults, but who would much rather be playing with the other children at the kid table."  (Pet. Ex. 3, ¶ 19.)

Green was also described as irresponsible by those who knew him.  His older sister Belinda Gaines, with whom Green lived briefly, stated that Green never helped out with household chores

when he lived with her.  She also said that when he lived alone, he only cleaned when his Aunt

Brenda visited and forced him to. (Pet. Ex. 9, ¶ 9-13.)  Additionally, Dr. Reschly testified that Green

was characterized as having "difficulty meeting the practical everyday demands of showing up on

time . . . ."  (Ev. Tr. 286.)  Finally, Mark Johnson stated that Green sometimes dressed

inappropriately for work and was irresponsible with his car. (Pet. Ex. 16, ¶¶55-63.)

Before engaging in an analysis of Green's social adaptive skills, including his skills under

this particular subset, Dr. Pasquale cautioned that consideration of Green's "personality make-up"

including his "anti-social and exploitive mind set" is necessary. (Ev. Tr. 586-88.)  It is under this

paradigm that Dr. Pasquale determined that Green displayed interpersonal skills and responsibility

that was not significantly limited. (Ev. Tr. 586-88; Resp. Ex. 6(D), p. 28.) Specifically, Dr. Pasquale

pointed to the fact that Green related well to his family in a manner that enabled him to have his

needs met. (Resp. Ex. 6(D), p. 28.)  This is supported by declarations from Belinda Gaines, his

aunts, and his brothers, who all described helping Green with some element of living.   Green is also

described by friends and family as "a good guy" and someone who was always joking around. (Pet.

Ex. 18, ¶ 36; Pet Ex. 19, ¶ 28-29.)

Dr. Pasquale also testified that Green had many jobs and, though he did not offer a work

ethic sufficient for traditional work, he was able to make money as a drug dealer since age sixteen.

(Resp. Ex. 6(D), p. 28.)  Dr. Pasquale related a particular incident in which he believes Grown

showed responsibility.  When Dr. Pasquale's  interview of Green in the Dinwiddie County Jail was

interrupted because of excessive noise, it was Green, and not Dr. Pasquale, who took the initiative

to ask deputies for increased quiet until the conclusion of the interview. (Ev. Tr. 572; Resp. Ex.

6(D), p. 28.)

### (ii)      Self-Esteem, Gullibility, and Naivete

Green presented much evidence suggesting significant limitations in self-esteem, gullibility and naivete.  At thirteen years old, for instance, Green was referred by his teachers to counseling for self-esteem activities. (Pet. Ex. 17(B).)  His peers also recognized these traits.  For example, Green's childhood friend, Tyrone McCann, shared a story in which another child drew a picture of a boy with a big head, making a group of children laugh.  Unaware that the drawing depicted him, Green joined in the laughter.  According to McCann, "He did not understand what we were laughing about and did not know that we were laughing at him, but he laughed right along anyway.  That made it all the funnier."  (Pet. Ex. 18, ¶ 27.)

Dr. Reschly also testified that Green always maintained unrealistic plans, such as his plan to attend college in the hypothetical event of his release from jail, but had no idea of how these plans could be accomplished. (Ev. Tr. 207-08.)  This, Dr. Reschly suggested, is indicative of a person who does not understand himself, others, or the practical social demands of the environment. (Pet. Ex. 1, ¶ 59.11.)

According to Dr. Pasquale, however, Green evidences many behaviors that do not indicate a lack of self-esteem, gullibility or naivete.  Specifically, Dr. Pasquale recounted an interview in which he asked Green about the alleged sexual abuse he suffered as a child.  Although he initially stated that he did not remember a woman taking his clothes off of him, he later asserted that this episode was the most painful event in his life.  According to Dr. Pasquale, this quick change in his perception of the event is representative of manipulation, the very opposite of gullibility. (Ev. Tr. 593-94.)

In another instance, Green described to Dr. Pasquale his idolization of Michael Myers from

the "Halloween" movies.  After admitting that he admired Myers because "he sought and destroyed" and "he made you suffer," Green swiftly corrected his tone to avoid accusation and sadistic labeling. (Ev. Tr. 586, 590-91; Resp. Ex. 6(D), p.29.)  Again, Dr. Pasquale notes that this behavior is not consistent with gullibility or naivete. (Resp. Ex. 6(D), p. 29.)

### (iii)    Ability to Follow Rules and Obey Laws

The final consideration under social adaptive skills is an individual's ability to follow rules and obey laws.  To this end, Dr. Reschly testified that Green was not a behavior problem at school and that any discipline he encountered was a result of his documented distractability. (Ev. Tr. 219.) Green's mother, however, described him as "quarrelsome" when he was fourteen. (Pet. Ex. 17(I).) Moreover, Green admitted to extensive drug dealing and breaking into a police lot to steal money and a flashlight at age thirteen, and was convicted of distributing counterfeit money at age fifteen. (Ev. Tr. 220, 589-90; Resp. Ex. 6(E), p. 46.)  Additionally, Green's history of alcohol and drug abuse, starting as early as age six, illustrates an early inability to follow rules and obey laws. (Ev. Tr. 579-80.)  Finally, Green has been convicted for robbery and murder.

Dr. Pasquale testified that, while Green obviously had difficulty following societal rules, he understood and followed the rules of the street in order to survive. (Ev. Tr. 589-91; Resp. Ex. 6(D), p. 28)  Dr. Pasquale does not attribute Green's inability to follow rules and obey the law to his intellectual deficits.  Instead, he asserts that Green's drive toward self-satisfaction, the absence of positive role models, and his psychopathic mind-set resulted in his valuing the rules of the street more than society's rules. (Ev. Tr. 586-88; Resp. Ex. 6(D), p. 28.)

### (c)    Practical Adaptive Skills

According to the AAMR, practical adaptive skills involve activities relevant to daily living,

occupational skills, and maintenance of a safe environment.  Its parameters include skills in activities such as hygiene, mobility, food preparation, eating, house cleaning, transportation, health concerns, money management, use of the phone, and job performance. (Pet. Ex. 1, ¶ 60.)

### (i)      Daily Living Activities

Testifying about Green's daily living capabilities, Dr. Reschly noted that Green was competent in eating and toileting, but presented some difficulty dressing. (Ev. Tr. 222-23.) Green's dress issues are corroborated by declarations from his mother and Mark Johnson, who stated he sometimes had to provide Green with clothing appropriate for work after Green arrived in dirty or overly-baggy clothes. (Pet. Ex. 10, ¶ 60; Pet. Ex. 16, ¶ 55-56.)  Additionally, many of the declarants stated that Green could not tie his shoes. (Ev. Tr. 223; Pet. Ex. 3, ¶ 10.)

Dr. Reschly also emphasized Green's mobility issues.  He testified that Green finally obtained his driver's license after taking the test two or three times. (Ev. Tr. 222.)  Green's driving record, which is said to be rife with citations, offers further support for Green's mobility deficiencies. (Ev. Tr. 222.)

According to the many declarations, Green's poor house-keeping skills are also well-known by his family and friends. (Pet. Ex. 9, ¶ 9-13.)  However, at trial, both his mother and sister testified that Green could care for himself. (Ev. Tr. 365-66.)  Green is also said to struggle in the kitchen. (Ev. Tr. 223-24.)  For example, several family members remarked that Green could not cook or even make Kool-Aid. (Pet. Ex. 5, ¶ 10; Pet. Ex. 6, ¶ 14-15; Pet. Ex. 4, ¶ 9.)  Finally, Dr. Reschly testified that when prompted, Green was unable to find an individual's telephone number in the phone book. (Ev. Tr. 224-25.)

The Director presented evidence disputing Green's, particularly in reference to Green's

stated mobility, food preparation, and telephone issues.  Specifically, Dr. Pasquale contested Green's purported mobility problems by emphasizing the fact that Green acquired a driver's license and was capable of taking a bus to Washington, D.C., and making hotel arrangements after murdering Mrs. Vaughan. (Resp. Ex. 6(D), p. 30.)  With respect to food preparation, though several declarants stated that Green was not even capable of mixing Kool-Aid and water, it is undisputed that Green worked at the Bracey Junction Restaurant where, according to his sister Belinda Gaines, he "grilled burgers and cooked french fries." (Pet. Ex. 9, ¶ 18.)  Finally, Green is said to have handled telephone orders as well as any other employee while working at Domino's, and he handily used a cellular telephone to call the Domino's store when out on deliveries. (Pet. Ex. 9, ¶ 23; Pet. Ex. 16, ¶ 32.)

### (ii)      Occupational Skills

Dr. Reschly's assessment of Green's significant limitations in occupational skills included both weaknesses and strengths.  Although Green was able to secure jobs, Dr. Reschly testified that he usually received help completing job applications and often got his jobs through family. (Ev. Tr. 230-31.)  Even with help, his applications were typically sloppy and incomplete.  For instance, after his sister, who worked at Domino's, gave Green his Domino's application, he responded negatively to a question asking whether he knew anyone who worked there. (Ev. Tr. 231; Pet. Ex. 16(A).)  Dr. Reschly also found it significant that each of Green's jobs required low-level skills and low education. (Ev. Tr. 228.)  Finally, Green displayed trouble maintaining legitimate employment.  For example, he was fired from Domino's after receiving too many moving violations. (Ev. Tr. 228; Pet. Ex. 16, ¶ 62.)

Dr. Reschly also recognized two strengths.  He testified that Green delivered pizzas with some success and displayed relative strengths in greeting people while on the job. (Ev. Tr. 228.)

To support his contention that Green's occupational skills were not significantly limited, Dr. Pasquale cited Green's various employers who commented positively on his work performance. (Ev. Tr. 583-84, 596.)   This is also supported by some of Green's evidence.   For instance, Mark Johnson's declaration states, "I cannot say that Kevin was any better or any worse at making deliveries than any other of my drivers."  (Pet. Ex. 16, ¶ 33.)  Tammy Johnson, Mark's wife who was also a manager at Domino's, told Dr. Pasquale during a 2000 telephone interview that Green was a good worker, and not slow minded or stupid. (Ev. Tr. 596.) Green was also considered a good employee by Clay Hardy, his boss at Abell Lumber, who promoted him on the merits of his work. (Trial Tr. 1024-25.)    Another employer, Bracey Junction Restaurant, gave Green a good performance rating, though he was ultimately terminated for missing a shift. (Resp. Ex. 6(D), p. 29.) Dr. Pasquale suggests that the problems that plagued Green's employment history, such as unexcused absence and tardiness, may have resulted from his motivation.  Specifically, Dr. Pasquale opines that the high returns of drug dealing lured Green from the promise of minimum wage at his legitimate jobs. (Resp. Ex. 6(D), p. 29.)

### (iii)      Maintenance of a Safe Environment

Dr. Reschly testified that Green demonstrated significant limitations in maintenance of a safe environment.  In evaluating Green's limitations, Dr. Reschly examined Green's behaviors in terms of age appropriateness. (Ev. Tr. 235.)  By way of example, Dr. Reschly testified that Green often spoke to strangers as a child and put himself in dangerous situations that other like-aged kids would know to avoid. (Ev. Tr. 235-36.)  Green's brother, Michael, corroborates this statement, explaining in his declaration that Green was overly trusting of strangers in their high-crime neighborhood and that he often rode the Metro train all day, alone, as a child. (Pet. Ex. 12, ¶ 13-18.)

Dr. Pasquale did not identify strengths in this area.

### (2)    Analysis of Green's Adaptive Behavior

The only Fourth Circuit case to discuss, in depth, whether a petitioner displayed significant limitations in adaptive behavior is Walker v. True, 399 F.3d 315 (4th Cir. 2005.)  In Walker, the court held that the petitioner alleged facts to establish that he had significant limitations in conceptual, social, and practical skills.  See id. at 321.  With respect to his conceptual skills, Walker identified deficiencies in language, reading, writing, handling money, dealing with unstructured time, and inordinate dependence on others.  Id.  Under the social skills prong of the statute, the court considered family testimony that Walker never had friends who were his peers, along with school records demonstrating a low frustration tolerance, inadequate control over his impulses, and his referral to special education classes due to emotional immaturity, learning difficulties, inability to control his own behavior, specific learning disabilities, and emotional disturbance.  Id.  Finally, to show that Walker's practical skills were severely limited, family members testified that he never paid a bill or rented an apartment, did not hold a job, and could not take the public bus or obtain a driver's license.  Id.  In consideration of all of this evidence, the Fourth Circuit concluded "that the facts alleged in Walker's petition, if true, would establish that he is mentally retarded and that his execution is therefore prohibited by the Eighth Amendment."  Id.  Accordingly, the court remanded the case for an evidentiary hearing before the district court "to determine whether Walker is mentally retarded under Virginia law."  Id. at 327.

On remand, the District Court for the Eastern District of Virginia held that "Petitioner has failed to show by a preponderance of the evidence that he has 'significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.'"  Walker v. True, No. 03-

0764, memorandum op. at 8 (E.D. Va. Aug. 30, 2006) (citing Va. Code. Ann. § 19.2-264.3:1.1(A)). Despite finding that Walker "presented evidence that he suffers from below average mental intelligence, struggles to perform some basic activities, exhibits anti-social behavior, and obtains financial support from others," the court held that "Petitioner has not shown by a preponderance of the evidence that he has significant limitations in adaptive behavior." Id. at 8. The court's determination was based on evidence that Walker's crime required "the ability to relate to others," and that he "associated himself with women on a personal and intimate level, engaged in homemaking activities, seduced under-aged girls, used others to help him avoid authorities, independently invoked his Miranda rights, used his brother's identity to obtain a driver's license, and obtained goods for himself in prison." Id. at 8-9.

Like the petitioner in Walker, Green has "presented evidence that he suffers from below average mental intelligence, struggles to perform some basic activities" and "exhibits anti-social behavior." Id. at 8. Considering Green's capabilities within the three subsets of adaptive behavior, however, this Court finds that, like Walker, Green displays some limitations, but has not proven beyond a preponderance of the evidence that he has significant limitations in adaptive behavior. See id.

### (a)    Conceptual Adaptive Skills

While the Court was presented with evidence suggesting Green's conceptual adaptive skills are below average, he has not proven beyond a preponderance of the evidence that he has significant limitations. The evidence shows that Green conversed freely while interviewed, sharing his opinion about his mental health diagnosis and his understanding of the status of his case. (Ev. Tr. at 596-98, 600-01.) Additionally, prison records show that Green requested sophisticated books and completed

a hand-written Request Form in which he effectively explained a mistake with the Commissary. (Resp. Ex. 3.)

Perhaps most persuasive under the conceptual adaptive skills prong, Green displayed an understanding of money concepts. Although Green has never had a checking account and is described as needing help paying bills (Ev. Tr. 205), Green told Dr. Pasquale that he handled his own money, had a savings account, paid his own rent, and was involved with transactions using money orders. (Ev. Tr. 599, 652; Resp. Ex. 6(E), p. 63.) He also reported significant profits from dealing drugs. (Resp. Ex. 6(D), p. 26.)

Finally, Green did not prove he has significant limitations in self-direction. Most notably, Green obtained a driver's license, concealed much of his criminal activity from his family, and requested from Dr. Pasquale a copy of his release of medical records, indicating independent participation in the direction of his case. (Ev. Tr. 290.)

### (b)   Social Adaptive Skills

Green was similarly unable to show, by a preponderance of the evidence, significant limitations in his social adaptive skills. The evidence showed that, although socially awkward, Green was often regarded as a "good guy" who liked to joke around and had girlfriends. (Ev. Tr. 592.)

That Green was regularly employed, and was on at least three occasions regarded as a good employee (Ev. Tr. 583-84, 596; Resp. Ex. 6(D), p. 29), shows a level of responsibility beyond that expected of someone with significant limitations. Additionally, Green displayed personal responsibility for his financial needs, albeit in an illegal context, by profitably distributing drugs when unemployed. (Ev. Tr. 574-75, 585.)

With respect to Green's self-esteem, gullibility, and naivete, Green asserts, with corroboration from school records and declarations, that he was easily influenced by others. (Pet. Ex. 17(B); 18, ¶ 27.)  After recounting specific conversations with Green, however, the Director's expert described Green as manipulative. (Ev. Tr. 593-94; Resp. Ex. 6(D), p. 29.)  Green's ability to enlist the help of his cousin in committing the instant murder is also indicative of manipulative behavior.

Finally, Green presented limitations in following rules and obeying laws from an early age. (Ev. Tr. 220, 579-80, 589-90.)  He began abusing drugs and alcohol as a young child, dealt drugs, has been convicted of two crimes and confessed to committing another crime. (Ev. Tr. 220, 579-80, 589-90.)  Although Green's propensity for ignoring rules and the law cannot be questioned, the extent to which his behavior is attributable to his intellectual deficits is unclear.  The Director contends that Green's actions are motivated by environmental factors, such as his upbringing and his psychopathy. (Resp. Ex. 6(D), p. 28.)

### (c)      Practical Adaptive Skills

Green was also unable to prove, beyond a preponderance of the evidence, significant limitations in his practical adaptive skills.  Green's evidence portrayed him as having mobility issues and difficulty dressing himself appropriately, cleaning his house, and cooking for himself. (Ev. Tr. 223; Pet. Ex. 10, ¶ 60; Pet. Ex. 16, ¶ 55-56; Pet. Ex. 9, ¶ 9-13; Pet. Ex. 5, ¶ 10.)  Much of this evidence was contested, however.  For instance, it is uncontroverted that Green was able to acquire a driver's license and navigate public transportation systems. (Ev. Tr. 222, Resp. Ex. 6(D), p. 30.)  Also, Green's mother and sister, who both stated in their declarations that Green had difficulty caring for himself, previously testified at trial that he could care for himself. (Ev. Tr. 365-66.)

Finally, Green's employment experiences in restaurants show that he was able to cook (Pet. Ex. 9, ¶ 18) and use the telephone (Pet. Ex. 16, ¶ 23.).

With respect to his occupational skills, Green showed that his various jobs always required low-level skills and low education and that he was usually hired with help from family and friends. (Ev. Tr. 228, 230-31.)  He was also shown to have difficulty retaining jobs. (Ev. Tr. 228.)  Three former employers, however, described Green as an average to above average employee. (Pet. Ex. 16, ¶ 62; Second Tr. 1026-30; Resp. Ex. 6(D), p. 29.)  In fact, he received a merit-based promotion at one job (Second Tr. 1024-25), an accomplishment that does not suggest significant limitations in occupational skills.

Finally, Green produced uncontested evidence that he had limitations maintaining a safe environment.  Specifically, Green presented evidence of that he was overly trusting of strangers despite growing up in a crime-ridden neighborhood and that he often rode the Metro train alone as a child. (Pet. Ex. 12, ¶ 13-18.)  The Director produced no evidence rebutting Green's contention that he has significant limitations in maintaining a safe environment.

In light of all of the evidence, though Green has shown some limitations in adaptive behavior, he has not met his burden of proving beyond a preponderance of the evidence that he has significant limitations in adaptive behavior.  Accordingly, he has not fulfilled the adaptive behavior prong of Virginia Code § 19.2-264.3:1.1(A).  As Green has failed to prove by a preponderance of the evidence both prongs of Virginia Code § 19.2-264.3:1.1, Claim V should be DENIED.

## III.  <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends that Green's petition for writ of habeas

corpus be DENIED and the Respondent's motion to dismiss be GRANTED.

Green's Claim I should be DENIED because the first portion was procedurally barred from review in the state courts and while Green has shown cause for failing to present the claim, he has not shown prejudice resulting therefrom which this Court must find before considering the merits of the claim.  The second portion of Claim I  was previously adjudicated by the Virginia Supreme Court on the merits and based on the holding in <u>Strickland</u> and none of the statutory exceptions apply that would allow this Court to review the claims on the merits.

Green's Claim II should be DENIED because it is barred by the statute of limitations.

Green's Claim III should be DENIED because it was previously adjudicated by the Virginia Supreme Court on the merits and based on the holding in <u>Strickland</u> and none of the statutory exceptions apply that would allow this Court to review the claims on the merits.

Green's Claim IV should be DENIED because it was previously adjudicated by the Virginia Supreme Court on the merits and based on the holding in <u>Strickland</u> and none of the statutory exceptions apply that would allow this Court to review the claims on the merits.

Green's Claim V should be DENIED because Green has failed to prove by a preponderance of the evidence both prongs of Virginia Code § 19.2-264.3:1.1.

Because Green has demonstrated  "a substantial showing of the denial of a constitutional right" as to Claims II and V, and because there are few appellate cases discussing the issues raised by those claims, it is recommended that the Court issue a certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure as to claims II and V, but not issue a certificate of appealability as to Claims I, III, and IV.  See Miller-El v. Cockrell, 537 U.S. 322 (2003).

## IV.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of right to appeal from a judgment of this court based upon such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 15, 2006

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to the following:

Eric Stephen Johnson, Esq.
Matthew Michael Leland, Esq.
Richard Wettersten Smith, Esq.
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC 20005-3096

Michele Jill Brace, Esq.
Virginia Capital Representation Resource Center
2421 Ivy Rd
Suite 301
Charlottesville, VA 22903

Timothy Meade Richardson, Esq.
Huff Poole & Mahoney PC
4705 Columbus St
Suite 100
Virginia Beach, VA 23462-1521

Katherine Pharis Baldwin, Esq.
Matthew Peter Dullaghan, Esq.
Paul Christopher Galanides, Esq.
Robert Quentin Harris, Esq.
Office of the Attorney General
900 E Main St
Richmond, VA 23219

Fernando Galindo, Acting Clerk

By _____
    Deputy Clerk

December      , 2006

106